**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>OLDCO, LLC, SUCCESSOR BY MERGER<br>TO COLTEC INDUSTRIES INC,<br><br>       Debtor. | Case No. 17-BK-30140<br><br>Chapter 11<br><br>[Joint Administration Pending][1] |

**DEBTOR'S MOTION FOR ORDER APPROVING (I) MAINTENANCE
OF EXISTING BANK ACCOUNT AND BANK ARRANGEMENTS,
(II) CONTINUED USE OF EXISTING BUSINESS FORMS,
(III) INTERCOMPANY TRANSACTIONS, (IV) LIMITED WAIVER OF
DEPOSIT GUIDELINES, (V) INVESTMENT OF EXCESS CASH, AND (VI)
GRANT OF ADMINISTRATIVE EXPENSE PRIORITY STATUS TO POST-
PETITION INTERCOMPANY CLAIMS**

OldCo, LLC, debtor and debtor-in-possession in the above-captioned case and successor

by merger to Coltec Industries Inc ("Coltec" or "Debtor"),[2] moves the Court for entry of an

Order approving (A) maintenance of its existing bank account and certain bank arrangements,

(B) continued use of its existing business forms, (C) intercompany transactions with non-debtor

affiliates, (D) a limited waiver of deposit guidelines, (E) investment of excess cash in a U.S.

treasuries fund, and (F) a grant of administrative expense priority status to post-petition

intercompany claims (this "Motion").  In support of this Motion, Coltec respectfully states as

follows:

**JURISDICTION AND VENUE**

    1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.

---

[1]   Contemporaneously with filing this Motion, Coltec moved to have its chapter 11 case jointly administered with the chapter 11 cases of *In re Garlock Sealing Technologies LLC* (10-BK-31607), *In re Garrison Litigation Management Group, Ltd.* (10-BK-31608) and *In re The Anchor Packing Company* (10-BK-31606), with *In re Garlock Sealing Technologies LLC* serving as the lead case.

[2]   For convenience, the term "Coltec" in this Motion refers to OldCo, LLC's predecessor, Coltec Industries Inc, when referring to events prior to the Coltec Restructuring and refers to OldCo, LLC when referring to events subsequent to the Coltec Restructuring.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 345, 363, 364, 503, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4002-1(d)(1) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Western District of North Carolina (the "Local Rules").

## BACKGROUND

3.      On January 30, 2017 (the "Coltec Petition Date"), Coltec filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Coltec Bankruptcy Case").  Coltec is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in the Coltec Bankruptcy Case.

4.      For additional background information regarding Coltec's history and corporate structure and events leading to the Coltec Petition Date, Coltec refers the Court and parties in interest to the Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases filed herein (the "Joint Administration Motion") and the Declaration of Joseph Wheatley in Support of OldCo, LLC's Chapter 11 Petition and First Day Motions filed herein (the "First Day Declaration").[3]

5.      In addition to the background set forth in the Joint Administration Motion and the First Day Declaration, Coltec believes the following additional background relevant to the relief sought in this Motion would be helpful to the Court and parties in interest.

---

[3]  Unless defined in this Motion, capitalized terms have the meanings ascribed to them in the Joint Plan and the Joint Administration Motion.

9292235v4

## A.    Coltec's Bank Account, Investment of Excess Cash and Business Forms

6.    The Bank Account: In the ordinary course of business, Coltec maintains one business bank account at Bank of America, N.A. ("BOA"), which has an account number ending in 6514 (the "Bank Account"). Money in the Bank Account is insured by the Federal Deposit Insurance Corporation (the "FDIC") up to $250,000.

7.    Through the Bank Account, Coltec can make disbursements and receive deposits. Disbursements can be made by automatic clearing house ("ACH") or wire transfer and deposits can be made by ACH or wire transfer or check. Coltec's disbursements from the Bank Account include (a) payment of accounts payable; (b) payment of *de minimis* federal and state taxes; (c) payment of professional fees and expenses; and (iv) payment of Coltec's other costs and expenses incurred in the ordinary course of business.

8.    Coltec has no employees, so it does not need to make disbursements from the Bank Account for employee payroll or other employee-related expenses or reimbursements, including payroll tax withholdings.

9.    Investment of Excess Cash: Before the Coltec Petition Date, EnPro Holdings, Coltec's immediate parent, deposited $5 million into the Bank Account to give Coltec sufficient funds to pay operating and bankruptcy-related expenses during the Coltec Bankruptcy Case.

10.    Because of this deposit, the Bank Account's balance will exceed the FDIC's $250,000 insurance limit (such excess amount, the "Excess Cash") at the beginning of the Coltec Bankruptcy Case.

11.    Before the Coltec Petition Date, Coltec began the process of opening an investment account with Banc of America Securities, LLC (the "Investment Account") for the purpose of depositing not less than the Excess Cash therein and investing such amount in one or more appropriate U.S. treasuries funds that invest funds solely in instruments backed by the full

3

9292235v4

faith and credit of the United States (collectively, the "US Treasuries Funds"). The US Treasuries Funds being considered by Coltec are designed to yield a return on idle cash with little investment risk while permitting Coltec to maintain liquidity. Before the Coltec Petition Date, Coltec began investigating and analyzing suitable US Treasuries Funds to meet its needs while satisfying the requirements of section 345 of the Bankruptcy Code, but had not decided on a specific US Treasuries Fund(s) to invest in before the need to file its Chapter 11 petition. After the Coltec Petition Date, Coltec will use its best efforts to promptly, and as soon as practical, transfer not less than the Excess Cash to the Investment Account and designate one or more US Treasuries Funds to invest such amount in. Coltec will then use funds from the Investment Account to replenish the Bank Account from time to time to allow Coltec to make payments for operating and bankruptcy-related expenses during the Coltec Bankruptcy Case.

12. After the Investment Account is established, the funds in the Bank Account will not exceed the FDIC's $250,000 insurance limit at any time during the Coltec Bankruptcy Case, except to the extent funds are needed in excess of the FDIC insurance limit for a brief period to pay large, one-time bankruptcy-related expenses (the policies described in paragraphs 9 through 12 above are collectively referenced as the "Investment Policy").

13. The Business Forms: In the ordinary course of business, Coltec uses business forms, including, but not limited to, letterhead, purchase orders, invoices and other similar documents (collectively, and as they may be modified, the "Business Forms"). Coltec does not use checks.

14. If the Court grants this Motion, Coltec will close its books and records to capture assets and liability balances as of the Coltec Petition Date and continue to record post-petition activity in the same books and records according to generally accepted accounting principles.

4

9292235v4

B.      **Coltec's Intercompany Transactions**

15.     Coltec's ultimate parent is EnPro. As a wholly owned subsidiary of EnPro, Coltec is part of an enterprise in which EnPro, in the ordinary course of business, enters into intercompany transactions with its subsidiaries and provides them certain corporate services and other benefits. Through intercompany services agreements or other arrangements, EnPro charges its subsidiaries for these services and benefits.

16.     On January 27, 2017, Coltec entered into an Intercompany Services Agreement with EnPro and EnPro Holdings (collectively, the "Parent") to formalize its relationship with the Parent (the "Coltec Services Agreement"). A copy of the Coltec Services Agreement is attached hereto as Exhibit A.

17.     The intercompany transactions governed by the Coltec Services Agreement are summarized below (collectively, the "Intercompany Transactions"):[4]

     (a)      Corporate Services: The Parent agrees to provide the following services (collectively, the "Corporate Services") to Coltec as requested by Coltec:

          i.      Legal support (but excluding legal support in connection with matters related to the Coltec Bankruptcy Case);

          ii.     Tax, human resources, and IT support;

          iii.    Treasury, accounting and other financial services;

          iv.     Coverage under corporate insurance policies;

          v.      Use of facilities, computer and telephone equipment, internet service and related utilities;

          vi.     Use of corporate credit cards; and

---

[4]     The description of the Coltec Services Agreement set forth herein is qualified in its entirety by the provisions of the Coltec Services Agreement. In the event of a conflict between the description set forth in this Motion and the Coltec Services Agreement, the Coltec Services Agreement shall control.

9292235v4

vii.    Periodic services of one or more employees in connection with the marketing, administration, and delivery of services for Coltec's Learning System business or as otherwise required by Coltec's business.

(b)    <u>License of Certain Intellectual Property</u>: During the term of the Coltec Services Agreement, the Parent grants Coltec a nonexclusive, royalty-free right and license to access, use and commercially exploit certain intellectual property in connection with Coltec's business and operations (the "License"). Coltec has certain obligations under the Coltec Services Agreement regarding its use of the licensed intellectual property.

(c)    <u>Payment Advances</u>: In the ordinary course of business, the Parent agrees to make, or cause to be made, payments on behalf of Coltec to third-party providers for expenses related to Coltec's business or in connection with charges incurred on corporate credit cards related to the operation of Coltec's business (collectively, the "Advances").

(d)    <u>Tax Sharing</u>: Coltec agrees to periodically reimburse EnPro for Coltec's share of income tax liability.

18.    Under the Coltec Services Agreement, Coltec accrues liability for the actual out-of-pocket costs of the Corporate Services and for the Advances (collectively, the "Unpaid Charges"). Beginning on January 31, 2018 and on or before January 31 of each calendar year, thereafter, Coltec must pay the Parent an amount equal to the Unpaid Charges for the previous calendar year.

19.    In support of this Motion, Coltec relies on the First Day Declaration.

6

9292235v4

**RELIEF REQUESTED**

20.        By this Motion, Coltec requests that the Court enter an order approving (a) maintenance of the Bank Account and the Bank Arrangements, (b) continued use of the Business Forms, (c) the Intercompany Transactions, (d) the Deposit Limited Waiver (as defined below), (e) the Investment Policy, and (f) a grant of administrative expense priority status to post-petition intercompany claims.

21.        Coltec also seeks a waiver, to the extent applicable, of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

22.        Coltec further seeks a waiver, to the extent applicable, of the requirements of Bankruptcy Rule 6003 because the uninterrupted continuation of the Corporate Services and the Advances under the Coltec Services Agreement is critical for a smooth transition into the Coltec Bankruptcy Case.

**BASIS FOR RELIEF REQUESTED**

23.        Section 363(c)(1) of the Bankruptcy Code permits a debtor in possession to use property of its estate in the ordinary course of business without Court approval. Coltec believes that much of the relief sought in this Motion is authorized under section 363(c)(1). However, because of the circumstances of the Coltec Bankruptcy Case, and because the Coltec Services Agreement is between Coltec and its parent companies, Coltec seeks the relief requested herein out of an abundance of caution.

**A.        Approving Use of the Existing Bank Account and the Bank Arrangements**

24.        Coltec seeks authority to continue using the Bank Account. Local Rule 4002-1(d)(1) provides for the Court's entry of operating orders in chapter 11 cases. Such orders typically require a debtor in possession to close its bank accounts and open new debtor-in-

7

possession accounts. Allowing Coltec to continue to use the Bank Account will assist it in accomplishing a smooth transition to operating as a debtor in possession.

25.     In other large chapter 11 cases, this Court has granted debtors in possession the authority to continue using existing bank accounts. *See, e.g.*, *In re Kaiser Gypsum Co., Inc.*, No. 16-bk-31602 (JCW) (Bankr. W.D.N.C. Sept. 30, 2016) (D.E. 8) (the "*Kaiser Gypsum* Order"); *In re Hendricks Furniture Grp., LLC*, No. 09-bk-50790 (JCW) (Bankr. W.D.N.C. June 12, 2009) (D.E. 33) (the "*Hendricks* Order"). Furthermore, this Court granted this relief to the debtors in the Garlock Bankruptcy Case (D.E. 46).

26.     Allowing Coltec to continue using the Bank Account will not prejudice creditors because Coltec has the capability, through its internal accounting system, to distinguish clearly between pre-petition and post-petition obligations and payments without closing the existing Bank Account and opening a new account.

27.     Coltec represents that if the relief requested herein is granted, it will implement appropriate mechanisms to ensure that no payments will be made on any debts it incurred before the Coltec Petition Date, other than those authorized by this Court. To further guard against such payments, Coltec has advised BOA not to honor pre-petition wire or ACH transfers on and after the Coltec Petition Date, except as otherwise expressly permitted by an order of the Court and directed by Coltec.

28.     Further, because Coltec has no employees, does not withhold payroll taxes, and pays only *de minimis* federal and state taxes, Coltec submits that there is no need for it to establish a separate tax account or payroll account during the Coltec Bankruptcy Case. Instead, Coltec requests that it be authorized to use the Bank Account for all its operations and expenses.

29.     Because Coltec uses only wire transfer or ACH and other similar methods for

9292235v4

payment of expenses incurred in its operations, it is necessary for Coltec to continue to conduct transactions in that fashion. Denying Coltec the opportunity to conduct transactions by wire transfer, ACH or other similar methods would interfere with its performance of its obligations, negatively impacting liquidity and unnecessarily disrupting its business operations.  It would also create additional costs to Coltec.

30.     Relatedly, Coltec requests authority for the following arrangements with BOA (collectively, the "Bank Arrangements"):

a.      BOA will charge, and Coltec will pay or honor, both pre-petition and post-petition service and other fees, costs, charges and expenses to which BOA may be entitled under the terms of and in accordance with its contractual arrangements with Coltec.

b.      BOA may "charge back" returned items to the Bank Account in the ordinary course of business.

c.      BOA may accept and honor all representations from Coltec as to which wires or ACH transfers should be honored or dishonored consistent with any order of this Court and governing law, whether such wires or ACH transfers are dated before, on or after the Coltec Petition Date.

d.      BOA shall not be liable to any party on account of (i) following Coltec's instructions or representations as to any order of this Court, (ii) the honoring of any wires or ACH transfers in a good faith belief that the Court has authorized such wire or ACH transfer to be honored, or (iii) an innocent mistake made despite implementation of reasonable item-handling procedures. Such relief is reasonable and appropriate because BOA is not in a position to independently verify or audit whether a wire or ACH transfer

9292235v4

may be paid in accordance with a Court order or otherwise.

31.    Coltec seeks approval of the Bank Arrangements to minimize disruption to the Bank Account and to assist Coltec in accomplishing a smooth transition to operating in chapter 11. This Court approved arrangements similar to the Bank Arrangements in the *Kaiser Gypsum* Order and in the Garlock Bankruptcy Case (D.E. 46).

32.    Accordingly, Coltec requests that this Court approve Coltec's continued use of the existing Bank Account for all its operations and expenses and the Bank Arrangements.

**B.**    **Approving Continued Use of the Existing Business Forms**

33.    Coltec seeks authority to continue using the existing Business Forms. Local Rule 4002-1(d)(1) provides for the Court's entry of operating orders in chapter 11 cases. Such orders typically require a debtor in possession to include the designation "debtor in possession" on bank signature cards, and might also require a reference to the bankruptcy case number and type of account on other business forms and checks.

34.    In the ordinary course of its business, Coltec uses many business forms.  To minimize expenses to the estate, Coltec requests authority to continue to use all correspondence and business forms (including, but not limited to, bank signature cards, letterhead, purchase orders, and invoices) as such forms were in existence immediately before the Coltec Petition Date, without reference to Coltec's status as a debtor-in-possession. Further, because most parties doing business with Coltec undoubtedly will be aware of its status as a debtor-in-possession as a result of the large and highly publicized nature of the Garlock Bankruptcy Case and this case, changing business forms is unnecessary and unduly burdensome.

35.    In other large cases, this Court has authorized debtors to continue using their pre-petition business forms. *See, e.g.*, *Kaiser Gypsum* Order; *Hendricks* Order. Furthermore, this Court granted this relief to the debtors in the Garlock Bankruptcy Case (D.E. 46).

9292235v4

36.    Accordingly, Coltec requests that this Court approve Coltec's continued use of the existing Business Forms.

## C.    Approving Intercompany Transactions with Non-Debtor Affiliates

37.    Section 363(c)(1) of the Bankruptcy Code authorizes Coltec to use property of the estate in the ordinary course of business without Court approval. Coltec believes its continued performance under the Intercompany Transactions governed by the Coltec Services Agreement is in the ordinary course of business and does not require Court approval. Nonetheless, out of an abundance of caution, Coltec seeks express authority to engage in such transactions on a post-petition basis because the Coltec Services Agreement is between Coltec and its parent companies.

38.    This Court approved similar interim relief for the debtors in the Garlock Bankruptcy Case (D.E. 44) and later approved assumption of similar services agreements in that case (D.E. 232). Other courts also have routinely approved similar intercompany transactions in complex chapter 11 cases. *See, e.g.*, *In re Ryckman Creek, LLC*, No. 16-10292 (Bankr. D. Del. Feb. 3, 2016) (D.E. 37); *In re Quiksilver, Inc.*, No. 15-11880 (Bankr. D. Del. Sept. 10, 2015) (D.E. 74); *In re Legend Parent, Inc.*, No. 14-10701 (Bankr. S.D.N.Y. April 15, 2014) (D.E. 90) (the "*Legend Parent* Order").

39.    Coltec relies on the Parent for the provision of the Corporate Services, the License and the Advances. The uninterrupted continuation of the Corporate Services and the Advances provided to Coltec under the Coltec Services Agreement is critical for a smooth transition into the Coltec Bankruptcy Case.

40.    Further, many of the Services return benefits to Coltec exceeding the cost charged to Coltec by EnPro.  For example, EnPro can negotiate lower premiums and better coverage on insurance policies than Coltec could, since EnPro-wide policies cover far more employees and

11

property than a policy that covered only Coltec.

41.     While the timing and form of payment set forth in the Coltec Services Agreement is different than Coltec's past practice with EnPro before the Coltec Restructuring, the formalized relationships set forth in the Coltec Services Agreement are substantially identical to the intercompany operational relationship between Coltec and EnPro as it has existed before and after the Coltec Restructuring. Further, EnPro treats other of its subsidiaries substantially the same as Coltec regarding the provision and reimbursement for the Corporate Services and Advances. Coltec believes the fees associated with the Corporate Services are fair and at or below market rates.

42.     Accordingly, in its informed business judgment, Coltec believes that continued performance of the Intercompany Transactions under the Coltec Services Agreement is in the best interests of Coltec, its estate, its creditors and other parties in interest.

D.      **Approving Limited Waiver of Deposit Guidelines and the Investment Policy**

43.     Section 345(a) of the Bankruptcy Code authorizes the deposit or investment of money of a debtor as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." Section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," the debtor must post a bond in favor of the United States and secured by the undertaking of an corporate surety, unless the Court orders otherwise "for cause."

44.     The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy Code, which was unchanged by the Bankruptcy Abuse

12

Prevention and Consumer Protection Act of 2005. The legislative history of that amendment

provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates. The purposes [sic] is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, *it can work to needlessly handcuff larger, more sophisticated debtors*. This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Sys., Inc.*

*In re Service Merch. Co. Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (emphasis in

original) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong.

Rec. H10767 (Oct. 4, 1994)).

45.    The Investment Policy. Coltec submits that investing the Excess Cash in the US

Treasuries Funds, pursuant to the Investment Policy, complies with the requirements of section

345 because all such investments are made in securities which are backed by the full faith and

credit of the United States Government. Further, in the Garlock Bankruptcy Case, the Court

approved the debtors' investment of excess cash in one or more US Treasuries Funds (D.E. 46).

Out of an abundance of caution, Coltec requests the Court approve the Investment Policy,

including Coltec's investment of the Excess Cash in one or more US Treasuries Funds.

46.    Deposit Limits. Before Coltec transfers funds to the Investment Account for

investment in the US Treasuries Funds, the balance in the Bank Account will exceed the FDIC

insurance limit of $250,000. During this period, Coltec requests a waiver of the requirements of

section 345(b) to permit it to keep the Excess Cash in the Bank Account without posting a bond

to secure those funds. Coltec also requests a waiver of section 345(b)'s requirements during

other brief periods of time when funds in excess of the FDIC insurance limit of $250,000 are

9292235v4

needed in the Bank Account to pay large, one-time bankruptcy expenses (such waivers, collectively, the "Deposit Limited Waiver").

47.     Coltec submits that cause exists for the Deposit Limited Waiver. Because of the strength and size of the depository bank, BOA, Coltec believes that any Excess Cash in the Bank Account before the Investment Account is established or for brief periods thereafter will not be sufficiently at risk to necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code. Moreover, such a waiver will allow Coltec to avoid the significant administrative difficulties and expenses relating to opening new accounts to ensure that all their funds are fully insured or secured strictly in accordance with the restrictions established by section 345(b) of the Bankruptcy Code.

48.     Significantly, the Court granted relief from the deposit requirements under section 345(b) to the debtors in the Garlock Bankruptcy Case (D.E. 46). In other large chapter 11 cases, other courts also have granted similar relief. *See, e.g.*, *Legend Parent* Order; *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del. June 4, 2014) (D.E. 801); *Hendricks* Order.

49.     Accordingly, Coltec submits that the Investment Policy and Deposit Limited Waiver should be approved and are in the best interests of Coltec, its estate, its creditors and other parties in interest.

**E.     Granting Administrative Expense Priority Status to Post-Petition Intercompany Claims**.

50.     By reason of the Intercompany Transactions arising under the Coltec Services Agreement, Coltec maintains relationships with the Parent, so there are intercompany claims that reflect, primarily if not solely, intercompany payables made in the ordinary course of Coltec's business operations.

51.     Although the Joint Plan is scheduled for confirmation proceedings in May 2017

14

and Coltec hopes to emerge from Chapter 11 shortly thereafter, Coltec seeks out of an abundance of caution an order granting administrative expense priority status to post-petition claims arising under the Coltec Services Agreement to ensure that it can pay such intercompany claims when due in the ordinary course of business after the Coltec Petition Date. Accordingly, Coltec respectfully requests that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against Coltec arising under the Coltec Services Agreement after the Coltec Petition Date (collectively, the "Intercompany Clams") be accorded administrative expense priority status. Coltec relies on the benefits provided by the Intercompany Transactions for the operation of its business, and continued performance under the Coltec Services Agreement is not only important to Coltec's successful restructuring, but is integral to ensure its ability to operate its business as a debtor-in-possession. Were Coltec required to obtain the services that comprise the Intercompany Transactions elsewhere, aside from incurring excessive financial burdens in identifying appropriate providers of these services and entering into individual agreements for providing these services, Coltec would be required to divert attention and efforts from ensuring a smooth transition into the chapter 11 process and, ultimately, working towards a successful restructuring. Moreover, the services provided under the Intercompany Transactions are ordinary course type tasks and functions.

52.     While Coltec is not seeking to assume the Coltec Services Agreement as an executory contract at this time, it respectfully requests the authority to continue performing thereunder in the ordinary course of business without need for further Court order. For the reasons discussed herein, the Court should authorize Coltec to perform under the Coltec Services Agreement and grant administrative expense priority status to any Intercompany Claims.

## NOTICE

9292235v4

53.    No trustee, examiner, or creditors' committee has been appointed in the Coltec Bankruptcy Case. Coltec has served notice of this Motion on (a) the Ad Hoc Committee; (b) the Garlock Committee; (c) Mr. Grier, in his capacity as the proposed legal representative for future Coltec Asbestos Claimants and the Future Asbestos Claimants' Representative in the Garlock Bankruptcy Case; (d) the Office of the United States Bankruptcy Administrator for the Western District of North Carolina; and (e) to the extent not set forth above, the parties listed on the updated Master Service List in the Garlock Bankruptcy Case (D.E. 5655) and any party that has filed a request for notices under Bankruptcy Rule 2002 since the filing of the updated Master Service List, and submits that, given the nature of the relief requested, no other or further notice need be given. No previous application for the relief requested herein has been made by Coltec to this or any other court.

WHEREFORE, Coltec respectfully requests that the Court enter an Order, substantially in the form attached hereto as Exhibit B, approving (a) maintenance of the Bank Account and the Bank Arrangements, (b) continued use of the Business Forms, (c) the Intercompany Transactions, (d) the Deposit Limited Waiver, (e) the Investment Policy, (f) the grant of administrative expense priority status to the Intercompany Claims, and (g) granting such other relief as the Court deems just and proper.

[remainder of page left blank intentionally –
signature page of counsel follows]

16

This the 30th day of January, 2017.

<table>
<tr>
<td>

*/s/ Daniel G. Clodfelter*

Daniel G. Clodfelter
N.C Bar No. 7661
danclodfelter@parkerpoe.com
William L. Esser IV
N.C. Bar No. 29201
willesser@parkerpoe.com
Ashley A. Edwards
N.C. Bar No. 40695
ashleyedwards@parkerpoe.com

PARKER POE ADAMS & BERNSTEIN, LLP
Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone:      (704) 372-9000
Facsimile:      (704) 334-4706

*Proposed Counsel to OldCo, LLC, Debtor and
Debtor-in-Possession*

</td>
<td>

*/s/ David M. Schilli*

David M. Schilli
N.C. Bar No. 17989
dschilli@robinsonbradshaw.com
Andrew W.J. Tarr
N.C. Bar No. 31827
atarr@robinsonbradshaw.com

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street
Suite 1900
Charlotte, NC 28246
Telephone:      (704) 377-2536
Facsimile:      (704) 378-4000

*Proposed Special Corporate and Litigation
Counsel to OldCo, LLC, Debtor and Debtor-
in-Possession*

</td>
</tr>
</table>

# EXHIBIT A

# INTERCOMPANY SERVICES AGREEMENT

**THIS INTERCOMPANY SERVICES AGREEMENT** (this "Agreement") is dated as of the 27th day of January, 2017, by and between **EnPro Holdings, Inc.**, a North Carolina corporation ("EHI"), **EnPro Industries, Inc.**, a North Carolina corporation (together with EHI, the "Parent") and **OldCo, LLC**, a North Carolina limited liability company (the "Subsidiary").

## RECITALS

**WHEREAS**, the Parent, directly or through its subsidiaries, other than the Subsidiary, provides the Subsidiary with certain corporate services, permits participation by the Subsidiary in certain insurance policies obtained by the Parent and/or its affiliates, allows for use of corporate credit cards in connection with the business of the Subsidiary, licenses certain intellectual property to Subsidiary and provides the services of certain employees in connection with the business of Subsidiary; and

**WHEREAS**, the parties hereto wish to formalize the relationship between the Parent and the Subsidiary regarding such matters; and

**WHEREAS**, the Subsidiary desires to acquire and pay or reimburse the Parent for (i) the services and insurance coverage set forth in Exhibit A hereto, as such Exhibit may be amended from time to time (the "Services"), (ii) the license of certain intellectual property to the Subsidiary and (iii) certain periodic payments by the Parent in connection with charges on corporate credit cards related to the business of Subsidiary;

**WHEREAS**, the Parent is willing to provide to the Subsidiary the Services, license certain intellectual property to the Subsidiary and make certain periodic payments on account of charges on corporate credit cards used in connection with the business of the Subsidiary, in each case pursuant to the terms and conditions set forth herein;

**WHEREAS**, in connection with the provision of Services hereunder, the Parent and the Subsidiary desire to agree to certain arrangements with respect to the payment of taxes related to the business of the Subsidiary, as further described in the Tax Sharing Agreement dated June 1, 2010 by and between EnPro Industries, Inc. and certain of its subsidiaries in the form attached hereto as Exhibit B (the "Tax Sharing Agreement");

9391891v3 22022.00010

**AGREEMENT**

       **NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

       1.     Services. Beginning on January 30, 2017, (the "Effective Date"), the Parent shall provide, or cause to be provided, to the Subsidiary all of the Services as may from time to time be reasonably requested by the Subsidiary. At the Parent's direction and in its sole discretion, the Services may be provided by any affiliate or employee of the Parent or its affiliates, but excluding the Subsidiary.

       2.     Fee for Services. In exchange for the Services, the Subsidiary shall pay to the Parent, in accordance with the provisions of **Section 6**, the actual out-of-pocket cost of each of the Services incurred by Parent on behalf of Subsidiary, including, without limitation, the amount of any Advances (as described below) (the "Services Charge").

       3.     Additional Services. At any time during the term of this Agreement, the Subsidiary may request that the Parent provide additional services. Upon any such request, the parties will discuss in good faith, without obligation, appropriate amendments to the Services and the Services Charge to reflect such additional services and, if mutually agreed, amend this Agreement to reflect such amendments.

       4.     Termination of Services. Either the Subsidiary or the Parent may terminate all or any portion of the Services on one-hundred and eighty (180) days' prior written notice to the other. In the event a portion of the Services is terminated, the Services Charge shall be equitably amended to reflect such termination.

       5.     Payment Advances. In the ordinary course of business and consistent with past practice, during the term of this Agreement the Parent shall make, or cause to be made at Parent's expense, payments on behalf of the Subsidiary (the "Advances") to third-party providers for expenses related to the business of the Subdiary or in connection with charges incurred on corporate credit cards related to the operation of the business of the Subsidiary. Consistent with past practice and in accordance with the provisions of **Section 6**, the Subsidiary shall reimburse the Parent for any payments made by the Parent, or caused to be made by the Parent at the Parent's expense, related to the Advances (all such reimbursements, collectively, "Advance Reimbursements").

9391891v3 22022.00010          2

6.      Intellectual Property License.

(a)     During the term hereof, Parent hereby grants to Subsidiary a nonexclusive, royalty-free right and license to access, use and commercially exploit the Licensed Intellectual Property (as defined below) in connection with the business and operations of Subsidiary. "Licensed Intellectual Property" means (i) any technical expertise, know-how, proprietary products, written works, whether or not copyrighted or copyrightable, (ii) trademarks, service marks, tradenames and other indicias of source or origin including, without limitation, the trademarks listed on Exhibit C hereto (collectively, the "Marks"), and (iii) the domain names and related web addresses and web pages (and the content located thereon), in each case related to or used or useful in connection with the business of the Subsidiary.

(b)     Subsidiary shall use the Marks solely in connection with goods and services that are of at least the quality of the goods and services provided by Parent and/or its affiliates prior to the date of this Agreement and that are of sufficient quality that the use of the Marks in connection with such goods and services will not reflect negatively on the goodwill associated with the Marks nor otherwise dilute the value of the Marks. Subsidiary shall use the same style and appearance of the Marks as used by Parent and/or its affiliates, shall strictly comply with the usage standards in any style guide or similar document provided by Parent, and shall not alter the Marks in any way without the prior written consent of Parent. Subsidiary shall permit inspection of its operations by Parent to confirm that the use of the Marks complies with the terms hereof. Should Parent determine in its sole discretion that any services provided by the Subsidiary using the Marks are of unacceptable quality or are otherwise not in accordance with the standards required under this Agreement, or that the marketing and sale of such services reflects negatively on the goodwill associated with the Marks or otherwise dilutes the value of the Marks, Parent may notify Subsidiary of the problem in writing. Upon such notice, Subsidiary shall promptly make any changes required to remedy the problem. Subsidiary shall discontinue the use of the Marks until the problem is corrected to Parent's satisfaction.

7.      Invoices; Settlement Procedures. Within fifteen (15) business days after each fiscal month-end during a calendar year, the Parent shall submit invoices to the Subsidiary that reflect any Services Charge and Advance Reimbursements for such month, with reasonable detail of each, as well as any amount previously invoiced but not paid by the Subsidiary as of the invoice date. Prior to the January 31 following such calendar year (each, a "Settlement Date", provided, however, that in the event that such January 31 is not a business day, the Settlement Date will be the business day immediately preceding such January 31), the Parent shall provide to the Subsidiary a summary invoice of all Services Charges, and Advance Reimbursements for such calendar year (collectively, the "Unpaid Charges"). All Unpaid Charges shall be due and payable on the Settlement Date and the Parent will not charge any interest on any Unpaid Charges for any period prior to such Settlement Date.

8.      Joinder to Tax Sharing Agreement.  Effective as of the Effective Date, the Subsidiary shall be deemed to be a party to, and be bound by the terms of, the Tax Sharing Agreement as an "Additional Subsidiary" as defined therein, and accordingly, shall be bound by (and entitled to the benefits of) all of the terms, conditions, duties and obligations of an Additional Subsidiary thereunder.  The Subsidiary further agrees, that pursuant to Section 9 of the Tax Sharing Agreement, the Subsidiary shall, for all purposes, be treated in the same manner as "Garlock" (as defined in the Tax Sharing Agreement) as described in such Section 9.

9.      Limitation of Liability.  THE LIABILITY OF THE PARENT UNDER THIS AGREEMENT RELATED TO THE PERFORMANCE OR NON-PERFORMANCE OF ANY SERVICE HEREUNDER, THE LICENSE OF INTELLECTUAL PROPERTY, OR ANY ADVANCE, INCLUDING, WITHOUT LIMITATION, LIABILITY OF THE PARENT FOR CLAIMS OF ANY KIND (WHETHER IN CONTRACT, INDEMNITY, TORT, STRICT LIABILITY, OR OTHERWISE) RELATED THERETO SHALL NOT EXCEED THE TOTAL AMOUNT PAID TO THE PARENT FOR SUCH SERVICE, LICENSE OR ADVANCE REIMBURSEMENT UNDER THIS AGREEMENT.

10.     Indemnification.

(a)     Subject to the limitation in **Section 9**, the Parent shall indemnify, defend and hold harmless the Subsidiary from and against all liabilities, claims, damages, losses and expenses (including, but not limited to, court costs and reasonable attorneys' fees), of any kind or nature caused by or arising in connection with the Parent's gross negligence or willful misconduct in its performance of this Agreement; unless such gross negligence or willful misconduct was caused by the acts or omissions of the Subsidiary.  Notwithstanding the foregoing, the Parent shall not be liable for any special, indirect, incidental or consequential damages relating to such third party claims.

(b)     The Subsidiary shall indemnify, defend and hold harmless the Parent and its affiliates (other than the Subsidiary) from and against all liabilities, claims, damages, losses and expenses (including, but not limited to, court costs and reasonable attorneys' fees), of any kind or nature caused by or arising in connection with the Subsidiary's gross negligence or willful misconduct in its performance of this Agreement; unless such failure is caused by the acts or omissions of the Parent.  Notwithstanding the foregoing, the Subsidiary shall not be liable for any special, indirect, incidental or consequential damages relating to such claims.

11.     Information.  Each party hereto covenants and agrees to provide the other party with all information regarding itself and transactions under this Agreement as is required by such party to comply with all applicable federal, state, county and local laws, ordinances, regulations and codes, including, but not limited to, securities laws and regulations.

12.     Confidential Information. Each party hereby covenants and agrees to hold in trust and maintain confidential, except as otherwise required by law, all Confidential Information relating to the other party or any of its subsidiaries.  For the purposes of this Agreement, Confidential Information shall mean all information disclosed by a party to the other in connection with this Agreement whether orally, visually, in writing or in any other tangible form, and includes, but is not limited to, technical, economic and business data, know-how, flow sheets, drawings, business plans, computer information data bases, and the like.  Without prejudice to the rights and remedies of any party to this Agreement, a party disclosing any Confidential Information shall be entitled to seek equitable relief by way of an injunction if the other party hereto breaches or threatens to breach any provision of this **Section 12**.

13.     Assignment.  Neither party may assign or transfer any of its rights or duties under this Agreement to any person or entity without the prior written consent of the other party.

14.     Notices.  Any notice, instruction, direction or demand under the terms of this Agreement required to be in writing will be duly given upon delivery, if delivered by hand, facsimile transmission or intercompany mail, or five (5) days after posting if sent by first class mail to the following addresses:

The Parent

EnPro Industries, Inc.

5605 Carnegie Blvd., Suite 500

Charlotte, North Carolina 28209-3100

Attention:  Robert McLean

and

The Subsidiary

Oldco, LLC

5605 Carnegie Blvd., Suite 500

Charlotte, North Carolina 28209-3100

Attention: Joe Wheatley

15.     Governing Law.  This Agreement shall be construed in accordance with and governed by the laws of the State of North Carolina.

16.     Suspension.  The obligations of any party to perform any acts hereunder may be suspended if such performance is prevented by fires, strikes, embargoes, riot, invasion, governmental interference, inability to secure goods or materials, or other circumstances outside the control of such party.

17.     Severability.  If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not render the entire Agreement invalid.  Rather, the Agreement shall be construed as if not containing the particular invalid or unenforceable provision, and the rights and obligations of each party shall be construed and enforced accordingly.

18.     Term; Termination; Rights Upon Termination.  The term of this Agreement shall be from the Effective Date to **January 31, 2018**, unless terminated earlier pursuant to this **Section 18**, provided, however, that unless a party provides notice of intent to terminate this Agreement at least one-hundred and eighty (180) days prior to the expiration, this Agreement shall automatically renew for a successive one-year period.  The Parent may terminate this Agreement in its sole discretion if, at the time of such election, the Parent no longer possesses, directly or indirectly, a majority the membership interests of the Subsidiary.  Upon expiration or termination of this Agreement or the termination of any of the Services, licenses, or Advances by either party, each party shall, upon request, forthwith return to the other party all reports, Confidential Information and any other information provided to the other party under this Agreement with respect to the terminated Services, licenses and/or Advances.  In addition, each party shall assist the other in the orderly termination of this Agreement and any of the Services, licenses and/or Advances described herein.  The termination or expiration of this Agreement shall not relieve any party of any obligations or liabilities accrued as of the effective date of the termination or expiration, and the Subsidiary shall pay, in accordance with **Section 9**, all Services Charges and Advance Reimbursements as due.

19.     Amendment.  This Agreement may only be amended by a written agreement executed by each of the parties hereto; provided that any of the Exhibits attached hereto may be amended upon the delivery of a replacement Exhibit so designated and executed by the parties hereto.

20.    <u>Entire Agreement</u>.  This Agreement, including the Exhibits, constitutes the entire agreement between the parties, and supersedes all prior agreements, representations, negotiations, statements or proposals related to the subject matter hereof.

21.    <u>Counterparts</u>.  This Agreement may be executed in separate counterparts, including by facsimile or other electronic transmission, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be signed by their duly authorized representatives.

OLDCO, LLC

By: _____

Name: __Joe Wheatley_____

Title: ___President & Treasurer_____

ENPRO INDUSTRIES, INC.

By: _____

Name: _Robert McLean_____

Title: ___General Counsel, Chief Administrative Officer,
& Secretary_____

ENPRO HOLDINGS, INC.

By: _____

Name: _Robert McLean_____

Title: ___Vice President & Secretary_____

9391891v3 22022.00010

**EXHIBIT A**

**SERVICES**

**I. Services:**

Legal support (but not including legal support in connection with matters related to any Chapter 11 proceedings to be commenced by the Subsidiary)

Tax support

Human Resources support

IT Support

Treasury services

Accounting and other financial services

Coverage under corporate insurance policies

Use of facilities, computer and telephone equipment, internet service and related utilities

Use of corporate credit cards

In addition, from time to time, the Parent shall provide the services of one or more employees in connection with the marketing, administration, and delivery of services related to employee health and safety seminars and programs or as otherwise required by the business of Subsidiary.  Services may include, among other things, the development of seminar materials, speaking engagements, administrative services related to the organization and execution of seminars, and client consulting services.

**EXHIBIT B**

**FORM OF**

**TAX SHARING AGREEMENT**

## TAX SHARING AGREEMENT

THIS TAX SHARING AGREEMENT, is made and entered into as of the 1st day of June, 2010, by and between ENPRO INDUSTRIES, INC. ("Parent"), GARRISON LITIGATION MANAGEMENT GROUP, LTD. ("Garrison"), THE ANCHOR PACKING COMPANY ("Anchor"), GARLOCK INTERNATIONAL INC. ("GII"), GARLOCK OVERSEAS CORPORATION ("GOC"), GARLOCK SEALING TECHNOLOGIES LLC ("Garlock" and referred to jointly with Garrison, Anchor, GII, and GOC as the "Subsidiaries"), and the additional entities executing this Agreement (the "Additional Subsidiaries").

## BACKGROUND STATEMENT

Parent owns all of the outstanding stock of Coltec Industries Inc ("Coltec"), which in turn owns all of the outstanding stock of Garrison, which in turn owns all of the outstanding stock of Anchor.  Coltec also owns all of the outstanding membership interests in Garlock, which in turn owns all of the outstanding stock of GII and GOC.

Parent files consolidated federal income tax returns in accordance with Sections 1501 and 1502 of the Internal Revenue Code (the "Code") and the regulations promulgated thereunder (the "Regulations") for and on behalf of itself, Coltec, Garrison, Anchor, GII, GOC, and other includable corporations within the meaning of Section 1504 of the Code that are members of the affiliated group (the "Group") of which Parent is the common parent.

For federal and state income tax purposes Garlock is disregarded as an entity separate from its sole member (Coltec) so that Garlock's income, deductions, and other tax items are treated as incurred directly by Coltec.

- 3 -

It is equitable that with respect to each taxable period for which a consolidated return is filed by Parent that includes a Subsidiary, such Subsidiary will pay to Parent an amount equal to the Subsidiary's Separate Return Tax Liability (as hereinafter defined).

It is also equitable that with respect to each taxable period for which a consolidated return has been or is filed by Parent that includes a Subsidiary and in which the Group utilized or utilizes a net operating loss of the Subsidiary, Parent shall, in the manner prescribed hereinafter, credit against the future liability of the Subsidiary to Parent hereunder, an amount equal to the income tax benefit obtained by Parent as a result of the utilization by the Group of such net operating loss or credit of such Subsidiary.

It is also equitable that this Agreement shall be effective as to any Additional Subsidiary as of the first day of any taxable year during which such Additional Subsidiary prepares separate financial statements for financial accounting purposes.

## STATEMENT OF AGREEMENT

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Payment of Separate Return Tax Liability by Subsidiary to Parent**.  With respect to each taxable period for which a consolidated return is filed by Parent which includes a Subsidiary, such Subsidiary shall pay to Parent an amount equal to the Separate Return Tax Liability of the Subsidiary, determined in accordance with **Section 2** hereof.  All payments of the Separate Return Tax Liability shall be made to Parent by such Subsidiary at least five business days prior to the due date of such consolidated

- 4 -

return or at such later date as determined by Parent (each, a "Payment Date"), whether or not the Group is obligated to pay a tax liability for the applicable period.

On each Payment Date, each Subsidiary other than Garlock shall make all payments of its respective Separate Return Tax Liability then due in cash. On each Payment Date, Garlock shall make all payments of its Separate Return Tax Liability then due in the following manner:

(a)      Garlock shall pay an amount (the "Note Income Charges") equal to the hypothetical tax liability of Garlock, as used in determining the Separate Return Tax Liability of Garlock, arising from the following promissory notes, including any interest accruing thereon: [1] the Amended and Restated Promissory Note dated as of January 1, 2010 in the original principal amount of $153,865,000 with Stemco LP as maker and Garlock as the original holder (the "Stemco Note") and [2] the Amended and Restated Promissory Note dated as of January 1, 2010, in the original principal amount of $73,381,000, with Coltec as maker and Garlock as the original holder (the "Coltec Note"):

(i)      First, through a corresponding reduction in the amount of outstanding PIK Amounts (as defined under the Coltec Note and the Stemco Note) owed to Garlock pursuant to the Stemco Note and the Coltec Note at such Payment Date in the following order (1) PIK Amounts under the Stemco Note and (2) PIK Amounts under the Coltec Note; provided, that the determination of outstanding PIK Amounts shall be made after giving effect to any payment of PIK Amounts to be made on or before such Payment Date under that certain Services Agreement dated as of June 1, 2010 between Garlock and the Parent and Coltec;

(ii)      Second, subject to the terms of any subordination agreement applicable to the Stemco Note or Coltec Note, if any Note Income Charges remain outstanding after applying the provisions of **Section 0** above, through a corresponding reduction in the amount of principal owed to Garlock at such Payment Date under the Stemco Note until the principal balance of the Stemco Note is paid in full and then through a corresponding reduction in the amount of principal owed to Garlock at such Payment Date under the Coltec Note until the principal balance of the Coltec Note is paid in full; and

- 5 -

(iii) *Third*, in cash, in an amount equal to any Note Income Charges that remain outstanding after applying the provisions of **Section 0** and **0** above, if any.

(b)    Garlock shall also pay an amount in cash equal to the Separate Return Tax Liability of Garlock *minus* the Note Income Charges; provided, that if such amount is less than zero, it shall be deemed a net operating loss of Garlock for such period and shall be taken into account only as provided in **Section 3**.

To the extent any payments of PIK Amounts or principal are made on the Stemco Note or the Coltec Note by virtue of this Agreement, Stemco LP and Parent or Coltec and Parent, as applicable, shall reflect such payment as an intercompany advance by Parent to Stemco LP or by Parent to Coltec, as applicable, and evidence that advance through documentation acceptable to Stemco LP or Coltec and Parent.

2.    <u>Determination of Separate Return Tax Liability</u>.  For each taxable period during which a Subsidiary is a member of the Group, the Separate Return Tax Liability of the Subsidiary shall mean the hypothetical tax liability (computed without regard to any credit or net operating loss deduction, subject to the last paragraph of this **Section 2**) determined as if the Subsidiary had filed a separate consolidated federal income tax return for the applicable period and its income were taxable at the highest corporate rate in effect for such period.  For purposes of determining the Separate Return Tax Liability of a Subsidiary:

(a)    Any dividends received by one member from another member will be assumed to qualify for the 100% dividends-received deduction of Section 243 of the 1986 Code or shall be eliminated from such calculation in accordance with the Regulations.

(b)    Gain or loss on intercompany transactions, whether deferred or not, shall be treated by each member in the manner required by Sections 1.1502-13 and 1.1502-13T of the Regulations.

(c)    Limitations on the calculation of a deduction or the utilization of tax credits or the calculation of a tax liability shall be made on a consolidated basis. Accordingly, the limitations provided in Sections 38(c), 56(a), 170(b)(2), 172(b) and 904 of the Code and similar limitations shall be applied on a consolidated basis.

- 6 -

(d)     Elections as to tax credits and tax computations which may have been different from the consolidated treatment if separate returns were filed shall be made on an annual basis by Parent.

The determination of the Separate Return Tax Liability of each Subsidiary shall be made by Parent, and such determination shall be conclusive for purposes hereof.  If the computation of the Separate Return Tax Liability of any Subsidiary other than Garlock (with Garlock's net operating losses applied in the accordance with **Section 1(b)**) pursuant to this **Section 2** for a taxable period does not result in positive tax liability, then for purposes of **Section 1** hereof the Separate Return Tax Liability of such Subsidiary shall be deemed to be zero, and any net operating loss of such Subsidiary for such period shall be taken into account only as provided in **Section 3**.

Notwithstanding any other provision hereof, to the extent any Subsidiary has a cumulative net loss for all taxable years from its admission to the Group through the end of the taxable year immediately prior to the taxable year described in Section 13 hereof, such cumulative net loss shall be applied to reduce its taxable income (but not below zero) in determining its Separate Return Tax Liability for any year.  For such purpose, each Subsidiary's taxable income or loss for each year prior to the year described in Section 13 hereof shall be calculated as if the Subsidiary filed a separate income tax return, consistent with the principles of this **Section 2**.

**3.**     **Credit to Separate Return Tax Liability of Subsidiary**.  If a Subsidiary is entitled to a tax credit or incurs a net operating loss during a taxable period, or would, if it filed a separate return for all periods covered by this Agreement, be entitled to a credit or a net operating loss deduction with respect to net operating losses or credit carried forward or back to such period (exclusive of net operating losses or credits utilized by the Group for prior or subsequent periods), and if it is determined by Parent that such credit, net operating loss or deduction will be utilized by Parent in filing its consolidated Federal income tax return for the current taxable period or for any previous period and that such credit, net operating loss or deduction will provide a tax benefit in any such period, Parent shall credit against the Separate Return Tax Liability owed by the Subsidiary to Parent pursuant to this Agreement for the current taxable period an amount equal to the net tax benefit which Parent, in its sole judgment, determines the Group will obtain.  Parent shall apply such credit against the Separate Return Tax Liability of the Subsidiary as provided above with respect to any taxable

- 7 -

period as of the first installment date for such year.  Parent shall have the right to adjust, as of the last day of succeeding quarters, the amount credited pursuant to this **Section 3** based upon the determination of Parent that the amount credited in preceding quarters was incorrect.

4.    **Excess Loss Account Income**.  If Parent is required for any reason to include in the Group's consolidated federal taxable income the amount of any excess loss account (as defined in Section 1.1502-32(3) of the Regulations) applicable to the stock of a Subsidiary, such Subsidiary shall pay to Parent the amount of the tax liability resulting from such inclusion as determined by Parent.  Such payment shall be made within sixty days following the end of the taxable period of the Group in which such inclusion occurred.  If the aforesaid payment constitutes taxable income to Parent, or increases the gain to Parent from disposition of the stock to which such excess loss account relates, the Subsidiary shall pay Parent an additional amount such that the Group would incur no net out-of-pocket tax liability from inclusion of such excess loss account, assuming the amount of such inclusion and the additional amounts paid were taxable to the Group at the highest applicable corporate tax rate for the period or inclusion and payment.

5.    **Tax Liability of Subsidiary in the Event of Disaffiliation**.  In accordance with Section 1.1502-6 of the Regulations, in the event that a Subsidiary becomes disaffiliated from the Group for any reason, such Subsidiary shall remain liable under this Agreement for the tax liability of the Group for the taxable period during which disaffiliation occurs and for prior taxable periods in which such Subsidiary or the other affected member, as the case may be, was a member of the Group.  A Subsidiary shall be required to pay Parent only those amounts for the period of disaffiliation that are determined pursuant to **Sections 1**, **2** and **4** hereof.  Payment of such tax liability by a Subsidiary shall be made to Parent at least five business days prior to the due date of the applicable tax return.  Moreover, should a federal income tax controversy with the Internal Revenue Service ultimately result in assessment of a tax deficiency against the Group for years in which a Subsidiary was affiliated with such Group or should the tax return or returns for such years be amended, such Subsidiary shall remain liable for the Subsidiary's portion of such tax deficiency determined pursuant to **Sections 1**, **2** and **4** hereof, plus interest and penalties as provided in **Section 8**, if any.

9391891v3 22022.00010

6.    **Payment of Tax Refunds to Subsidiary**.  If, after the disaffiliation of a Subsidiary from the Group, Parent receives from the Internal Revenue Service any refund of tax (and interest, if any) paid by the Group, any amount of which in the sole judgment of Parent should be regarded as a refund of amounts paid by a Subsidiary pursuant to **Section 1** hereof, such amount shall be paid by Parent to the Subsidiary within sixty business days after receipt.

7.    **Indemnity**.  In the event a Subsidiary is required to pay the Internal Revenue Service tax liability in excess of its Separate Return Tax Liability determined pursuant to **Section 2** hereof, such Subsidiary shall be entitled to reimbursement within sixty business days of such payment by Parent.  In the event Parent is required to pay to the Internal Revenue Service taxes due to the disallowance of all or part of any item utilized by Parent and for which a Subsidiary received credit against amounts due from such Subsidiary hereunder as provided in **Section 3** hereof (or if Parent would have been so required to pay the Internal Revenue Service but for other adjustments), the Subsidiary shall pay to Parent the amount of such additional tax paid by Parent (or which Parent would have been required to pay but for other adjustments); provided, however, the amount so paid by such Subsidiary to Parent shall not exceed the cumulative payments made by Parent to the Subsidiary pursuant to **Section 3** hereof with respect to such item (except as provided in **Section 8** below).

8.    **Payment of Interest, Penalties and Expenses**.  Interest, penalties and expenses incurred by Parent in connection with the amendment of any consolidated tax return, and/or the examination of any consolidated return by the Internal Revenue Service or subsequent administrative or judicial proceedings, shall be borne equitably by those parties whose tax liability may be affected by such amendment, examination or subsequent proceedings.  No interest shall be charged to Parent or a Subsidiary in connection with any allocation under this Agreement, however, unless interest is payable to the Internal Revenue Service or to another member of the Group as a result of any tax allocation.

9.    **Treatment of Garlock as a Corporation for Income Tax Purposes**. Notwithstanding that Garlock is disregarded as an entity separate from Coltec for income tax purposes, Garlock shall be treated as a separate corporation for purposes of this Agreement, including determining its Separate Return Tax Liability.  In addition, Garlock shall make payments to Coltec to reflect that Coltec will, in effect, be paying

- 9 -

state income taxes on Garlock's behalf. The amount of such payments from Garlock to Coltec shall be determined by EnPro by applying the principles of this Agreement, including determining Garlock's separate state income tax liability as if it were a separate corporation.

10.   **Parent as Agent**.

Parent, as agent for each member of the Group, shall have full authority to prepare and file the Group's consolidated federal income tax return, to pay any consolidated tax liability shown thereon, and to represent the Group in connection with the examination of any such return by the Internal Revenue Service and in the resolution of disputes regarding any consolidated tax liability.

Each Subsidiary shall provide Parent with the data necessary for the proper and timely filing of all federal tax returns and forms. In the event a Subsidiary fails to provide data in proper form and within sufficient time to permit the timely filing of any such tax return, any penalties or interest assessed against the Group by reason of a delay in filing such tax return shall be payable by such Subsidiary. If a Subsidiary provides data in proper form and within sufficient time to permit the timely filing of a particular tax return, any penalties or interest assessed against the Group by reason of a delay in filing such return shall not be payable by such Subsidiary.

The agency power of Parent, as described in this section, shall extend to all periods during which a Subsidiary is a member of the Group, and in the event of such Subsidiary's disaffiliation, Parent shall retain the sole power to make or change on behalf of such Subsidiary any election or other decision affecting tax liabilities for such periods that such Subsidiary was affiliated with the Group under the provisions of the Code providing for elections.

11.   **State Income or Excise Tax Returns**. Parent shall have the authority, where permitted by applicable law, to file in any state consolidated income franchise and excise tax returns on behalf of the Group and, at Parent's discretion, to allocate state income or excise tax liabilities among the members of the Group.

12.   **Binding Effect**. This Agreement shall be binding upon and shall inure to the benefit of Parent and each Subsidiary and their respective successors and assigns;

9391891v3 22022.00010

provided, however, that neither this Agreement, nor any rights or interest hereunder, shall be assignable by any such corporation without the prior written consent of Parent.

13.    **Application of Agreement**.  As to the Subsidiaries, this Agreement shall be applicable to the taxable period of the Group ending December 31, 2010, and to each taxable period thereafter, so long as a consolidated federal income tax return is filed by Parent which includes a Subsidiary.  As to the Additional Subsidiaries, this Agreement shall be effective the first day of any taxable year during which any such Additional Subsidiary prepares separate financial statements for financial accounting purposes. The parties hereto specifically recognize that from time to time other companies may become members of the Group and hereby agree that such new members may become Additional Subsidiaries by executing the master copy of this Agreement that shall be maintained at Parent's headquarters.  It will not be necessary for all the other members to resign the Agreement, and instead the new member may simply sign the existing Agreement and it will be effective as if the old members had resigned.  Failure of one or more parties hereto to meet the definition of a member of the Group shall not operate to terminate this Agreement with respect to the other parties as long as two or more parties hereto continue so to qualify.  Upon effectiveness of this Agreement with respect to any Additional Subsidiary, such Additional Subsidiary shall be deemed a "Subsidiary" for all purposes of this Agreement.

14.    **Modifications**.  This Agreement may be modified or amended only pursuant to an instrument in writing executed by all the parties signatory hereto.

15.    **Entire Agreement**.  This Agreement constitutes the entire agreement among the parties relating to the allocation of the consolidated federal income tax liability of the Parent and the Subsidiaries between or among the parties.

16.    **Applicable Law**.  This Agreement shall constitute a contract governed and construed in accordance with the laws of the State of North Carolina.

17.    **Headings**.  The headings used in this Agreement are for convenience only and shall not in any way affect the meaning or interpretation of any provision hereof.

18.    **Multiple Copies**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall together constitute one Agreement.

- 11 -

9391891v3 22022.00010

[The remainder of this page was intentionally left blank.]

9391891v3 22022.00010

IN WITNESS WHEREOF, this Agreement has been executed and the corporate seals affixed hereto as of the date first above written.

ENPRO INDUSTRIES, INC.

By: _____ (SEAL)

Name: _____

Title: _____

GARRISON LITIGATION MANAGEMENT GROUP, LTD.

By: _____ (SEAL)

Name: _____

Title: _____

THE ANCHOR PACKING COMPANY

By: _____ (SEAL)

Signature Page to the Tax Sharing Agreement [S-1]

9391891v3 22022.00010

Name: _____

Title: _____


**GARLOCK INTERNATIONAL INC.**


By: _____ (SEAL)

Name: _____

Title: _____


**GARLOCK OVERSEAS CORPORATION**


By: _____ (SEAL)

Name: _____

Title: _____

- 14 -

GARLOCK SEALING TECHNOLOGIES LLC


By: _____ (SEAL)

Name: _____

Title: _____


COLTEC INDUSTRIES INC.


By: _____ (SEAL)

Name: _____

Title: _____


CORROSION CONTROL CORPORATION


By: _____ (SEAL)

Name: _____

Title: _____


Signature Page to the Tax Sharing Agreement [S-2]

9391891v3 22022.00010

**STEMCO LP**

BY:  COLTEC INDUSTRIES INC, ITS GENERAL PARTNER

By: _____ (SEAL)

Name: _____

Title: _____

**V.W. KAISER ENGINEERING, INCORPORATED**

By: _____ (SEAL)

Name: _____

Title: _____

- 16 -

**QFM SALES AND SERVICES, INC.**

By: _____ (SEAL)

Name: _____

Title: _____

**COLTEC INTERNATIONAL SERVICES CO.**

By: _____ (SEAL)

Name: _____

Title: _____

**GGB, INC.**

By: _____ (SEAL)

Name: _____

Title: _____

Signature Page to the Tax Sharing Agreement [S-3]

9391891v3 22022.00010

STEMCO HOLDINGS, INC.

By: _____ (SEAL)

Name: _____

Title: _____

COMPRESSOR PRODUCTS HOLDINGS, INC.

By: _____ (SEAL)

Name: _____

Title: _____

- 18 -

9391891v3 22022.00010

**COMPRESSOR SERVICES HOLDINGS, INC.**

By: _____ (SEAL)

Name: _____

Title: _____

**EXHIBIT C**

**MARKS**

# SafetyFirst



# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 17-BK-30140 |
| OLDCO, LLC, SUCCESSOR BY MERGER TO COLTEC INDUSTRIES INC, | Chapter 11 |
| Debtor. | |

**ORDER APPROVING (I) MAINTENANCE OF EXISTING BANK
ACCOUNT AND BANK ARRANGEMENTS, (II) CONTINUED
USE OF EXISTING BUSINESS FORMS, (III) INTERCOMPANY
TRANSACTIONS, (IV) LIMITED WAIVER OF DEPOSIT GUIDELINES,
(V) INVESTMENT OF EXCESS CASH, AND (VI) GRANT OF
ADMINISTRATIVE EXPENSE PRIORITY STATUS TO POST-PETITION
<u>INTERCOMPANY CLAIMS</u>**

Upon the Debtor's Motion for Order Approving (I) Maintenance of Existing Bank

Account and Bank Arrangements, (II) Continued Use of Existing Business Forms, (III)

Intercompany Transactions, (IV) Limited Waiver of Deposit Guidelines, (V) Investment of

Excess Cash, and (VI) Grant of Administrative Expense Priority Status to Post-Petition

Intercompany Claims (the "Motion"); and it appearing that the relief requested in the Motion is

in the best interests of Coltec,[1] its estate, its creditors and other parties in interest; and it

appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334;

and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157; and it appearing that

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion.

proper and adequate notice of the Motion has been given and that no other or further notice is

necessary; and upon the record herein; and upon consideration of the First Day Declaration; and

after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      Coltec is hereby authorized to continue using the Bank Account for all its

operations and expenses. Without limiting the generality of the foregoing, but subject to all of

the terms and conditions of this Order, Coltec is authorized to (a) designate, maintain, and

continue to use, with the same number, the Bank Account and (b) treat the Bank Account for all

purposes as an account of Coltec as debtor-in-possession.

3.      BOA is authorized to continue to service and administer the Bank Account for

Coltec as debtor-in-possession, without interruption and in the ordinary course of business, and

to receive, process, honor and pay any or all checks, drafts, wires or ACH transfers for the Bank

Account in accordance with this Order; provided, however, that no wire or ACH transfers

presented, issued, or drawn on the Bank Account before the Coltec Petition Date shall be

honored, unless (a) authorized by order of this Court; (b) not otherwise prohibited by a "stop

payment" request received by BOA from Coltec; and (c) supported by sufficient funds in the

Bank Account.

4.      The following Bank Arrangements are approved:

(a)      BOA is authorized to charge, and Coltec is authorized to pay or honor,

both prepetition and postpetition service and other fees, costs, charges and

expenses to which BOA may be entitled under the terms of and in

accordance with its contractual arrangements with Coltec.

2

(b)  BOA is authorized to "charge back" returned items to the Bank Account in the ordinary course of business.

(c)  BOA is authorized to accept and honor all representations from Coltec as to which wires or ACH transfers should be honored or dishonored consistent with any order of this Court and governing law, whether such wires or ACH transfers are dated before, on or after the Coltec Petition Date.

(d)  BOA shall not incur, and is hereby released from, any liability to any party on account of (i) following Coltec's instructions or representations as to any order of this Court, (ii) the honoring of any wires or ACH transfers in a good faith belief that the Court has authorized such wire or ACH transfer to be honored, or (iii) an innocent mistake made despite implementation of reasonable item-handling procedures.

5.    Notwithstanding anything to the contrary herein, in no event shall BOA be obligated to (a) honor payment item unless there are sufficient and collected funds in the Bank Account or (b) process any wire or ACH transfer except upon terms and conditions that are acceptable to BOA.

6.    Coltec and BOA are authorized to continue to perform pursuant to the terms of their pre-petition agreement relating to the Bank Account, except to the extent otherwise directed by the terms of this Order, and Coltec and BOA shall continue to enjoy the rights, benefits, privileges and remedies afforded them under such agreement except to the extent otherwise directed by the terms of this Order.

3

7.      Coltec may, without further order of this Court, agree to and implement changes to the Bank Account in the ordinary course of business.

8.      Coltec is hereby authorized to maintain and continue to use the Business Forms without reference to its debtor-in-possession status.

9.      Coltec is hereby authorized to continue engaging in the Intercompany Transactions in the ordinary course of business.

10.     Coltec is hereby authorized to proceed according to the Investment Policy.

11.     Cause exists for granting the Deposit Limited Waiver and such Deposit Limited Waiver is hereby approved.

12.     The Intercompany Claims shall be entitled to administrative expense priority status under sections 503(b)(1) and 364(b) of the Bankruptcy Code.

13.     To the extent applicable, notwithstanding Bankruptcy Rules 6003 and 6004(a) and (h), notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.     Nothing in this Order shall be deemed to prejudice the right of the U.S. Bankruptcy Administrator to file a motion to alter or amend this Order regarding the maintenance of the Bank Account, but the granting of any such motion shall have prospective effect only.

15.     Coltec is authorized and empowered to take such steps and perform such actions as may be necessary to implement and effectuate the terms of this Order.

16.     Any party may request that the Court reconsider entry of this Order by filing a motion for reconsideration within fourteen (14) days of service of this Order.

17.    This Court shall retain jurisdiction with respect to all matters relating to the

interpretation or implementation of this Order.

This Order has been signed electronically.  The judge's                    United States Bankruptcy Court
signature and court's seal appear at the top of the Order.

5