# SETTLEMENT FACILITY
# CLAIMS RESOLUTION PROCEDURES

**~~TABLE OF CONTENTS~~Table of Contents**

Page

# SECTION 1

# DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.1(a) | "Asbestos Claims Bar Date" | 1 |
| 1.1(b) | "Bankruptcy Court" | 2 |
| 1.1(c) | "Bystander Coltec/GST Product Contact" | 2 |
| 1.1(d) | "Claim" | 2 |
| 1.1(e) | "Claimant" | 2 |
| 1.1(f) | "Claimant Advisory Committee" or "CAC" | 2 |
| 1.1(g) | "Claim Form" | 2 |
| 1.1(h) | "Coltec/GST Product Contact" | 2 |
| 1.1(i) | "Coltec Products" | 2 |
| 1.1(j) | "Contact Group" | 2 |
| 1.1(k) | "Direct Claim" | 2 |
| 1.1(l) | "Direct Coltec Product Contact" | 3 |
| 1.1(m) | "Direct GST Product Contact" | 3 |
| 1.1(n) | "Entity" | 3 |
| 1.1(o) | "Expedited Claim Review" | 3 |
| 1.1(p) | "Extraordinary Claim" | 3 |
| 1.1(q) | "Extraordinary Claim Review" | 4 |
| 1.1(r) | "Foreign Claim" | 4 |
| 1.1(s) | "Future Claim" | 4 |
| 1.1(t) | "Future Claimants' Representative" or "FCR" | 4 |
| 1.1(u) | "GST Product(s)" | 4 |
| 1.1(v) | "Indirect Claim" | 4 |
| 1.1(w) | "Injured Party" or "IP" | 4 |
| 1.1(x) | "Matrix Amount" | 5 |
| 1.1(y) | "Maximum Annual Payment" | 5 |
| 1.1(z) | "Maximum Settlement Values" | 5 |
| 1.1(aa) | "Other Claims" | 5 |
| 1.1(bb) | "Petition Date" | 5 |
| 1.1(cc) | "Pre-Petition Judgment GST Asbestos Claim" | 5 |
| 1.1(dd) | "Present Claim" | 6 |
| 1.1(ee) | "Related" | 6 |
| 1.1(ff) | "Releasee" | 6 |
| 1.1(gg) | "Secondary Coltec/GST Product Contact" | 6 |
| 1.1(hh) | "Settled Claims Bar Date" | 6 |
| 1.1(ii) | "Settled GST Asbestos Claim" | 6 |
| 1.1(jj) | "Trust" | 7 |
| 1.1(kk) | "Trustee" | 7 |
| 1.1(ll) | "United States" | 7 |

**~~TABLE OF CONTENTS~~Table of Contents**
(continued)

Page

## SECTION 2

## OVERVIEW

| | | |
|---|---|---|
| 2.1 | CRP Goals | 7 |
| 2.2 | Compensable Diseases | 8 |
| 2.3 | Trustee's Determination of Maximum Settlement Values, Medical Information Factors and Maximum Annual Payment | 8 |
| 2.4 | Trust Claims Payment Ratio | 11 |

## SECTION 3

## ORDERING AND PROCESSING OF CLAIMS

| | | |
|---|---|---|
| 3.1 | Establishment of the FIFO Processing Queue | 13 |
| 3.2 | Processing of Claims | 13 |
| 3.3 | Payment of Claims | 13 |
| 3.4 | Same Day Liquidation | 14 |
| 3.5 | Resolution of Settled GST Asbestos Claims and Pre-Petition Judgment GST Asbestos Claims | 14 |

## SECTION 4

## OTHER CLAIM ISSUES

| | | |
|---|---|---|
| 4.1 | Deceased or Incompetent Claimant | 16 |
| 4.2 | Hardship Claims | 17 |
| 4.3 | Second Disease (Malignancy) Claims | 17 |
| 4.4 | Conspiracy Theories | 18 |
| 4.5 | Foreign Claims | 18 |
| 4.6 | Worker's Compensation Claims | 18 |

## SECTION 5

## EFFECT OF STATUTES OF LIMITATIONS AND REPOSE AND ASBESTOS CLAIMS BAR DATE

| | | |
|---|---|---|
| 5.1 | Time-Barred Claims | 19 |
| 5.2 | Filing Deadline for Claims Subject to Bar Date | 19 |
| 5.3 | Filing Deadline for Claims Not Subject to an Asbestos Claims Bar Date | 20 |

**~~TABLE OF CONTENTS~~Table of Contents**
(continued)

Page

## SECTION 6

## SETTLEMENT REVIEW PROCESS

| | | |
|---|---|---|
| 6.1 | Claimant's Choice of Expedited Claim or Extraordinary Claim Review | 20 |
| 6.2 | Expedited Claim Review and Extraordinary Claim Review Distinguished | 20 |
| 6.3 | Payment of Claims Accepting Settlement Offers | 21 |
| 6.4 | Submission Requirements | 21 |
| 6.5 | Threshold Requirements for All Claimants | 21 |
| 6.6 | Medical Requirements for All Claimants | 22 |
| 6.7 | Coltec/GST Product Contact Requirement for All Claimants | 25 |
| | 6.7(a)   Coltec/GST Product Contact | 25 |
| | 6.7(b)   Documentation of Coltec/GST Product Contact | 26 |
| | 6.7(c)   Site List Limitations | 27 |
| 6.8 | Additional Documentation and Information for Extraordinary Claim Review | 27 |
| | 6.8(a)   Requirement to Identify Other Claims | 27 |
| | 6.8(b)   Information Required About Other Claims | 28 |
| | 6.8(c)   Authorization for Release of Information | 28 |
| | 6.8(d)   Attorney or Claimant Certification | 29 |
| | 6.8(e)   Individual Claimant Certification | 29 |
| 6.9 | Releases | 29 |

## SECTION 7

## RELIABILITY OF CLAIM INFORMATION

| | | |
|---|---|---|
| 7.1 | Reliable Information | 30 |
| 7.2 | Copies | 30 |
| 7.3 | Unreliable Information | 31 |

## SECTION 8

## CLAIM FORMS AND FEES

| | | |
|---|---|---|
| 8.1 | Claim Forms | 31 |
| 8.2 | Claim Fees | 32 |

## SECTION 9

## DEFERRALS, WITHDRAWALS, ARBITRATION AND LITIGATION

| | | |
|---|---|---|
| 9.1 | Deferrals and Deficiencies | 32 |

TABLE OF CONTENTSTable of Contents
(continued)

Page

9.2     Withdrawals .................................................................................................... 33
9.3     Establishment of ADR Procedures ................................................................. 33
9.4     Claims Eligible for Arbitration ...................................................................... 34
9.5     Limitations on and Payment of Arbitration Awards ..................................... 34
9.6     Suits in the Tort System ................................................................................. 35
9.7     Payment of Judgments for Money Damages .................................................. 35
9.8     Punitive Damages ........................................................................................... 36

## SECTION 10

## INDIRECT CLAIMS

10.1    Indirect Claims .............................................................................................. 36
10.2    Presumptively Valid Indirect Coltec/GST Asbestos Claims ......................... 37
        10.2(a)   Not Disallowed .............................................................................. 37
        10.2(b)   Payment of and Release by Direct Claimant ................................. 37
        10.2(c)   Establishing Indirect Claim ........................................................... 37
10.3    Otherwise Valid Indirect Claims ................................................................... 38
10.4    Processing and Payment of Indirect Claims .................................................. 38

## SECTION 11

## AUDITS

11.1    Audit Program ................................................................................................ 39
11.2    Inconsistent Information ................................................................................. 39
11.3    Fraud .............................................................................................................. 40

## SECTION 12

## MISCELLANEOUS

12.1    Medicare ......................................................................................................... 40
12.2    Insurance Document Requests ....................................................................... 41
12.3    Confidentiality of Claimant Submissions ...................................................... 42
12.4    No Attorney Necessary ................................................................................... 42
12.5    Consent and Consultation Procedures ........................................................... 42
12.6    Amendments ................................................................................................... 43
12.7    Severability .................................................................................................... 44
12.8    Governing Law ............................................................................................... 44
12.9    Relation to Other Plan Documents ................................................................ 44

### SETTLEMENT FACILITY CLAIMS RESOLUTION PROCEDURES

These Claims Resolution Procedures ("**CRP**") were adopted as part of the Modified Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC, Proposed Successor by Merger to Coltec Industries Inc (the "**Plan**"). They set forth the requirements that Claimants must meet to receive payments from the GST Settlement Facility (the "**Settlement Facility**"). The Asbestos Trustee (the "**Trustee**") will administer these CRP consistent with the terms set forth herein and the terms of the Plan and the Asbestos Trust Agreement (the "**Settlement Facility Agreement**"). The Settlement Facility expressly assumes all liabilities and responsibilities for the Claims, as defined below, and the Reorganized Debtors shall have no further financial or other responsibility or liability therefor.

### Section 1

### Definitions

1.1    **Definitions** The following defined terms apply. All capitalized terms used but not defined here shall have the meanings given to such terms in the Plan.

1.1(a)    **"Asbestos Claims Bar Date"** means, as applicable, either (a) October 6, 2015, the date by which, as ordered by the Bankruptcy Court, unliquidated GST Asbestos Claimants with diagnoses of asbestos-related diseases pre-dating August 1, 2014 must have filed a claim with the Bankruptcy Court to avoid the risk of being barred from asserting claims against the Debtors or (b) _____, 2016, the date by which, as ordered by the Bankruptcy Court, unliquidated Coltec Asbestos Claimants (who are not GST Asbestos Claimants) with diagnoses of asbestos-related diseases pre-dating August 1, 2014 must have filed a claim with the Bankruptcy Court to avoid the risk of being barred from asserting claims against Coltec.

1.1(b)   **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of North Carolina.

1.1(c)   **"Bystander Coltec/GST Product Contact"** means the Injured Party's performance of job duties on a regular basis in close proximity to a worker who is performing activities that qualify as Direct Coltec Product Contact or Direct GST Product Contact in a time frame that is reasonably contemporaneous.

1.1(d)   **"Claim"** means a Direct Claim or an Indirect Claim.

1.1(e)   **"Claimant"** means an Entity asserting a Claim.

1.1(f)   **"Claimant Advisory Committee" or "CAC"** means a committee established pursuant to the Settlement Facility Agreement to represent the interests of holders of present Coltec Asbestos Claims and holders of present GST Asbestos Claims.

1.1(g)   **"Claim Form"** means the information and documents that the Claimant is required to submit to the Settlement Facility to initiate processing of his or her Claim.

1.1(h)   **"Coltec/GST Product Contact"** means Direct Coltec Product Contact, Direct GST Product Contact, Bystander Coltec/GST Product Contact and Secondary Coltec/GST Product Contact or any combination of the four.

1.1(i)   **"Coltec Products"** means asbestos-containing products supplied or manufactured by Coltec.

1.1(j)   **"Contact Group"** means one or more of the five contact groups to which an Injured Party is assigned pursuant to the provisions of Appendix I hereto.

1.1(k)   **"Direct Claim"** means a claim asserted by a person seeking a remedy for personal injury or wrongful death caused by exposure to asbestos fibers or dust in Coltec Products and/or GST Products that is channeled to the Settlement Facility.

2

1.1(l) **"Direct Coltec Product Contact"** means the Injured Party's hands-on performance of one of the following workplace activities on a regular basis: (a) grinding, scraping or wire brushing of asbestos gaskets contained in a Coltec Product in the removal process; (b) cutting individual gaskets from asbestos sheet material for installation in a Coltec Product; or (c) cutting or removal of asbestos packing contained within a Coltec Product.

1.1(m) **"Direct GST Product Contact"** means the Injured Party's hands-on performance of one of the following workplace activities on a regular basis: (a) grinding, scraping or wire brushing of Garlock asbestos gaskets in the removal process; (b) cutting individual gaskets from Garlock asbestos sheet material; or (c) cutting or removal of Garlock asbestos packing.  The Bankruptcy Court found that these activities cause the release of asbestos fibers or dust from Garlock Products, many of which products were encapsulated and therefore were not friable and did not release asbestos fibers or dust on contact unless ground, scraped, brushed or cut.

1.1(n) **"Entity"** means any person, individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, the Bankruptcy Administrator or any governmental unit or any political subdivision thereof.

1.1(o) **"Expedited Claim Review"** means the process for determining Matrix Amounts (settlement offers for qualified Claimants) as set forth in Appendix I to these CRP.

1.1(p) **"Extraordinary Claim"** means a malignant Claim that meets the exposure and medical criteria set forth in Appendix I and that is with respect to an Injured Party who credibly documents (a) a history of extraordinary Coltec/GST Product Contact with little or

3

no exposure to asbestos from other Entities' products and (b) there has not been and there is little likelihood of a substantial recovery elsewhere.

1.1(q)  **"Extraordinary Claim Review"** means the process for determining Matrix Amounts (settlement offers for qualified Claimants) as set forth in Appendix II to these CRP.

1.1(r)  **"Foreign Claim"** means a Claim based on alleged exposure to asbestos fibers or dust from Coltec Products and/or GST Products that occurred outside of the United States and its territories and possessions with respect to Injured Parties who are not United States citizens or permanent residents.

1.1(s)  **"Future Claim"** means a Claim based on a medical diagnosis dated after the Effective Date.

1.1(t)  **"Future Claimants' Representative" or "FCR"** means Joseph W. Grier, III (or any duly appointed successor), who was appointed to represent the interests of holders of Future Coltec Asbestos Claims in the Order [details to come] and holders of Future GST Asbestos Claims in the Order Granting Debtors' Motion for Appointment of Joseph W. Grier, III as Future Asbestos Claimants' Representative [Docket No. 512].

1.1(u)  **"GST Product(s)"** means asbestos-containing products supplied or manufactured by GST.

1.1(v)  **"Indirect Claim"** means a claim that is asserted as a third-party indemnification, contribution, subrogation or similar claim by an Entity that has paid the Holder of a Direct Claim to which the Settlement Facility would otherwise have had an obligation.

1.1(w)  **"Injured Party" or "IP"** means the individual whose alleged injury is the subject of the Claim.

1.1(x)  **"Matrix Amount"** means the settlement offer determined under Expedited Claim Review or Extraordinary Claim Review.

1.1(y)  **"Maximum Annual Payment"** means the amount of cash allocated by the Trustee, pursuant to the provisions of Section 2.3 hereof, to each year of the life of the Settlement Facility to achieve the goal of paying settlement amounts to holders of Present and Future Claims that are as equal as possible.

1.1(z)  **"Maximum Settlement Values"** means the maximum settlement values set forth in the chart in Appendix I for the five Contact Groups.

1.1(aa) **"Other Claims"** means claims for compensation against Entities other than OldCo, LLC, successor by merger to Coltec Industries Inc ("Coltec"), Garlock Sealing Technologies LLC ("GST") or Garrison Litigation Management Group, Ltd. ("GLM") that relate directly or indirectly to the alleged injuries that are the subject of a Claim.

1.1(bb) **"Petition Date"** means June 5, 2010.

1.1(cc) **"Pre-Petition Judgment GST Asbestos Claim"** means a Claim against a Debtor evidenced by a written judgment entered before the Petition Date that was not yet subject to a Final Order as of the Confirmation Date and was timely filed by the applicable Asbestos Claims Bar Date, which Claim is listed on Appendix VII.  If the holder of a Claim against a Debtor evidenced by a written judgment entered before the Petition Date that was not yet subject to a Final Order as of the Confirmation Date failed to submit such Claim to the Bankruptcy Court prior to the applicable Asbestos Claims Bar Date but obtains relief from the Bankruptcy Court for the Claim to be deemed timely filed, then such Claim shall be added to Appendix VII and included within the definition of a Pre-Petition Judgment GST Asbestos Claim.

1.1(dd)**"Present Claim"** means a Claim based on a medical diagnosis dated on or prior to the Effective Date.

1.1(ee) **"Related"** means, with respect to a Coltec Asbestos Claim and/or a GST Asbestos Claim, all Coltec Asbestos Claims and GST Asbestos Claims based on a particular Injured Party's injury (such as Claims by the Injured Party, his or her estate, and family members for loss of consortium, wrongful death, or similar related Claims).

1.1(ff) **"Releasee"** means any entity or person released under the form of Settlement Release attached hereto as Appendix III.

1.1(gg)**"Secondary Coltec/GST Product Contact"** means regular contact with asbestos fibers or dust from Coltec Products and/or GST Products through contact with someone who had Direct Coltec Product Conduct, Direct GST Product Contact or Bystander Coltec/GST Product Contact. The Claimant must demonstrate that the occupationally exposed person experienced Direct Coltec Product Contact, Direct GST Product Contact or Bystander Coltec/GST Product Contact.

1.1(hh)**"Settled Claims Bar Date"** means September 30, 2014, the date by which, as ordered by the Bankruptcy Court, Settled GST Asbestos Claims must have filed a claim with the Bankruptcy Court to avoid the risk of being barred from asserting such claims against the Debtors.

1.1(ii) **"Settled GST Asbestos Claim"** means a Claim based on a settlement agreement listed on Appendix VI marked as liquidated (a Claim as to which the holder and the Debtors agree that the applicable settlement agreement is enforceable) or disputed (a Claim as to which the holder and the Debtors disagree as to the enforceability of the settlement agreement). All Settled GST Asbestos Claims listed on Appendix VI were filed by the Settled Claims Bar

Date or were identified as undisputed in the Debtors' [filed Plan] schedules.  If the holder of a

Claim that, as of the Petition Date, was subject to a settlement agreement enforceable under

applicable law between GST and the holder of such Claim, failed to submit such Claim to the

Bankruptcy Court prior to the Settled Claims Bar Date but obtains relief from the Bankruptcy

Court for such Claim to be deemed timely filed, then such Claim shall be added to Appendix VI

and included within the definition of Settled GST Asbestos Claim.

      1.1(jj)  **"Trust"** means a post-confirmation organization established pursuant to a

plan of reorganization under the Bankruptcy Code to assume and pay the asbestos-related

liability of a debtor.

      1.1(kk)**"Trustee"** means the trustee for the Settlement Facility identified in the

Settlement Facility Agreement (or any duly appointed successor).

      1.1(ll)  **"United States"** means the United States of America and its political

subdivisions, including states, territories, commonwealths, possessions, and now-existing

compacts of free association (namely, those with the Federated States of Micronesia, the

Marshall Islands, and Palau), as well as all ships and vessels of the United States Navy, the

United States Coast Guard, or any other branch of the armed services of the United States of

America.

## Section 2

## Overview

2.1    **CRP Goals**. The CRP are designed and shall be implemented by the Trustee to

the best of his or her ability to (a) generate settlement offers to Claimants that are fair,

expeditious and properly reflective of the injuries allegedly caused to the Injured Parties by

exposure to asbestos fibers or dust from Coltec Products or GST Products, many of which were

encapsulated and (b) ensure that over the life of the Settlement Facility, Present and Future Claims are treated fairly and equitably in all matters, including the payment of settlement amounts from the Settlement Facility that are as equal as possible.  Subject to Section 4.3 hereof, the holder of a Claim may only seek compensation from the Settlement Facility for one Claim with respect to an Injured Party, regardless of whether the Injured Party was exposed to both Coltec Products and GST Products.

2.2    **Compensable Diseases**. These CRP compensate the following diseases: malignant mesothelioma, asbestos-related cancers (lung, colo-rectal, laryngeal, esophageal, pharyngeal, or stomach), severe asbestosis, disabling asbestosis, and non-severedisabling asbestosis.  To be compensated, Claimants must satisfy medical requirements for their particular disease and credibly demonstrate that they were exposed to asbestos fibers or dust from Coltec Products or GST Products.  If the medical and exposure requirements are satisfied, then the amount that the Claimant is eligible to receive (the Matrix Amount) is determined through the use of published and objective formulas in Appendix I (Expedited Claim Review) and Appendix II (Extraordinary Claim Review), based on the individual characteristics of the Injured Party, such as occupation, industry, disease, age, life status, number of dependents, economic loss, duration of exposure to asbestos in Coltec Products and/or GST Products, jurisdiction (in the case of Present Claims), and law firm (in the case of Present Claims).

2.3    **Trustee's Determination of Maximum Settlement Values, Medical Information Factors and Maximum Annual Payment.** The ACC and the FCR previously agreed to preliminary Maximum Settlement Values and Medical Information Factors for disclosure statement purposes only.  Before any payment is made, however, the Trustee shall, in a prudent and conservative manner, independently determine the Maximum Settlement Values

8

and Medical Information Factors, in addition to determining the Maximum Annual Payment, recognizing in all cases the express goal of these CRP that, over the life of the Settlement Facility, Present and Future Claims are to be treated fairly and equitably in all matters, including the payment of settlement amounts from the Settlement Facility that are as equal as possible. The Medical Information Factor for malignant mesothelioma shall in no instance be less than 1.

In determining the Maximum Settlement Values, the Medical Information Factors and the Maximum Annual Payment, the Trustee shall consult with the FCR and the CAC and consider, among other things, the number and disease types of Present Claims, the number of Present Claims that are time-barred, the projected number and disease types of Future Claims, the available fund to pay Settled GST Asbestos Claims, the Pre-Petition Judgment GST Asbestos Claims, the Claims Payment Ratio, the value and liquidity of assets then available to the Settlement Facility for the payment of Claims, anticipated future returns on such assets, all anticipated administrative and legal expenses, an appropriate reserve to allow for unexpected Claims and possible forecasting errors, and any other material matters that are reasonably likely to affect the sufficiency of funds to provide equal treatment to all holders of Present and Future Claims. In addition, in setting the Medical Information Factors, the Trustee, if he or she deems such information relevant or useful, in his or her sole discretion, may consider the historical relationships among the various disease levels in the tort system with respect to recoveries.

In determining the Maximum Settlement Values, the Medical Information Factors and the Maximum Annual Payment, to the fullest extent provided by the Plan and any orders entered by the Bankruptcy Court, the Trustee shall have access to and may rely upon, among other things, the Debtors' various claims databases, including information provided in response to

9

each Asbestos Claims Bar Date, the Settled Claims Bar Date and the Debtors' questionnaires, and the forecasting models and estimates of the Debtors, the ACC and the FCR.

Each of the FCR and the CAC has the right to challenge the Trustee's determination of the Maximum Settlement Values, the Medical Information Factors and the Maximum Annual Payment, which dispute shall be governed by the Settlement Facility Agreement.

Once the Maximum Annual Payment is determined for a given year, the Settlement Facility's distributions to Claimants for each year shall not exceed that Maximum Annual Payment.

The Trustee shall be required to actively monitor the number of claims submitted, the number of claims paid, the Settlement Facility's costs and expenses and the Settlement Facility's available assets.  If the Trustee determines at any time, in his or her sole discretion, that Future Claims may not receive settlement amounts equal to those of Present Claims for any reason, including because more claims are submitted than were projected or asset values are lower than projected ("**Risk of Unequal Treatment**"), the Trustee shall immediately reduce the Maximum Settlement Values and/or the Maximum Annual Payment by an appropriate percentage after first consulting with the CAC and the FCR.  Once the Trustee determines there is a Risk of Unequal Treatment, all payments shall be frozen until the Trustee is satisfied the Maximum Settlement Values, the Maximum Annual Payment and/or the Medical Information Factors are adjusted properly.

The Trustee may only increase the Maximum Annual Payment, the Medical Information Factors and the Maximum Settlement Values with the consent of both the CAC and the FCR.  Any increase or decrease in the Maximum Settlement Values shall be the same percentage across all Maximum Settlement Values absent the consent of both the CAC and the FCR.

In addition to the adjustments described above, commencing on the second January 1 to occur after the Settlement Facility commences paying Claims, and annually thereafter, the Trustee shall adjust the Maximum Settlement Values by the amount of any upward change over the prior year in the Consumer Price Index for all Urban Consumers ("**CPI-U**") published by the United States Department of Labor, Bureau of Labor Statistics.

If the Maximum Settlement Values are increased over time, other than as the result of an inflation adjustment, Claimants who have previously been paid by the Settlement Facility will receive a proportional additional payment unless the Trustee, after consultation with the CAC and the FCR, concludes that the amount is so modest (such as less than $100.00) and the administrative costs and burdens are so great in comparison to the benefit to the subject Claimant that such additional payment should be deferred.

In the event there are insufficient funds in any year to pay the liquidated Claims, the available funds shall be paid to the maximum extent to Claimants based on their place in the FIFO Payment Queue described below. Claims for which there are insufficient funds will be carried over to the next year where they will be placed at the head of the FIFO Payment Queue. If there are excess funds because there was an insufficient amount of liquidated Claims to exhaust the respective Maximum Annual Payment amount, then the excess funds will be rolled over.

2.4     **Trust Claims Payment Ratio.** The Claims Payment Ratio for the various disease categories shall be (i) 85% for "Category A" Claims, which consist of Claims involving malignant mesothelioma, (ii) 10% for "Category B" Claims, which consist of Claims involving ~~non-mesothelioma malignancies and severe asbestosis~~lung cancer and (iii) 5% for "Category C" Claims, which consist of claims involving ~~non-severe~~colo-rectal cancer, laryngeal cancer,

esophageal cancer, pharyngeal cancer, stomach cancer, severe asbestosis, disabling asbestosis, and non-disabling asbestosis (Category A, Category B and Category C shall be referred to herein as "**Disease Categories**"); provided, however, that all Foreign Claims, as defined in Section 4.5, that are paid by the Settlement Facility shall be placed in Category C notwithstanding the Injured Party's disease level. The Trustee shall apply the Claims Payment Ratio to the Maximum Annual Payment to determine the amount of money available in such year to compensate Claims that fall into each of the Disease Categories.

In the event there are insufficient funds in any year to pay the Claims within any or all of the Disease Categories, the available funds within the particular Disease Category shall be paid to the maximum extent to Claimants in the particular Disease Category based on their place in the FIFO Payment Queue described below. Claims for which there are insufficient funds will be carried to the next year where they will be placed at the head of the FIFO Payment Queue. If there are excess funds in a Disease Category because there was an insufficient amount of liquidated Claims to exhaust the Maximum Annual Payment amount for that Disease Category, then the excess funds for such Disease Category will be rolled over and remain dedicated to the respective Disease Category to which they were originally allocated, so long as the Claims Payment Ratio remains in place.

The Trustee shall not amend the Claims Payment Ratio for five (5) years after the Settlement Facility first makes Claim Forms available and provides notice of such date on its website. Following the expiration of that five (5) year initial period, the Trustee may, with the consent of both the CAC and the FCR, amend the Claims Payment Ratio but only to prevent manifest injustice. An increase in the number of Category B and Category C Claims beyond those predicted or expected shall not constitute manifest injustice. If the Trustee amends the

Claims Payment Ratio, as part of such amendment, the Trustee may, with the consent of both the CAC and the FCR, transfer excess funds in a Disease Category to another Disease Category with insufficient funds.  In the situation where there are excess funds for a Disease Category, the Trustee may instead, with the consent of both the CAC and the FCR, make adjustments that result in increased payments to the holders of Claims in such Disease Category.

## Section 3

### Ordering and Processing of Claims

3.1    **Establishment of the FIFO Processing Queue**. The Settlement Facility will order Claims to be reviewed for processing purposes on a first-in, first-out ("FIFO") basis except as otherwise provided herein (the "**FIFO Processing Queue**"). A Claimant's position in the FIFO Processing Queue shall be determined according to the date that the Claim is filed with the Settlement Facility, with an earlier filing date being given priority over a later filing date. If any Claims are filed on the same date, the Claimant's position in the FIFO Processing Queue shall be determined by the date of diagnosis of the asbestos-related disease, with an earlier diagnosis date being given priority over a later diagnosis date.  A Claim shall be deemed filed on the date the Claimant places the Claim Form in the mail, or the date upon which the Claimant submits the Claim Form electronically.

3.2    **Processing of Claims**. The Settlement Facility will review its Claim files on a regular basis. The Settlement Facility shall, upon determining that a Claim qualifies for a settlement offer, tender to the Claimant an offer of payment of the amount determined under these procedures, together with a form of Settlement Release (as defined in the Plan).  The form of Settlement Release is attached hereto as Appendix III.

13

3.3     **Payment of Claims**. Claims shall be paid in FIFO order based on the date the Settlement Facility received the Settlement Release (the "**FIFO Payment Queue**").

3.4     **Same Day Liquidation**. If any Claims are liquidated on the same date, each such Claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of such Claimant's asbestos-related disease, with earlier diagnosis dates given priority over later diagnosis dates, and older claimants given priority over younger claimants if they were diagnosed on the same date.

3.5     **Resolution of Settled GST Asbestos Claims and Pre-Petition Judgment GST Asbestos Claims.**   In order to receive payment from the Settlement Facility, the holder of a Settled GST Asbestos Claim or a Pre-Petition Judgment GST Asbestos Claim must submit all documentation that the Trustee deems necessary to demonstrate to the Settlement Facility that the claim is in fact a Settled GST Asbestos Claim and eligible for payment under the terms of the applicable settlement agreement or a Pre-Petition Judgment GST Asbestos Claim that qualifies for payment hereunder.

The Trustee shall consult with the CAC and the FCR with respect to a Pre-Petition Judgment GST Asbestos Claim and may appeal or seek further review of such Judgment.  If the Settlement Facility is successful in such appeal or further review process, then such Claim shall not be payable by the Settlement Facility as a Pre-Petition Judgment GST Asbestos Claim.  The holder of such Claim may, however, submit such Claim to the Settlement Facility and be eligible for payment subject to all of the criteria contained herein with respect to non-Pre-Petition Judgment GST Asbestos Claims.

With respect to Settled GST Asbestos Claims, if the Debtors do not agree that the settlement is enforceable as indicated on Appendix VI hereto, the Claim is payable as a Settled

GST Asbestos Claim only if Settlement Facility determines that the settlement is enforceable under applicable law. Settled GST Asbestos Claims that were disallowed by the Bankruptcy Court as not settled may submit Claims to the Settlement Facility and be eligible for a payment subject to all of the criteria contained herein with respect to non-Settled GST Asbestos Claims.

Notwithstanding any other provision of these CRP to the contrary, all Settled GST Asbestos Claims and Pre-Petition Judgment GST Asbestos Claims must be submitted to the Settlement Facility within three (3) months after the Settlement Facility first makes Claim Forms available and provides notice of such date on its website. No Settled GST Asbestos Claim shall be paid until the expiration of such three-month period. A claimant may submit a Claim to the Settlement Facility pending receipt of relief from the Bankruptcy Court with respect to the Settled Claims Bar Date, but the Settlement Facility will not process any such Claim until the subject Claimant provides evidence that relief from the Bankruptcy Court has been obtained.

The liquidated value of a Settled GST Asbestos Claim or a Pre-Petition Judgment GST Asbestos Claim shall be the unpaid portion of the amount agreed to in the enforceable settlement agreement between GST and the holder of such Claim, the unpaid portion of the final judgment, or the unpaid portion of the amount awarded by the jury verdict or non-final judgment (as to which the Trustee elects not to appeal or seek further review), as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the settlement agreement, if any, or under applicable state law for settlements or judgments, as of the Petition Date; however, except as otherwise provided in Section 9.7 below, the liquidated value of such a Claim shall not include any punitive or exemplary damages. The liquidated amount of any such Claim shall be subject to a payment percentage to be determined by the Trustee after the Effective Date. The Trustee shall set the payment percentage such that the holders of the Settled GST Asbestos

15

Claims and the Pre-Petition Judgment GST Asbestos Claims receive the same percentage recovery as it is anticipated that other Claimants shall receive based on the estimated tort system value of the Claims channeled to the Settlement Facility and the assets available to pay such liabilities.  To calculate the payment percentage, the Trustee shall divide the present value of the assets that the Settlement Facility is expected to have available to pay Claims over the life of the Settlement Facility by the present value in the tort system of all Claims that are projected to be paid by the Settlement Facility over its lifetime.[1]

Holders of Settled GST Asbestos Claims and Pre-Petition Judgment GST Asbestos Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before submitting a Claim to the Settlement Facility.  Only in the event that such security or surety is insufficient to pay the Claim in full shall the deficiency be processed and paid by the Settlement Facility.  Any such deficiency shall be subject to the payment percentage.

A total fund of $10 million will be available to pay Settled GST Asbestos Claims (the "**Settled Claims Maximum**").  If the total amount paid by the Settlement Facility to Settled GST Asbestos Claims is less than the Settled Claims Maximum, the remaining surplus shall be made available to pay non-Settled GST Asbestos Claims within 60 days of the final liquidation of the last disputed Settled GST Asbestos Claim.

---

[1] For this purpose only, the present value of assets available to pay Claims shall be determined by subtracting the present value of the Settlement Facility's projected costs of administration and other expenses from the present value of the sum of the $480 million aggregate qualified settlement contributions that will be made by the Debtors and their Affiliates under the Plan and the investment income the Settlement Facility is anticipated to receive over the life of the Settlement Facility.

**Section 4**

**Other Claim Issues**

4.1 **Deceased or Incompetent Claimant**. Where the Claimant is deceased or

incompetent, if the settlement and payment of his or her Claim must be approved by a court of

competent jurisdiction prior to acceptance of an offer by the Claimant's representative, such

offer shall remain open so long as proceedings before that court remain pending, provided that

the Settlement Facility has been furnished with evidence that the settlement offer has been

submitted to such court for approval. If the offer is ultimately approved by that court and

accepted by the Claimant's representative, the Settlement Facility shall pay the Claim in the

amount so offered.

4.2 **Hardship Claims**. The Settlement Facility may liquidate and pay certain

qualified Claims that also qualify as Hardship Claims, as defined below, at any time. Such

Claims may be considered separately no matter what the order of processing otherwise would

have been under these CRP. A Hardship Claim, following its liquidation, shall be placed at the

head of the FIFO Payment Queue for its Disease Category for purposes of payment, subject to

the Maximum Annual Payment and Claims Payment Ratio described above. An otherwise

qualified Claim qualifies for payment as a "**Hardship Claim**" if (i) the Claim is an

asbestos-related malignancy claim, and (ii) the Trustee, in his or her sole discretion, determines

(a) that the Claimant needs financial assistance on an immediate basis based on the Claimant's

expenses and all sources of available income, and (b) that the Claimant's dire financial condition

is a result of the Claimant's asbestos-related disease.

4.3 **Second Disease (Malignancy) Claims**. The holder of a non-malignant

asbestos-related disease Claim (including the holder of such a claim that was settled and paid by

17

a Debtor prior to the formation of the Settlement Facility) may file a new Claim based on a malignant asbestos-related disease that qualifies for payment from the Settlement Facility if it is diagnosed after payment on the non-malignant Claim. The Settlement Release shall not require such a Claimant to release the subsequent disease Claim, and the Settlement Facility shall not enforce the provision of any release entered into with a Debtor releasing such a subsequent disease Claim. Any additional payments to which such Claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for such non-malignant Claim.

4.4     **Conspiracy Theories**. Claims based on conspiracy theories against the Debtors are not compensable under these CRP.

4.5     **Foreign Claims.** Foreign Claims are not compensable under these CRP unless the holder of a Foreign Claim files a lawsuit in the United States. If this occurs, the Settlement Facility shall process the holder's claim provided the holder complies with the requirements set forth herein. The holder of the Foreign Claim shall be required to submit to the Settlement Facility a filing fee pursuant to Section 8.2 hereof and information establishing, to the Trustee's satisfaction, that the Injured Party is suffering from one of the diseases described in Appendix I and that such Injured Party had at least six (6) months of Coltec/GST Product Contact. All information submitted to the Settlement Facility must be in English. If these requirements are met, the Settlement Facility shall determine the amount that the Claimant is entitled to receive based on the disease of the Injured Party. If the Injured Party is suffering from mesothelioma, the settlement amount shall be $100; if the Injured Party is suffering from asbestos-related lung cancer or severe asbestosis, the settlement amount shall be $50; if the Injured Party is suffering from asbestos-related other cancer or disabling asbestosis, the settlement amount shall be $25;

18

and if the Injured Party is suffering from non-~~severe~~disabling asbestosis, the settlement amount shall be $10.

4.6 **Worker's Compensation Claims**. If an Injured Party's Claim is based on exposure to asbestos fibers or dust while that Injured Party was an employee of a Debtor, all Workers Compensation insurance remedies must be shown to have been exhausted in good faith prior to the submission of a Claim to the Settlement Facility, and if there is any recovery under the Debtors' Workers Compensation insurance, the Settlement Facility shall not have any liability with respect to the Claim.

## Section 5

### Effect of Statutes of Limitations and Repose and Asbestos Claims Bar Date

5.1 **Time-Barred Claims.** No Claim will be entitled to any distribution from the Settlement Facility if it was time-barred as of the Petition Date.

5.2 **Filing Deadline for Claims Subject to Bar Date**. Claims subject to an Asbestos Claims Bar Date (i.e., those where the alleged disease was diagnosed prior to August 1, 2014) that were submitted to the Bankruptcy Court in compliance with such Asbestos Claims Bar Date must be submitted to the Settlement Facility within the later of (i) the statute of limitations applicable under non-bankruptcy law in the jurisdiction where a claim against a Debtor was filed or, if not filed, could have been timely and properly filed (including any extension of time by operation of 11 U.S.C. Section 108(c)), and (ii) two (2) years after the Settlement Facility first makes Claim Forms available and provides notice of such date on its website.

Claims that were subject to an Asbestos Claims Bar Date but that were not submitted to the Bankruptcy Court prior to such Asbestos Claims Bar Date are barred and not compensable under these CRP unless relief has been obtained from the Bankruptcy Court, in which case the

Claim must be submitted to the Settlement Facility within the deadline described in the previous paragraph.  A claimant may submit such Claim to the Settlement Facility pending receipt of relief from the Bankruptcy Court, but the Settlement Facility will not process any such Claim until the subject Claimant provides evidence that relief from the Bankruptcy Court has been obtained.

   5.3   **Filing Deadline for Claims Not Subject to an Asbestos Claims Bar Date**.

Claims not subject to an Asbestos Claims Bar Date (i.e., those where the alleged disease was diagnosed after August 1, 2014) must be filed within the later of (i) the statute of limitations applicable under non-bankruptcy law in the jurisdiction where a claim against a Debtor could have been timely and properly filed, including, but not limited to, any state where Coltec/GST Product Contact occurred, the Claimant's state of residence, and the state of North Carolina or any other state of a Releasee's residency or incorporation, (ii) two (2) years after the Settlement Facility first makes Claim Forms available and provides notice of such date on its website, and (iii) two (2) years after the date of diagnosis.

## Section 6

## Settlement Review Process

   6.1   **Claimant's Choice of Expedited Claim or Extraordinary Claim Review**.

Matrix Amounts pursuant to Expedited Claim Review and Extraordinary Claim Review are determined through the use of formulas set forth in Appendix I and II, respectively, to these CRP.  A Claimant may submit a Claim for Expedited Claim Review or, if the Claim is an Extraordinary Claim, Extraordinary Claim Review.

   6.2   **Expedited Claim Review and Extraordinary Claim Review Distinguished**.

Within Expedited Claim Review and Extraordinary Claim Review, Matrix Amounts are

calculated by reference to occupation, industry, disease, age, life status, number of dependents, economic loss, duration of Coltec/GST Product Contact, jurisdiction (in the case of Present Claims), and law firm (in the case of Present Claims). The manner in which these factors are determined and valued is detailed in Appendix I hereto. Only Claims satisfying the criteria set forth in Appendix I, as well as all other criteria in these CRP, are eligible for settlement offers under these CRP.

Expedited Claim Review requires less information than Extraordinary Claim Review as Claims submitted for Extraordinary Claim Review are subject to additional verification and documentation requirements. Only holders of Extraordinary Claims may seek Extraordinary Claim Review.

6.3     **Payment of Claims Accepting Settlement Offers**. If the Settlement Facility determines the Claim is eligible for payment under Expedited Claim Review or Extraordinary Claim Review (as applicable) and the Claimant executes the form of Settlement Release attached hereto as Appendix III, the Claim shall be placed in the FIFO Payment Queue following which the Settlement Facility shall disburse payment subject to the requirements of these CRP.

6.4     **Submission Requirements**. Whether a Claim is submitted under either Expedited Claim Review or Extraordinary Claim Review, it must meet threshold, medical, and Coltec/GST Product Contact requirements set forth below, and must be submitted with the information necessary to determine a settlement offer under either the Expedited Claim or Extraordinary Claim Review procedures described in Appendices I and II.

6.5     **Threshold Requirements for All Claimants**. To be eligible for a payment under these CRP, a Claimant must satisfy the following threshold requirements:

(a)     The Claimant (or the Claimant's predecessor) has not released the Claim against the Debtors, the Reorganized Debtors, the Settlement Facility, or

Reorganized Garrison (or had such Claim resolved by final judgment, dismissal, or order), subject to the exception for Second Disease Claims described in Section 4.3;

(b)    The Claimant has not obtained a judgment based on the asbestos-related injury alleged in the Claim that has been fully satisfied;

(c)    The Claim has not been disallowed by the Bankruptcy Court, except that Settled GST Asbestos Claimants whose Claims are disallowed by the Bankruptcy Court as not settled may nevertheless submit such Claims to the Settlement Facility and be eligible for a payment from the Settlement Facility, subject to all criteria contained herein;

(d)    The Claimant has not transferred his or her right to recover with respect to the Claim such that the Claim can be asserted by another person. (The fact that a Claimant has executed a "subrogation agreement" with a health insurer or that a statutory provision grants to any governmental entity rights of subrogation shall not be construed as a transfer of the Claimant's right to recover); and

(e)    The Claim is not barred under the terms of an Asbestos Claims Bar Date or the Settlement Claims Bar Date, as applicable, unless relief has been obtained from the Bankruptcy Court.

6.6    **Medical Requirements for All Claimants.** To be eligible for a payment under these CRP, all Claimants must support their Claims with the medical documentation described in Appendix I applicable to the condition they allege. All diagnoses must be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos and the diagnosis, or (ii) a history of exposure to asbestos fibers or dust sufficient to establish a 10-year latency period.  Such statement may take the form of information in the Injured Party's medical records or reports (i.e., exposure history).

Medical evidence provided in support of the Claim must be credible and consistent with recognized medical standards.  Each diagnosis must be made by a board-certified physician in an appropriate specialty, whose license and certification are not (or were not at the time of the diagnosis) on inactive status, to a level of reasonable medical probability.  Pulmonary function testing, where required, must be performed using equipment, methods of calibration, and

22

techniques that meet the lung function testing criteria adopted by the American Thoracic Society ("**ATS**") current as of the date the test is performed.[2]

Any diagnosis of asbestosis (including in connection with asbestos-related lung cancer or laryngeal cancer) must be made by (i) a board-certified pathologist, who personally reviewed the Injured Party's pathology, or (ii) a board-certified internist, pulmonologist, radiologist, or occupational medicine physician who actually examined the Injured Party or reviewed and listed relevant medical records, with findings contained in a narrative written report.

In assessing the reliability of any diagnosis, the Trustee may consider whether the diagnosis discusses the basis for the opinion and the reason for rejection of other reasonably possible diagnoses.

A finding by a physician that a Claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the Settlement Facility as a diagnosis.

With respect to all disease Claims, the Trustee may require, among other things, the submission of x-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, and results of medical examination or reviews of other medical evidence.

The Trustee must require that medical evidence submitted comply with recognized medical standards, including those regarding equipment, testing, methods, and procedures to assure that such evidence is reliable.

In the case of deceased Injured Parties, the Trustee may take into account the medical standards in place at the time of the subject test in evaluating the reliability of the evidence, and

_____

[2] Pulmonary function testing performed in a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations, or performed, reviewed, or supervised by a board-certified pulmonologist, internist, radiologist or occupational medicine physician shall be presumed to comply with ATS standards, and the Claimant may submit a summary report of the testing.  In all other cases, the Claimant must submit the full report of the testing; provided, however, that if the pulmonary function testing was conducted prior to the Effective Date of the Plan and the full report is not available, the Claimant must then submit a declaration signed by a board-certified pulmonologist, internist, radiologist or occupational medicine physician, in the form provided by the Settlement Facility, certifying that the pulmonary function testing was conducted in compliance with ATS standards.

at the Claimant's request, the Trustee may waive the board-certified requirements in the case of an otherwise qualified physician whose X-ray and/or CT scan readings are submitted for the deceased Injured Party.  The decision to waive this requirement in that circumstance shall be in the Trustee's sole discretion.

With respect to malignant mesothelioma, the Settlement Facility in assessing the reliability of a diagnosis may consider and request information concerning the following:

- Whether the pathologist or laboratory has performed a panel of appropriate (as of the time of the diagnosis) immunohistochemical stains on tumor tissue from a biopsy, and if not, whether there is good cause and whether the laboratory has instead performed a panel of appropriate immunohistochemical stains on a specimen obtained from cytology;

- Whether the pathological report identifies the morphologic form of the tumor; that is, whether the tumor is epithelial (also referred to as epithelioid), sarcomatous (also referred to as sarcomatoid), or mixed epithelial and sarcomatous (sometimes referred to as biphasic or bimorphic);

- Whether all treating physicians who expressed a diagnosis in the records concurred that the Injured Party had diffuse malignant mesothelioma;

- Whether there is an expert finding that the gross distribution of tumor in the Injured Party's thorax is typical of malignant pleural mesothelioma;

- Whether there is an expert finding that the gross distribution of tumor in the Injured Party's abdominal cavity is typical of malignant peritoneal mesothelioma;

- Whether there is a report by a board-certified radiologist documenting that the gross distribution of tumor based on CT scans or PET scans of the Injured Party's thorax is typical of malignant pleural mesothelioma; and

- Whether there is a report by a board-certified radiologist documenting that the gross distribution of tumor based on CT scans or PET scans of the Injured Party's abdominal cavity is typical of malignant peritoneal mesothelioma.

6.7   **Coltec/GST Product Contact Requirement for All Claimants.**

6.7(a)   **Coltec/GST Product Contact**. To be eligible for payment from the Settlement Facility, the Claimant must demonstrate to the Trustee's satisfaction that the Injured Party experienced Coltec/GST Product Contact, which Coltec/GST Product Contact could have credibly contributed to causing his or her asbestos-related condition. The Claim Form must require certification of the Claimant's belief in this regard and will set forth the specific exposure information required by the Settlement Facility, including the Injured Party's occupation or occupations. The Trustee may also require submission of other or additional evidence of Coltec/GST Product Contact when he or she deems it to be necessary.

All Claimants, other than malignant mesothelioma Claimants, must credibly demonstrate to the Trustee's satisfaction that the Injured Party had at least six (6) months of total Coltec/GST Product Contact during the Injured Party's career (or the career of the occupationally exposed person in the case of Secondary Coltec/GST Product Contact). Claims involving Injured Parties with malignant mesothelioma must credibly demonstrate Coltec/GST Product Contact to the Trustee's satisfaction, but there is no six-month minimum; however a shorter duration of Coltec/GST Product Contact will proportionately decrease the valuation of such a Claim. If an Injured Party's only Coltec/GST Product Contact is Secondary Coltec/GST Product Contact, the Settlement Facility shall only make a settlement offer if the Injured Party has been diagnosed with malignant mesothelioma. If the Claimant experienced Coltec/GST Product Contact while

confined to a ship at sea for fifty (50) days, the Settlement Facility shall consider the fifty (50)

days of exposure equivalent to six (6) months of total Coltec/GST Product Contact.

For all Coltec/GST Product Contact, Claimants must provide (i) identification (by name,

address or other description) of the residence(s), plant(s), ship(s), or commercial building(s),

and, if applicable, the city and state where Coltec/GST Product Contact allegedly occurred; (ii)

the month and year(s) Coltec/GST Product Contact began and ended; (iii) the Injured Party's

occupation, job title, and employer(s) at the time of Coltec/GST Product Contact (or, in the case

of Secondary Coltec/GST Product Contact, the occupation, job title, and employer(s) of the

occupationally exposed person at the time of Coltec/GST Product Contact); (iv) identification of

the type of Coltec Product and/or GST Product with which the Injured Party had contact; and (v)

the manner in which the Injured Party experienced Coltec/GST Product Contact.  If a Claimant

does not know the Injured Party's job title or employer for any period of time, he or she shall

explain the reason for the lack of knowledge, and the Trustee, based on the facts, may, in his or

her sole discretion, waive the requirement that such information be provided.

The Contact Groups for various occupations and industries are contained in Appendix IV

to these CRP.  The Contact Groups have been defined based on the assumed potential frequency

and intensity of contact with Coltec Products and/or GST Products.

6.7(b)  **Documentation of Coltec/GST Product Contact.** All information

required by 6.7(a), including particularly the Injured Party's occupation, must be evidenced by

(a) interrogatories, declarations, depositions, testimony, or other sworn statements verified or

made under penalty of perjury by a person who is competent to testify to the information

contained therein, providing sufficient background information to explain how such person

acquired the personal direct knowledge of such facts and allowing the Settlement Facility to

determine the credibility of the person making the sworn statement; or (b) other credible and authentic documents (such as, for example, union membership records, military records and social security records).   The Settlement Facility may request copies of other documents necessary for assessing the credibility of the allegation of Coltec/GST Product Contact, including copies of any interrogatory answers submitted by the Claimant or Injured Party in any asbestos litigation relating to the alleged asbestos-related injury.

6.7(c)   **Site List Limitations.** Evidence that Coltec Products and/or GST Products were used at a plant, facility, or other worksite where the Injured Party worked is, in and of itself, not sufficient to provide the showing required in this Section 6.7.

6.8   **Additional Documentation and Information for Extraordinary Claim Review**. To be eligible for a payment under these CRP, a Claim submitted for Extraordinary Claim Review must provide the following additional information:

6.8(a)   **Requirement to Identify Other Claims**. A Claimant seeking Extraordinary Claim Review must submit the information described in Section 6.8(b) about all Other Claims that relate in any way to the alleged injuries for which the Claimant seeks compensation. Other Claims about which information must be submitted include claims by the Claimant, the Claimant's decedent, and any present or past Holder of the Claim. Other Claims include, but are not limited to, the following: (a) lawsuits filed in any court, arbitration proceedings before any panel or tribunal, and administrative proceedings (such as Worker's Compensation claims) before any governmental or quasi-governmental body; (b) claims that were resolved or settled without the institution of litigation (such as pre-filing settlements reached after notification of the existence of a claim without the need to file a lawsuit); and (c)

claims that have been submitted in bankruptcy proceedings or to Trusts or claims resolution Entities that resulted from bankruptcy proceedings.

6.8(b)  **Information Required About Other Claims**. The Claimant shall submit the following information for each Other Claim: (a) the name of the Entity against whom the Other Claim was made, (b) the date of the Other Claim, and (c) the amounts of all payments received or to be received from the Entity to whom the Other Claim was submitted. The Claimant must also submit copies of any documents submitted to or served upon any such Entity containing information regarding the alleged Injured Party's contact with or exposure to asbestos or asbestos-containing products, including without limitation any claim forms submitted to Trusts (along with any attachments), ballots submitted by or on behalf of the Claimant in any bankruptcy case, and any discovery response filed or served in tort litigation. The Claimant shall also certify that, to the best of his knowledge, at that time, with the exception of the Other Claims that have been expressly disclosed and identified by the Claimant, no other Entity is known to the Claimant to be potentially responsible for the alleged injuries that are the basis of the Claim.

6.8(c)  **Authorization for Release of Information**. Any Claimant seeking Extraordinary Claim Review shall execute a release of information form in favor of the Settlement Facility, in the form attached as Appendix V, authorizing all Trusts against whom an Other Claim has been made or asserted based on the Injured Party's injury to release to the Settlement Facility all information submitted to it by the person or Entity who made the Other Claim and to disclose the status of any such claim and the amount and date of any payment on the claim. The release of information form shall authorize the Settlement Facility to obtain all submissions made by the Claimant or his heirs, executors, successors, or assigns in the future to

any Trust. The Settlement Facility may amend the form attached as Appendix V from time to time to add newly established Trusts. These authorizations will be used not only to verify information provided in connection with particular Claims but also in connection with the Settlement Facility's periodic audits for fraud.

6.8(d)  **Attorney or Claimant Certification.** If the Claimant seeking Extraordinary Claim Review (or any Related Claimant) is or has been represented by an attorney in any litigation or in the filing of Trust claims based on the injury that forms the basis for the Claim, the Claimant shall provide a certification under penalty of perjury of such attorney. The certification shall affirm that the attorney has fully investigated the alleged injuries that are the basis of the Claim, including conferring with any other attorneys who represent the Claimant with respect to claims against Trusts or any other Entity, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any Entity that is not identified in the Claim Form submitted to the Settlement Facility by the Claimant.

6.8(e)  **Individual Claimant Certification.** If the Claimant seeking Extraordinary Claim Review (or any Related Claimant) has not been represented by an attorney in any litigation or in the filing of Trust claims based on the injury that forms the basis for the Claim, the Claimant shall provide a certification under penalty of perjury that he or she has fully investigated the alleged injuries that are the basis of the Claim, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any Entity that is not identified in the Claim Form submitted to the Settlement Facility by the Claimant.

6.9  **Releases**. As a condition to making a payment to any Claimant, the Settlement Facility shall obtain from such Claimant a Settlement Release in the form attached hereto as Appendix III.  The protection afforded by such release is supplemental to, and does not derogate

29

from or imply any deficiency in, the protection provided by the Discharge Injunction and the

Asbestos Channeling Injunction.  The Trustee may modify the provisions of the Settlement

Release so long as he or she obtains the consent of the CAC, the FCR and the Reorganized

Debtors to the modifications.

## Section 7

## Reliability of Claim Information

7.1     **Reliable Information.** Although the Settlement Facility will not strictly apply

rules of evidence and authenticity standards, information provided in support of a Claim,

including evidence of Coltec/GST Product Contact, must be, at a minimum, reliable, meaningful

and credible so that the Trustee is fully informed regarding the foundations for facts asserted in

support of the Claim and is able to determine whether the Injured Party was exposed on a regular

basis to asbestos fibers or dust from Coltec Products and/or GST Products to the extent required

by the standards set forth in Appendix I for the Injured Party's Contact Group.   Medical

information submitted in support of a Claim must comply with recognized medical standards

(including, but not limited to, standards regarding equipment, testing methods, and procedures).

7.2     **Copies.** The Settlement Facility normally will accept copies, including electronic

copies, instead of authenticated copies of x-ray reports, laboratory tests, medical examinations,

and other medical records and reviews that otherwise comply with recognized medical and legal

standards unless circumstances indicate that the copies of the tests, reports, and/or review are not

authentic or are otherwise unreliable.   Further, the Settlement Facility normally will accept

copies, including electronic copies, instead of authenticated copies of deposition testimony,

union membership records, invoices, affidavits, business records, deck logs, military service

records (including leave records) or other credible indirect or secondary evidence in a form

30

otherwise acceptable to the Settlement Facility that establishes an Injured Party's occupation, occupational history, business or other losses, or the Injured Party's presence at a particular ship, facility, job site, building or buildings, or location during a time period in which the Coltec Product and/or GST Product was present, unless circumstances show that the information being submitted is unreliable.

7.3    **Unreliable Information.** The Trustee has sole discretion to exclude and disregard unreliable information.  Examples of unreliable information include, but are expressly not limited to, circumstances that raise questions of authenticity of copies or where persons preparing Claims or verifying facts offered in support of a Claim lack direct knowledge of such facts, but fail to reveal and describe what facts and how and from what sources they learned those facts, which they relied upon as the basis for their assertion of such facts. In deciding whether to exclude and disregard unreliable information, the Trustee shall consider, but not be strictly bound by, rules of evidence.  Rather, the Trustee shall instead exercise his or her discretion to determine whether the subject information is sufficiently probative.  If any Trust has rejected or will not consider any information submitted by a particular law firm or claimant or prepared by a particular doctor or expert, such information shall be deemed presumptively unreliable.

**Section 8**

**Claim Forms and Fees**

8.1    **Claim Forms**. The Trustee shall prepare suitable and efficient Claim Forms for all Claims consistent with these CRP, and after consulting with both the CAC and the FCR, shall post the materials to the Settlement Facility's website and provide such Claim Forms upon a written request to the Settlement Facility for such materials. The Claim Forms shall include such

instructions as the Trustee shall approve.   The Claimant must certify that all information submitted on the Claim Form, including occupation information, is truthful and accurate.   All Claim Forms shall be signed by the Claimant or the Claimant's representative, including the Claimant's attorney, under penalty of perjury and must include a contact address (which may be an attorney) at which the Claimant may receive notices from the Settlement Facility, including an email and street address. For any notices the Trust is required to send to Claimants under these CRP or the Plan, the Trust may serve the notice by email. The Trustee may subsequently modify any of the Claim Forms so long as (a) any modifications are consistent with the goals, principles and provisions of these CRP and (b) the Trustee consults with the CAC and the FCR with respect to the modifications.

8.2     **Claim Fees.** To be processed by the Settlement Facility, Claimants must submit the following filing fees:  (i) $100 for Category A Claims; (ii) $75 for Category B Claims; and (iii) $50 for Category C Claims.   The fees shall be refunded in full to a Claimant who receives and accepts payment of a settlement offer from the Settlement Facility.   At any time following the three-year anniversary of the date the Settlement Facility first makes Claim Forms available, the Trustee may amend the filing fees with the consent of both the CAC and the FCR. Notwithstanding anything contained herein, holders of Settled GST Asbestos Claims marked as liquidated on Appendix VI shall not be required to submit a filing fee to the Settlement Facility.

### Section 9

### Deferrals, Withdrawals, Arbitration and Litigation

9.1     **Deferrals and Deficiencies**. At any time within the first year following the date of the filing of a Claim, the Claimant can request that the processing of his or her Claim by the Settlement Facility be deferred for a period not to exceed one (1) year without affecting the

32

status of the Claim for statute of limitations purposes. When the Claimant certifies to the Settlement Facility that the Claim is ready for review, the Claim shall return to active status and be placed in the FIFO Processing Queue, and the Settlement Facility shall review the Claim when it is reached in the FIFO Processing Queue. If the Claimant fails to certify that the Claim is ready for review before the end of the one-year deferral period, such Claim shall be stricken and not be eligible for payment by the Settlement Facility.

After reviewing a Claim, the Settlement Facility shall either approve the Claim for payment or provide the Claimant with a list of deficiencies in the Claim Form that preclude a settlement offer. The Claimant shall have six (6) months in which to respond to these deficiencies to attempt to obtain a settlement offer. If the Settlement Facility does not receive a response within six (6) months, the Settlement Facility shall reject the Claim. There is no time limit within which a Claim must be either approved or rejected by the Settlement Facility, but a Claimant must respond to each deficiency notice received from the Settlement Facility within six (6) months to avoid a claim rejection. This provision will not preclude the assertion of Second Disease Claims. If a rejected Claim is re-submitted, it shall be required to pay a new filing fee.

9.2    **Withdrawals.** If a Claimant withdraws a Claim, such Claim will not be eligible for payment by the Settlement Facility.

9.3    **Establishment of ADR Procedures.** The Trustee, after consultation with the CAC and the FCR, shall establish binding and non-binding Alternative Dispute Resolution ("ADR") procedures for resolving disputes concerning Claims. The ADR Procedures shall, in the first instance, contain the following provisions with respect to the allocation of the costs associated with arbitration:  (a) if the Claimant elects non-binding arbitration, the costs associated with the arbitration and the arbitrator's fees shall be split 50/50 between the Claimant

33

and the Settlement Facility; and (b) if the Claimant elects binding arbitration, the Settlement Facility shall pay the costs associated with the arbitration and the arbitrator's fees.  The ADR procedures may be modified by the Trustee for good cause after consultation with the CAC and the FCR.  A Claimant whose Claim is eligible for arbitration may arbitrate disputes over whether a settlement offer should have been made on a Claim or not, and, if made, the amount of the settlement offer.  In all arbitrations, the arbitrator shall apply the requirements of these CRP.

9.4     **Claims Eligible for Arbitration.** Only Expedited Review Claims are eligible for arbitration.  In order for an Expedited Review Claim to be eligible for arbitration, the Claimant must first complete Expedited Claim Review, which shall be treated as completed for these purposes when the Claim has been reviewed by the Settlement Facility and either (i) the Settlement Facility has made a settlement offer on the Claim, the Claimant has rejected the settlement offer, and the Claimant has notified the Settlement Facility of the rejection in writing, or (ii) the Settlement Facility has rejected the Claim and notified the Claimant in writing.  The holder of a Settled GST Asbestos Claim or a Pre-Petition Judgment GST Asbestos Claim may seek arbitration to resolve any dispute concerning whether the Claim qualifies for payment hereunder.  The decisions of the Trustee and the Extraordinary Claim Review Panel concerning Extraordinary Claims are final and not subject to review in arbitration or the tort system.

9.5     **Limitations on and Payment of Arbitration Awards.** For an Expedited Claim Review Claim, the arbitrator shall not return an award in excess of the Maximum Settlement Value for the appropriate Contact Group under Expedited Claim Review after taking into account disease, with both the appropriate Contact Group and disease being determined by the arbitrator.  A Claimant who submits to arbitration and who accepts the arbitral award shall

34

receive payments in the same manner as one who accepts the Settlement Facility's original settlement offer.

9.6     **Suits in the Tort System.** If the holder of a disputed Claim disagrees with the Settlement Facility's determination regarding the Claim, and if the holder has first submitted the Claim to, and completed, non-binding arbitration as provided above, the holder may file a lawsuit against the Settlement Facility in any of the following jurisdictions:  (a) the jurisdiction in which the IP resided at the time of diagnosis; (b) any jurisdiction in which the IP experienced Coltec/GST Product Contact; (c) the jurisdiction in which the Claimant resided at the time the Claim was filed with the Settlement Facility; and (d) the state of North Carolina or any other state of a Releasee's residency or incorporation.  Any such lawsuit must be filed by the Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Settlement Facility, all defenses which could have been asserted by a Debtor) shall be available at trial.

9.7     **Payment of Judgments for Money Damages.** If and when a Claimant obtains a judgment in the tort system, the Claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the Claimant shall receive from the Settlement Facility an initial payment (subject to the Maximum Annual Payment and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Settlement Facility's last offer to the Claimant or (ii) the award that the Claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  Subject to the cap on payment set forth below, the Claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years

35

six (6) through ten (10) following the year of the initial payment (also subject to the Maximum Annual Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).  Under no circumstances shall interest be paid under any statute on any judgments obtained in the tort system.

The total amount paid with respect to a Claim shall not exceed the Maximum Settlement Value for the appropriate Contact Group under Expedited Claim Review after taking into account disease, with both the appropriate Contact Group and disease being determined by the court.  For example, if the court determines that the Claim is a Contact Group 2 Claim and the Injured Party's disease is mesothelioma, the total amount paid with respect to such Claim shall not exceed [————$44,400].

9.8  **Punitive Damages.** Except as provided below for Claims asserted under the Alabama Wrongful Death Statute, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be paid.  The only damages that may be awarded pursuant to these CRP to Alabama Claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania without regard to its choice of law principles.

## Section 10

## Indirect Claims

10.1  **Indirect Claims**. Indirect Claims shall be subject to the same options, categorization, evaluation, and payment provisions of these CRP as all other Claims, subject to the criteria in this Section.

10.2    **Presumptively Valid Indirect Coltec/GST Asbestos Claims**. Indirect Claims shall be treated as presumptively valid and paid by the Settlement Facility if they meet the following requirements.

10.2(a) **Not Disallowed**. Such Claim satisfied the requirements of the applicable Asbestos Claims Bar Date and is not otherwise disallowed by Section 502(e) of the Bankruptcy Code or subordinated under Section 509(c) of the Bankruptcy Code.

10.2(b) **Payment of and Release by Direct Claimant**. The Holder of such Claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the Holder of a Direct Claim for which the Settlement Facility would otherwise have had a liability or obligation under these CRP (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Settlement Facility from any liability to the Direct Claimant, and (iii) the Claim is not otherwise barred by a statute of limitation or repose or by other applicable law.

10.2(c) **Establishing Indirect Claim**. To establish a presumptively valid Indirect Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's Claim must also have been fixed, liquidated, and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Settlement Facility and all other parties referenced above) or a Final Order (as defined in the Plan) provided that such Claim is valid under applicable law. In any case where the Indirect Claimant has satisfied the Claim of a Direct Claimant against the Settlement Facility under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Settlement Facility a release in form and substance satisfactory to the Settlement Facility.

10.3    **Otherwise Valid Indirect Claims**. If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Settlement Facility with a full release of the Direct Claimant's Claim, the Indirect Claimant may request that the Settlement Facility review the Indirect Claim to determine whether the Indirect Claimant can establish under applicable law that the Indirect Claimant has paid all or a portion of a Direct Claim. If the Indirect Claimant can satisfactorily show that it has paid all or a portion of such a liability or obligation, the Settlement Facility shall process such Indirect Claim on the same basis as the Settlement Facility would have processed the underlying Direct Claim in the absence of payment by such Indirect Claimant to the Direct Claimant; provided, however, that if the Indirect Claim is submitted with respect to an asserted subrogation right, (a) such Indirect Claim shall not be processed until the relevant Direct Claim has been submitted to the Settlement Facility and approved and (b) if the Direct Claimant's law firm has entered into an agreement with respect to lien issues, the Settlement Facility shall abide by the lien resolution procedures provided for in such agreement. In no event shall the amount paid to the Indirect Claimant be greater than (a) the amount to which the Direct Claimant would have otherwise been entitled, or, if less, (b) the amount paid by such Indirect Claimant on account of such Direct Claim.

10.4    **Processing and Payment of Indirect Claims**. Indirect Claims that are entitled to payment from the Settlement Facility shall be processed and paid in accordance with procedures to be developed and implemented by the Settlement Facility consistent with the provisions of this Section 10, which procedures shall, consistent with the threshold requirements of this Section 10, provide the same Expedited Claim and Extraordinary Claim Review and payment

procedures and rights to the Holders of such Claims as the Settlement Facility would have afforded the Holders of the underlying Direct Claims.

## Section 11

### Audits

11.1   **Audit Program**. The Trustee, after consultation with the CAC and the FCR, shall develop methods for auditing the claims process, including, but not limited to, the evaluation, ordering, processing, and payment of Claims. The Trustee shall also develop methods for auditing Claims themselves, including, but not limited to (i) the reliability of medical evidence, including additional reading of x-rays, CT scans, and verification of pulmonary function tests; (ii) the reliability of evidence of Coltec/GST Product Contact, including, but not limited to, the identification of occupation and industry; (iii) the reliability of evidence of sources of asbestos exposure; and (iv) allocation of the costs of audits.  In developing audit methods, the Trustee may consider audit procedures adopted by other Trusts.  Once finalized, the Trustee's audit methods shall be implemented by the Settlement Facility.  In conducting an audit, the Trustee may request any relevant non-privileged information, in his or her discretion, including information concerning Other Claims, from a Claimant or Claimant's attorney.  The Trustee may require a Claimant whose Claim is being audited to execute a release of information form in favor of the Settlement Facility in the form attached as Appendix V.  If the Claimant refuses to provide information concerning Other Claims, the Trustee may, in his or her sole discretion, invoke the remedies in this Section 11.

11.2   **Inconsistent Information**. In the event that the Trustee reasonably determines that any individual or Entity has engaged in a pattern or practice of providing inconsistent or

unreliable medical or exposure evidence to the Settlement Facility, the Trustee shall decline to accept additional evidence from such provider.

      11.3    **Fraud**. In the event that an audit reveals that fraudulent information has been provided to the Settlement Facility, the Trustee shall penalize any Claimant or Claimant's attorney by rejecting the Claim or by other means including, but not limited to, (i) reordering the priority of payment of all affected Claimants' Claims; (ii) raising the level of scrutiny of additional information submitted from the same source or sources; (iii) refusing to accept additional evidence from the same source or sources; (iv) refusing to accept Claims filed by a particular law firm; (v) seeking the prosecution of the Claimant or Claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152; (vi) seeking sanctions from the Bankruptcy Court; (vii) filing complaints for disciplinary action with appropriate State Bar organizations; and (viii) requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits.

## Section 12

## Miscellaneous

      12.1    **Medicare**. Pursuant to the terms of the Settlement Facility Agreement, with respect to payments made by the Settlement Facility, the Settlement Facility shall act as reporting agent for any Entities determined to have a reporting obligation under 42 U.S.C. § 1395y et seq. or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto, including Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2008 (P. L. 110-173), or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection

therewith or relating thereto.   The Settlement Release shall contain provisions designed to protect the Settlement Facility from any Medicare reimbursement claims.

      12.2   **Insurance Document Requests.** In order to facilitate the collection by the Debtors and Coltec of insurance and to satisfy obligations under the Debtors' and Coltec's insurance funding and settlement agreements, the Settlement Facility shall provide to the Debtors, Coltec or any settling insurer identified by the Debtors or Coltec, promptly upon request, access to data and other information reasonably relating to Claims submitted to and accepted and paid by the Settlement Facility.   To this end, the Trustee shall make available for review, inspection and audit by such parties, at a mutually agreeable time, records, data and other information reasonably relating to payments made by the Settlement Facility for Claims. Such information shall include, to the extent available: (a) the Injured Party's name, address, social security number, date of birth and occupation; (b) the period of the Injured Party's exposure to asbestos-containing products manufactured or distributed by the Debtors or Coltec, including work site(s) and identification of the type of asbestos-containing product(s); (c) with respect to Extraordinary Claims, the period(s) of the Injured Party's exposure to the asbestos-containing products manufactured or distributed by other companies unrelated to the Debtors and Coltec; (d) the Injured Party's asbestos-related disease, including any medical diagnosis; (e) the date of the Injured Party's diagnosis with an asbestos-related disease; (f) if the Injured Party is deceased, the cause of death and name of his or her personal representative; and (g) amounts paid by the Settlement Facility to or on behalf of the Injured Party.   All data and information provided pursuant to this Section 12.2 shall be protected by an order or stipulation, so ordered by the Bankruptcy Court, protecting the confidentiality of such data and information

and restricting the uses thereof to the express purposes stated in this Section 12.2. The Trustee shall consult with the CAC and the FCR prior to providing the requested data and information.

12.3    **Confidentiality of Claimant Submissions**. All submissions to the Settlement Facility by Claimants, including any materials that the Settlement Facility receives as a result of the utilization of the release of information form attached hereto in Appendix V, shall be treated as confidential by the Settlement Facility. The Settlement Facility will take appropriate steps to preserve the confidentiality of such submissions. The Trustee shall disclose the Claimant submissions with the permission of the Claimant or in response to a valid subpoena. The Settlement Facility shall provide the Claimant or counsel for the Claimant with a copy of any such subpoena promptly after being served. Nothing in these CRP, the Plan or the Settlement Facility Agreement expands, limits or impairs the obligation under applicable law of a Claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of factual information to the Settlement Facility for the purpose of obtaining compensation for asbestos-related injuries from the Settlement Facility.

12.4    **No Attorney Necessary**. These CRP establish an administrative procedure for making defined payments to Claimants based on objective criteria. Furthermore, these CRP are designed so that Claimants can file their Claims without the assistance of an attorney. The Settlement Facility shall not require Claimants to retain an attorney in order to file Claims with the Settlement Facility. In addition, the Trustee shall administer these CRP so as to encourage and facilitate Claimants filing Claims without the assistance of an attorney.

12.5    **Consent and Consultation Procedures**. Pursuant to the Plan and Settlement Facility Agreement, these CRP will be administered by the Trustee and, where applicable, as set forth herein and in the Settlement Facility Agreement, in consultation with the CAC and the FCR

42

or upon having obtained their consent.  The initial Trustee, members of the CAC, and the FCR are identified in the Settlement Facility Agreement.

12.6   **Amendments**.  The Trustee, after consulting with the CAC and the FCR, may amend these CRP, including the appendices attached hereto; provided, however, that (a) if the consent of both the CAC and the FCR is required for the subject change pursuant to the provisions hereof or of any such appendices, the Trustee must first obtain such consent and (b) the Trustee may not change any provisions in these CRP or the appendices attached hereto that grant the CAC and the FCR consent or consultation rights without first obtaining the consent of both the CAC and the FCR.  The Settlement Facility Agreement sets forth further details, not inconsistent with these CRP, concerning amendments, including remedies if consent cannot be obtained.  Nothing herein is intended to preclude the CAC or the FCR from proposing to the Trustee amendments to these CRP.  Any amendments must continue to ensure holders of Present Claims and Future Claims are treated fairly and equitably and receive settlement payments that are as equal as possible.  Notwithstanding anything contained in these CRP or the Settlement Facility Agreement to the contrary, neither these CRP, the Settlement Facility Agreement, the Settlement Facility Bylaws nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 524(g) of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Asbestos Channeling Injunction or any other injunction or release issued or granted in favor of any (or all) of Asbestos Protected Persons in connection with the Plan or (iii) the Settlement Facility's qualified settlement fund status under the QSF Regulations.

12.7    **Severability**. Should any provision contained in these CRP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these CRP.

12.8    **Governing Law**. For all purposes, these CRP and their administration shall be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to its conflict of laws provisions.

12.9    **Relation to Other Plan Documents**. In the event that these CRP conflict with the Plan, the Plan shall control.   In the event these CRP conflict with the Settlement Facility Agreement, these CRP shall control.

## APPENDIX I: EXPEDITED CLAIM REVIEW

### Introduction

This Appendix describes how the Settlement Facility will calculate Matrix Amounts under Expedited Claim Review.

Under this process, the Settlement Facility will make settlement offers to qualifying Claimants based on the alleged Injured Party's ("IP") personal characteristics, the occupation in which they allege contact with Coltec Products and/or GST Products, and the time duration working in such occupation.

To qualify for a settlement offer under either Expedited Claim Review or Extraordinary Claim Review, the Claimant, other than a malignant mesothelioma Claimant, must demonstrate that the IP had at least six months of Coltec/GST Product Contact, as defined in the CRP, and must meet the medical criteria described herein and otherwise meet all the applicable medical requirements in the CRP, including those relating to the credibility of medical information.

### I.A    Occupation and Industry Groups

The Settlement Facility will determine the IP's Contact Group based on the IP's occupation and industry during which the IP had Coltec/GST Product Contact; provided, however, that for an IP with Secondary Coltec/GST Product Contact, the Settlement Facility will determine the IP's Contact Group based on the relevant occupationally exposed person's occupation and industry (as noted in the CRP, malignant mesothelioma is the only disease that the Settlement Facility will provide compensation for if all of the IP's exposure is Secondary Coltec/GST Product Contact).   The Contact Groups for each occupation and industry are contained in Appendix IV to these CRP.   Occupations and/or industries that would not give rise to exposure to Coltec/GST Product Contact are not listed in Appendix IV.   The Contact Groups

have been defined based on the assumed potential frequency and intensity of the IP's contact with asbestos-containing gasket or packing products, as follows:

Group 1: Occupations in which there is relatively high frequency of gasket or packing removal work.

Group 2: Occupations in which there is some gasket or packing removal work with significantly less frequency than in Group 1; close bystander contact from gasket or packing removal is likely.

Group 3: Gasket or packing removal work is not frequent; potential for bystander contact from gasket or packing removal exists, but is not frequent.

Group 4: Occasional bystander contact with gaskets or packing or extensive insulation exposure; job does not involve gasket or packing removal work, or minimal compared to Group 3; bystander contact from gasket or packing removal work is possible, but unlikely.

Group 5: Occupation is unlikely to be encountered or contact with gasket or packing removal is very unlikely.

The Settlement Facility will offer Claimants in each Contact Group a settlement no higher than the maximum settlement value allowed for the Contact Group (the "**Maximum Settlement Values**"):[3]

| Contact Group | Maximum Settlement Values |
|---------------|---------------------------|
| Group 1 | $[148,000] |
| Group 2 | $[44,400] |
| Group 3 | $[18,500] |
| Group 4 | $[9,250] |
| Group 5 | $[740] |

The Claimant's Expedited Claim Review settlement offer will be the Maximum Settlement Value for the Claimant's Contact Group multiplied by the IP Factors Index described below. The IP Factors Index varies based on the IP's disease and medical information, demographic characteristics, jurisdiction (in the case of Present Claims) (if the Claimant elects to

---

[3]  The Plan Proponents have agreed for Disclosure Statement purposes on the preliminary Maximum Settlement Values bracketed in the table above and to the preliminary Medical Information Factors bracketed elsewhere in these CRP.  The Trustee will ultimately determine the Maximum Settlement Values and Medical Information Factors.  See CRP Section 2.3.

document that factor), economic loss (if Claimant elects to report and document any), law firm (in the case of Present Claims) (if the Claimant elects to document that factor), and the length of time the IP spent in the activity or activities in which the IP experienced Coltec/GST Product Contact in the relevant Contact Group.

If the IP had Coltec/GST Product Contact in more than one Contact Group, then the Settlement Facility will calculate a separate settlement offer based on the IP's time in each Contact Group (taking into account all years in that Contact Group, whether in the same or different occupations and whether or not continuous) by calculating a separate IP Factors Index for each Contact Group and multiplying it by the Maximum Settlement Value for that Contact Group. The Settlement Facility will then offer the Claimant the highest settlement offer yielded by this calculation.

### I.B    Alleged Injured Party Factors Index

The Settlement Facility will calculate an IP Factors Index according to the rules set forth below.

#### I.B.1   Medical Information Factor

The Settlement Facility will assign a Medical Information Factor based on the following medical criteria (a Claim with respect to an IP who does not meet the medical criteria for any of the listed diseases shall receive a Medical Information Factor of 0).  Any increase in the Medical Information Factors shall require the consent of both the CAC and the FCR.  The Medical Information Factor for malignant mesothelioma shall in no instance be less than 1.

**Mesothelioma (Medical Information Factor = 1.0)**

1. Diagnosis of malignant mesothelioma by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of

Healthcare Organizations; provided, however, that if a Claimant can establish a compelling reason for the absence of such a pathology report, the Settlement Facility may elect, in its sole discretion, to accept a credible diagnosis based upon (i) a physical examination of the IP by a physician providing the diagnosis, which physical examination included a review by the physician of tests results relating to other possible explanations for the Injured Party's condition, or (ii) other credible evidence, including, but not limited to medical records demonstrating treatment of the IP based on a clinical diagnosis of malignant mesothelioma or a death certificate indicating the cause of death is malignant mesothelioma.

**Asbestos-Related Lung Cancer (Medical Information Factor = [~~——~~ 0.25])**

1. Diagnosis of primary lung cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, which diagnosis affirms that exposure to asbestos fibers or dust was a contributing factor in causing the IP's lung cancer; and

2. Either (a) diagnosis of asbestosis (see 3. below), (b) an elevated asbestos lung tissue fiber burden (see 4. below), or (c) a diagnosis of bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification (see 5. below).

3. A diagnosis of asbestosis must be by a board-certified pulmonologist, internist, radiologist or occupational medicine physician and must be supported by either pathology or radiology:

    a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982); and

    b. If by radiology, the Claimant must provide either (i) a roentgenographic interpretation report of a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2

chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater (Section 2B of the current NIOSH form), or   (ii) a written radiology report of a board-certified physician verifying that the Injured Party has a CT scan showing bilateral interstitial fibrosis together with a report from another physician that affirms that the bilateral interstitial fibrosis was caused by asbestos exposure.

4. An elevated asbestos lung tissue fiber burden must be documented by the report of a board-certified pathologist of a retained asbestos fiber burden determined by a laboratory employing procedures and the method of determining reference range values described in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982).  The laboratory findings must report either (a) a retained fiber count equivalent to at least one million fibers greater than five microns in length per gram of dry lung tissue (values reported as fibers greater than five microns in length per gram of wet lung tissue may be multiplied by a factor of ten to convert to dry lung tissue measurement) or (b) a retained fiber count within the reference range values of the testing laboratory for bona fide cases of asbestosis.

5. A diagnosis of bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification must be by a board-certified pulmonologist, internist, radiologist or occupational medicine physician and must be supported by either pathology or radiology:

a. If by pathology, a board-certified pathologist must diagnose bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification; and

b. If by radiology, the Claimant must provide either (i) a roentgenographic interpretation report of a NIOSH-certified B-reader or a board-certified physician verifying that the Injured Party has a quality 1 or 2 chest x-ray showing either bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification, or (ii) a written radiology report of a board-certified physician verifying that the Injured Party has a CT scan showing either bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification.

**Severe Asbestosis (Medical Information Factor = [~~——~~ 0.25])**

1. Diagnosis of ~~bilateral diffuse interstitial fibrosis of the lungs~~ asbestosis caused by inhalation of asbestos fibers or dust, by board-certified pulmonologist, internist, radiologist, or occupational medicine physician, based on either:

a. A quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing: bilateral small irregular opacities (s, t, or u) with a profusion grading of 2/1 ~~1/0~~ or higher; or

b. Pathological asbestosis graded 1(B) or higher under the criteria published in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982).

2. In addition to (1), asbestos-related pulmonary impairment, as demonstrated by pulmonary function testing showing either:

a. Forced vital capacity below ~~the lower limit of normal or below 80~~ 65 percent of predicted and FEV1/FVC ratio (using actual values) ~~at or above the lower limit of normal or at or~~ above 65 percent; or

b. Total lung capacity, by plethysmography or timed gas dilution, below ~~the lower limit of normal or below 80~~65 percent of predicted.

~~3. If the pulmonary impairment standards are not met, verification that the IP has a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 2/1 or higher.~~

**Asbestos-Related Other Cancer (Medical Information Factor = [~~———~~**0.10**])**

1. Diagnosis of colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, which diagnosis affirms that exposure to asbestos fibers or dust was a contributing factor to the Injured Party's cancer; and

2. Either (a) a diagnosis of asbestosis (see 3. below) or (b) a diagnosis of bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral calcification (see 4. below).

3. A diagnosis of asbestosis must be by a board-certified pulmonologist, internist, radiologist, or occupational medicine physician and must be supported by either pathology or radiology:

a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982); and

b. If by radiology, the Claimant must provide either (i) a roentgenographic interpretation report of a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater

I- 7

(Section 2B of the current NIOSH form) or (ii) a written radiology report of a board-certified physician verifying that the Injured Party has a CT scan showing bilateral interstitial fibrosis together with a report from another physician that affirms that the bilateral interstitial fibrosis was caused by asbestos exposure.

4. A diagnosis of bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification must be by a board-certified pulmonologist, internist, radiologist or occupational medicine physician and must be supported by either pathology or radiology:

a. If by pathology, a board-certified pathologist must diagnose bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification; and

b. If by radiology, the Claimant must provide either (i) a roentgenographic interpretation report of a NIOSH-certified B-reader or a board-certified physician verifying that the Injured Party has a quality 1 or 2 chest x-ray showing either bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification, or (ii) a written radiology report of a board-certified physician verifying that the Injured Party has a CT scan showing either bilateral pleural plaques, diffuse bilateral pleural thickening, or bilateral pleural calcification.

**~~Non-Severe~~Disabling Asbestosis (Medical Information Factor = [ ~~0.03~~ ])**

1. Diagnosis of bilateral diffuse interstitial fibrosis of the lungs caused by inhalation of asbestos fibers or dust, by board-certified pulmonologist, internist, radiologist, or occupational medicine physician, based on either:

a. A quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing: bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher;

b. A CT scan that has been read by a board-certified physician showing bilateral interstitial fibrosis; or

b. A CT scan that has been read by a board-certified physician showing bilateral interstitial fibrosis; or

c. Pathological asbestosis graded 1(B) or higher under the criteria published in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982).

2. In addition to (1), asbestos-related pulmonary impairment, as demonstrated by pulmonary function testing showing either:

a. Forced vital capacity below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above 65 percent; or

b. Total lung capacity, by plethysmography or timed gas dilution, below 80 percent of predicted.

**Non-Disabling Asbestosis (Medical Information Factor = [0.02])**

1. Diagnosis of bilateral diffuse interstitial fibrosis of the lungs caused by inhalation of asbestos fibers or dust, by board-certified pulmonologist, internist, radiologist, or occupational medicine physician, based on either:

a. A quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing: bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher;

b. A CT scan that has been read by a board-certified physician showing bilateral interstitial fibrosis; or

c. Pathological asbestosis graded 1(B) or higher under the criteria published in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982).

### I.B.2   Age Factor

Claimants with younger IPs receive higher settlement offers than Claimants with older IPs. The Settlement Facility will determine the Age Factor based on the earlier of the IP's diagnosis date and death date (the "**IP Age**"). The Settlement Facility will assign an Age Factor of 1 for an IP Age of 75. The Settlement Facility will decrease the Age Factor by 0.015 for every IP Age year above 75, but will not decrease the Age Factor below 0.7. The Settlement Facility will increase the Age Factor by 0.015 for every IP Age year below 75, but will not increase the Age Factor above 1.4.

### I.B.3   Life Status Factor

If the IP is alive at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Life Status Factor of 1.3. If the IP is deceased at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Life Status Factor of 1.

### I.B.4   Dependents Factor

If the IP does not have a spouse or other dependents (minor children, adult disabled dependent children, or dependent minor grandchildren) as of the date the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 0.8. If the IP has a spouse but no other dependents as of the date the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 1. Finally, if the IP has dependents (minor children, adult disabled dependent children, or dependent minor

grandchildren) who derive (or who derived at the time of the diagnosis of the disease that is the subject of the Claim) at least one-half of their financial support from the IP, the Settlement Facility will assign a Dependents Factor of 1.4.

### I.B.5   Economic Loss Factor

Claimants may elect (but are not required) to document economic losses related to the IP's loss of earnings, pension, social security, home services, medical expenses, and funerary expenses. If the Claimant does not document economic loss or for which the economic loss amount is $200,000 or less, the Settlement Facility will assign an Economic Loss Factor of 1.0. If the documented economic loss amount is greater than $200,000, the Settlement Facility will adjust the Economic Loss Factor upward by 0.001 for every thousand dollars of economic loss over $200,000, up to a maximum Economic Loss Factor of 1.4.  All claimed economic loss over $200,000 must be supported by adequate documentation.

### I.B.6   Duration of Coltec/GST Product Contact Factor

If the IP spent an aggregate of between six (6) months (other than an IP with malignant mesothelioma for whom there is no minimum period of exposure) and two (2) years performing the activity or activities in which the IP experienced Coltec/GST Product Contact in a Contact Group, the Settlement Facility will assign a Duration of Coltec/GST Product Contact Factor of 0.8.   If the IP spent an aggregate of between two (2) years and four (4) years performing the activity or activities in which the IP experienced Coltec/GST Product Contact in a Contact Group, the Settlement Facility will assign a Duration of Coltec/GST Product Contact Factor of 0.9.  If the IP spent an aggregate of between four (4) years and six (6) years performing the activity or activities in which the IP experienced Coltec/GST Product Contact in a Contact Group, the Settlement Facility will assign a Duration of Coltec/GST Product Contact Factor of

1.0.  If the IP spent an aggregate of between six (6) years and eight (8) years performing the activity or activities in which the IP experienced Coltec/GST Product Contact in a Contact Group, the Settlement Facility will assign a Duration of Coltec/GST Product Contact Factor of 1.1.  If the IP spent an aggregate of eight (8) years or more performing the activity or activities in which the IP experienced Coltec/GST Product Contact in a Contact Group, the Settlement Facility will assign a Duration of Coltec/GST Product Contact Factor of 1.2.  The periods of time hereunder need not be continuous (i.e., the months spent by the IP performing the activity or activities in which the IP experienced Coltec/GST Product Contact in a Contact Group will be added together to determine the relevant number of months for the calculation of the Duration of Coltec/GST Product Contact Factor) and shall be calculated based on the amount of time that the IP spent performing the activity or activities in which the IP experienced Coltec/GST Product Contact in an occupation and industry in the relevant Contact Group.  If the Claimant experienced Coltec/GST Product Contact in a Contact Group while confined to a ship at sea for one hundred (100) days, the Settlement Facility shall consider the one hundred (100) days of exposure equivalent to one year of Coltec/GST Product Contact in the Contact Group.

### I.B.7   Jurisdiction Factor

If a Claimant holding a Present Claim believes that the Claimant's Jurisdiction, as defined below, justifies a higher Settlement Offer because of the values of historical settlements and verdicts in such jurisdiction against the Debtors, the Claimant may elect to provide evidence to the Settlement Facility (a) regarding the amounts of such settlements and verdicts and (b) establishing which jurisdiction is the Claimant's Jurisdiction.  If the Claimant does not elect to provide such evidence, the Settlement Facility will assign a Jurisdiction Factor of 1.0.  If the Trustee is convinced, in his or her sole discretion, that the Claimant is entitled to a higher value

based on the historical settlements and verdicts in the Claimant's Jurisdiction, he or she shall adjust the Jurisdiction Factor up to a maximum Jurisdiction Factor of 1.2.  For these purposes, the "**Claimant's Jurisdiction**" is the jurisdiction in which the Claimant filed a lawsuit against a Debtor in the tort system based on the injury that is the subject of the Claim; provided, however if no such lawsuit was filed, the Claimant may elect as the Claimant's Jurisdiction either (a) the jurisdiction in which the IP resides at the time of diagnosis or when the claim is filed with the Settlement Facility or (b) any jurisdiction in which the IP experienced Coltec/GST Product Contact.  The Jurisdiction Factor for all Future Claims shall be 1.0.

### I.B.8   Law Firm Factor

If a Claimant holding a Present Claim believes that the identity of the law firm representing the Claimant justifies a higher Settlement Offer because the law firm obtained above average prepetition settlements and verdicts for similarly situated claims against the Debtors in the five years before the Debtors' bankruptcy filing, the Claimant may elect (but is not required) to provide evidence to the Settlement Facility supporting such belief.   Such evidence must demonstrate that the law firm played a substantial role in the prosecution, trial and resolution of such claims, such as actively participating in court appearances, discovery and trial of the subject cases; the mere referral of a case, without further involvement will not be viewed as having played a substantial role in the prosecution and resolution of a case.  If the Claimant does not elect to provide such evidence, the Settlement Facility will assign a Law Firm Factor of 1.0.  If the Trustee is convinced, in his or her sole discretion, that the Claimant is entitled to a higher value based on the identity of the law firm representing the Claimant, he or she shall adjust the Law Firm Factor up to a maximum Law Firm Factor of 1.2.  The Law Firm Factor for all Future Claims shall be 1.0.

### I.B.9   Calculation of IP Factors Index

To calculate the IP Factors Index, the Settlement Facility will multiply the Medical Information Factor, Age Factor, Life Status Factor, Dependents Factor, Economic Loss Factor, Duration of Coltec/GST Product Contact Factor, Jurisdiction Factor, and Law Firm Factor and divide, in the case of Present Claims, by 6.1641216, which is the maximum possible value of the product of those factors for Present Claims.[34]  In the case of Future Claims, the Settlement Facility shall divide the product of the various factors by 4.28064, which is the

---

[34]   6.1641216 = 1.0 (Medical Information Factor) x 1.3 (Life Status Factor) x 1.4 (Dependents Factor) x 1.4 (Age Factor) x 1.4 (Economic Loss Factor) x 1.2 (Duration of Coltec/GST Product Contact Factor) x 1.2 (Jurisdiction Factor) x 1.2 (Law Firm Factor).

maximum possible value of those factors for Future Claims.[45]   The purpose of the different denominators is to ensure that no Present Claimant receives more than a Future Claimant simply by reference to the Law Firm and Jurisdiction Factors.  The range of the IP Factors Index is 0% to 100%.

### I.C      Settlement Offer Determination

The Settlement Facility will determine the Expedited Claim Review Matrix Amount by multiplying the Maximum Settlement Value for the Claimant's Contact Group by the IP Factors Index. If the IP had Coltec/GST Product Contact in more than one Contact Group, then the Settlement Facility will determine a separate settlement offer based on the IP's time in each Contact Group (taking into account the period of time in that Contact Group, whether in the same or different industries/occupations and whether or not continuous) by calculating a separate IP Factors Index for each Contact Group and multiplying it by the Maximum Settlement Value for that Contact Group. (For example, if the IP had five years in Group 1 and ten years in Group 2, the Settlement Facility will calculate separate settlement offers for the time in Group 1 and the time in Group 2.) The Settlement Facility will then offer the Claimant the highest settlement offer yielded by this calculation.

If a Claim is with respect to an IP who has malignant mesothelioma but less than six (6) months of Coltec/GST Product Contact, the Settlement Facility shall calculate the Expedited Claim Review Matrix Amount in the manner described above, but with a beginning Maximum Settlement Value set proportionately below the normal Maximum Settlement Value to reflect the fact that the Claim does not have six (6) months of Coltec/GST Product Contact.  For example, if a Claim is with respect to an IP who has malignant mesothelioma with three (3) months of

---

[45] 4.28064 = 1.0 (Medical Information Factor) x 1.3 (Life Status Factor) x 1.4 (Dependents Factor) x 1.4 (Age Factor) x 1.4 (Economic Loss Factor) x 1.2 (Duration of Coltec/GST Product Contact Factor) x 1.0 (Jurisdiction Factor) x 1.0 (Law Firm Factor).

Coltec/GST Product Contact and is in Contact Group 1, the Matrix Amount for such Claim shall be calculated based on a Maximum Settlement Value proportionally reduced to reflect the fact that such Claim has 50% of the Coltec/GST Product Contact of a Claim with six (6) months of Coltec/GST Product Contact.  By way of example, if because of the application of the other factors, an IP with six (6) months of Coltec/GST Product Contact would have been offered a Matrix Amount of $_____, an identically situated IP with three (3) months of Coltec/GST Product Contact would be offered $_____.

## APPENDIX II: EXTRAORDINARY CLAIM REVIEW

This Appendix describes how the Settlement Facility will calculate Matrix Amounts for Claimants electing Extraordinary Claim Review. In order to be eligible to elect Extraordinary Claim Review, the Claim must be an Extraordinary Claim as defined in Section 6.1 of the CRP, specifically a malignant Claim that meets the exposure and medical criteria set forth in Appendix I and that is with respect to an Injured Party who credibly documents (a) a history of extraordinary Coltec/GST Product Contact with little or no exposure to asbestos from other Entities' products and (b) there has not been and there is little likelihood of a substantial recovery elsewhere.  Claimants diagnosed with non-malignant diseases do not qualify for Extraordinary Claim Review.  Any dispute as to whether a Claim is or is not an Extraordinary Claim shall be submitted to a special Extraordinary Claims Panel to be established by the Trustee with the consent of the CAC and the FCR.  All decisions of the Extraordinary Claims Panel as to whether a Claim is or is not an Extraordinary Claim shall be final and not reviewable in either arbitration or court.

Under Extraordinary Claim Review, qualifying Claimants will receive a settlement offer based on the same IP factors as under Expedited Claim Review, but the Settlement Facility will also consider the IP's complete job and exposure history, and information regarding the Claimant's Other Claims.

In Extraordinary Claim Review, the maximum allowed settlement offer (the "**Maximum Extraordinary Settlement**") is an amount equal to five (5) times the Expedited Claim Review Matrix Amount that the subject Claim would have received under the Expedited Claim Review. The Settlement Facility shall first calculate the Expedited Claim Review Matrix Amount for the Extraordinary Claim in the manner set forth in Appendix I and multiply such amount by five (5)

to determine the Maximum Extraordinary Settlement.  The Settlement Facility will then use information provided by the Claimant pursuant to Section 6.8 of the CRP to determine the percentage of the Maximum Extraordinary Settlement that the Settlement Facility will offer the Claimant, with the amount to be offered being determined by the Trustee, in his or her complete discretion, after consideration of the merits of the Extraordinary Claim. In making such determination, the Trustee shall consider, among other things, the number of companies that contributed to the IP's exposure to asbestos-containing products.  Based on information provided by the Claimant in compliance with the CRP, the Settlement Facility will calculate the total number of such parties as (a) the number of companies whose products are identified as a source of the IP's asbestos exposure in tort discovery (including in interrogatory answers and depositions): (b) if not already included in (a), the number of Trusts where the Claimant has filed or expresses an intention to file a claim; and (c) if not already included in (a) or (b), the asbestos defendants in whose bankruptcy proceedings the Claimant cast a ballot, unless the Claimant verifies that he will not file a claim against such defendant's Trust.  The Trustee's determination of the amount to be offered to the holder of an Extraordinary Claim shall be final and not reviewable in either arbitration or court.

**APPENDIX III:  FORM OF SETTLEMENT RELEASE**

# GARLOCK SETTLEMENT FACILITY
# RELEASE AND INDEMNITY AGREEMENT

NOTICE: THIS IS A BINDING DOCUMENT THAT AFFECTS YOUR LEGAL RIGHTS. PLEASE CONSULT YOUR ATTORNEY IN CONNECTION WITH EXECUTING THIS DOCUMENT. IF YOU DO NOT PRESENTLY HAVE AN ATTORNEY, YOU MAY WISH TO CONSIDER CONSULTING ONE.

WHEREAS, the undersigned, who is either the "Injured Party," or the/an "Official Representative"[56] (either being referred to herein as the "**Claimant**"), has filed a claim (the "**Claim**") with the Garlock Settlement Facility (the "**Settlement Facility**") pursuant to the Settlement Facility Claims Resolution Procedures (the "**CRP**") established in *In re Garlock Sealing Technologies, LLC*, Case No. 10-BK-31607 (Bankr. W.D.N.C.) and *In re OldCo, LLC*, Case No. 16-BK-_____ (Bankr. W.D.N.C) and such Claimant asserts a GST Asbestos Claim and/or a Coltec Asbestos Claim (collectively, "**Asbestos Claim**") (all capitalized terms not defined herein shall have the respective meanings ascribed to them either in the CRP or in the Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC, Proposed Successor by Merger to Coltec Industries Inc (the "**Plan**") confirmed by the United States Bankruptcy Court for the Western District of North Carolina and the United States District Court for the Western District of North Carolina on [DATE], Case Nos. 10-BK-31607 and 16-BK-_____ (lead cases)), and

WHEREAS, the Claimant has agreed to settle and compromise the Injured Party's Claim, for and in consideration of the allowance of the Claim by the Settlement Facility and its payment pursuant to the CRP in accordance with the terms set forth therein and herein;

NOW, THEREFORE, the Claimant hereby agrees as follows:

1.      On behalf of the Injured Party, the Injured Party's estate, the Injured Party's heirs and/or anyone else claiming rights through the Injured Party, now and in the future, the Claimant hereby fully and finally RELEASES, ACQUITS and FOREVER DISCHARGES (a) the Settlement Facility, the Debtors, the Reorganized Debtors, the CAC, the FCR and their respective settlors, trustors, trustees, directors, officers, agents, consultants, financial advisors, servants, employees, attorneys, heirs and executors and (b) the other Asbestos Protected Parties (collectively the "**Releasees**"), except as expressly provided in paragraphs 2 and 5 herein.

2.      Notwithstanding the paragraph immediately above or anything to the contrary contained herein, if the Claim involves a non-malignant asbestos-related disease, the Injured Party may file a new Asbestos Claim against the Settlement Facility for a malignant disease that is diagnosed after the date of the Claimant's original submission of a proof of claim form to the Settlement Facility with respect to the Claim.

3.      The Claimant expressly covenants and agrees forever to refrain from bringing any

---

[56] The "Official Representative" is the/a person who under applicable state law or legal documentation has the authority to represent the Injured Party, the Injured Party's estate or the Injured Party's heirs.

suit or proceeding at law or in equity, against the Releasees with respect to any Claim released herein.

4.       Except as expressly provided herein, the Claimant intends this Release and Indemnity Agreement to be as broad and comprehensive as possible so that the Releasees shall never be liable, directly or indirectly, to the Injured Party or the Injured Party's heirs, legal representatives, successors or assigns, or any other entity claiming by, through, under or on behalf of the Injured Party, for or on account of any Asbestos Claim, whether the same is now known or unknown or may now be latent or may in the future appear to develop, including all spousal or dependants' claims for the Injured Party's injuries. If the Claimant is an Official Representative, the Claimant represents and warrants that the Claimant has all requisite legal authority to act for, bind, release claims of and accept payment on behalf of the Injured Party and all heirs of the Injured Party on account of any Asbestos Claim against the Releasees and hereby agrees to indemnify and hold harmless, to the extent of payment hereunder, excluding attorney's fees and costs, the Releasees from any loss, cost, damage or expense arising out of or in connection with the rightful claim of any other entity to payments with respect to the Injured Party's Asbestos Claim.

5.       This Release and Indemnity Agreement is not intended to bar any cause of action, right, lien or claim which the Claimant may have against any alleged tortfeasor or other person or entity not included in the definition of Releasees. The Claimant hereby expressly reserves all his or her rights against such persons or entities. This Release and Indemnity Agreement is not intended to release or discharge any Asbestos Claim or potential Asbestos Claim that the Injured Party's heirs (if any), spouse (if any), the Official Representative (if any) or the Official Representative's heirs (if any) (other than the Injured Party) may have as a result of their own exposure to asbestos or asbestos-containing products.

6.       The Claimant represents and warrants that all valid liens and reimbursement claims relating to benefits paid to or on account of the Injured Party in connection with, or relating to, the Asbestos Claim, have been resolved or will be resolved from the proceeds of the settlement payment to the Claimant under this Release or otherwise.  It is further agreed and understood that no Releasee shall have any liability to the Claimant or any other person or entity in connection with such liens or reimbursement claims and that the Claimant will hold the Releasees harmless  from any and all such alleged liability to the extent of payment hereunder, excluding attorney's fees and costs.  In addition, the Claimant will hold the Releasees harmless, to the extent of payment hereunder, excluding attorney's fees and costs, from any and all liability arising from subrogation, indemnity or contribution claims related to the Asbestos Claim released herein.

7.       It is further agreed and understood that if the Claimant has filed a civil action against the Settlement Facility, the Claimant shall dismiss such civil action and obtain the entry of an Order of Dismissal with Prejudice with respect to any Asbestos Claim released herein no later than 30 days after the date hereof.

8.       The Claimant understands that the Asbestos Claim released herein has been

allowed by the Settlement Facility, and a liquidated value of $xxxxxx has been established for such Claim.

9.      In the event of a verdict against others, any judgment entered on the verdict that takes into account the status of the Settlement Facility as a joint tortfeasor legally responsible for the Injured Party's injuries shall be reduced by no more than the total and actual amount paid as consideration for this Release or such lesser amount as allowed by law.

10.     The Claimant understands, represents and warrants this Release and Indemnity Agreement to be a compromise of a disputed claim and not an admission of liability by, or on the part of, the Releasees. Neither this Release and Indemnity Agreement, the compromise and settlement evidenced hereby, nor any evidence relating thereto, will ever be admissible as evidence against the Settlement Facility in any suit, claim or proceeding of any nature except to enforce this Release and Indemnity Agreement. However, this Release and Indemnity Agreement is and may be asserted by the Releasees as an absolute and final bar to any claim or proceeding now pending or hereafter brought by or on behalf of the Injured Party with respect to the Asbestos Claim released herein, except as expressly provided herein.

11.     The Claimant (1) represents that no judgment debtor has satisfied, in full or in part, the Settlement Facility's liability with respect to the Injured Party's Asbestos Claim as the result of a judgment entered in the tort system and (2) upon information and belief, represents that the Claimant has not entered into a release (other than this Release and Indemnity Agreement) that discharges or releases the Settlement Facility's liability to the Claimant with respect to the Injured Party's Asbestos Claim.

12.     The Claimant represents that he or she understands that this Release and Indemnity Agreement constitutes a final and complete release of the Releasees with respect to the Injured Party's Asbestos Claim, except as expressly provided in paragraphs 2 and 5 herein. The Claimant has relied solely upon his or her own knowledge and information, and the advice of his or her attorneys (if any), as to the nature, extent and duration of the Injured Party's injuries, damages, and legal rights, as well as the alleged liability of the Settlement Facility and the legal consequences of this Release and Indemnity Agreement, and not on any statement or representation made by or on behalf of the Settlement Facility.

13.     This Release and Indemnity Agreement contains the entire agreement between the Claimant and the Releasees and supersedes all prior or contemporaneous, oral or written agreements or understandings relating to the subject matter hereof, including, without limitation, any prior agreements or understandings with respect to the liquidation of the Claim.

14.     This Release and Indemnity Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof and shall be binding on the Injured Party and his or her heirs, legal representatives, successors and assigns.

15.     To the extent applicable, the Claimant hereby waives all rights under Section 1542 of the California Civil Code, and any similar laws of any other state. California Civil Code

Section 1542 states:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

The Claimant understands and acknowledges that because of the Claimant's waiver of Section 1542 of the California Civil Code, even if the Injured Party should eventually suffer additional damages, the Injured Party will not be able to make any claim against the Releasees for those damages, except as expressly provided in paragraphs 2 and 5 herein. The Claimant acknowledges that he or she intends these consequences.

16.     If the Claimant's counsel directed the [NAME OF CLAIMS PROCESSING FACILITY] (the "**Claims Processor**") to transmit to the Settlement Facility any information from the Claims Processor for purposes of settling the Claim, the Claimant acknowledges that the Claimant consented to the disclosure, transfer and/or exchange of information related to the Claim (including medical information) between the Settlement Facility and the Claims Processor in connection with the [NAME OF CLAIMS PROCESSING FACILITY]'s processing of the Claim.

17.     The Claimant authorizes payment pursuant to Paragraph 8 to the Claimant or the Claimant's counsel, as trustee for the Claimant.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

## Medicare Secondary Payer Certification

The Claimant hereby represents and certifies to the Settlement Facility that, in respect of the Claim, the Claimant has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with or relating to the Asbestos Claim.

## Certification

I state that I have carefully read the foregoing Release and Indemnity Agreement and know the contents thereof, and I sign the same as my own free act. I additionally certify, under penalty of perjury, that the information that has been provided to support the Claim is true according to my knowledge, information and belief and further that I have the authority as the Claimant to sign this Release and Indemnity Agreement.

I am: _____ the Injured Party

_____ the Official Representative of the Injured Party, the Injured Party's Estate or the Injured Party's Heirs

EXECUTED this _____ day of _____, 20_ _____


_____

Signature of the Claimant

Name of the Claimant:

CLAIMANT SSN: ***-**-

Name of the Injured Party if different from the Claimant:

INJURED PARTY SSN: ***-**-

[If Claimant is not executing this Release and Indemnity Agreement electronically using the electronic signature process, the Claimant's signature must be authenticated by the signatures of two persons unrelated to the Claimant who witnessed the signing of this Release and Indemnity Agreement or by a notary public.]

SWORN to and subscribed before me this _____ day of _____, 20__

_____
Notary Public
My Commission Expires: _____

[OR]

Signatures of two persons unrelated to the Claimant by blood or marriage who witnessed the signing of this Release and Indemnity Agreement

_____    _____
Witness Signature                         Witness Signature

**APPENDIX IV:  OCCUPATION CLASSIFICATION
INTO CONTACT GROUPS**

**Contact Groups**

| Code | Occupation | Original PIQ Code | Contact Group |
|---|---|---|---|
| G-1 | GASKET CUTTER (SECONDARY MANUFACTURING ONLY) | NA | 1 |
| G-2 | INDUSTRIAL PLUMBER | O-43 | 1 |
| G-3 | MARITIME MACHINERY REPAIRMAN | N-13 | 1 |
| G-4 | MARITIME MACHINIST'S MATE | N-12 | 1 |
| G-5A | MILLWRIGHT (CHEMICAL, MARITIME, MILITARY, PETROCHEMICAL, SHIPYARD CONSTRUCTION/REPAIR, TEXTILE, AND UTILITIES INDUSTRIES) | O-37 | 1 |
| G-6 | PIPEFITTER | O-41 | 1 |
| G-7 | STEAMFITTER | O-55 | 1 |
| N-1 | U.S. NAVY MACHINERY REPAIRMAN | N-13 | 1 |
| N-2 | U.S. NAVY MACHINIST'S MATE | N-12 | 1 |
| N-3 | U.S. NAVY PIPEFITTER | N-16 | 1 |
| G-8 | BOILER TECHNICIAN / REPAIRMAN / BOILERMAKER | O-09; O-10; O-11 | 2 |
| G-9A | FIREMAN (CHEMICAL, MARITIME, MILITARY, PETROCHEMICAL, SHIPYARD CONSTRUCTION/REPAIR, UTILITIES INDUSTRIES) | O-25 | 2 |
| G-10A | MACHINIST (MARITIME, MILITARY, SHIPYARD CONSTRUCTION/REPAIR, UTILITIES INDUSTRIES) | O-36 | 2 |
| G-11 | MARITIME ENGINEMAN, OILER, WIPER | N-5 | 2 |
| G-5B | MILLWRIGHT (OTHER INDUSTRIES) | O-37 | 2 |
| G-12 | REFINERY WORKER (CHEMICAL, LONGSHORE, AND PETROCHEMICAL INDUSTRIES) | O-47 | 2 |
| G-13 | SHIPFITTER / SHIPWRIGHT / SHIP BUILDER (CONSTRUCTION TRADES, MARITIME, MILITARY, AND SHIPYARD CONSTRUCTION/REPAIR | O-53 | 2 |

| Code | Occupation | Original PIQ Code | Contact Group |
|------|-----------|-------------------|---------------|
| | INDUSTRIES) | | |
| N-4 | U.S. NAVY BOILER TECHNICIAN, BOILER MAKER | N-1; N-2 | 2 |
| N-5 | U.S. NAVY ENGINEMAN, OILER, WIPER | N-5 | 2 |
| N-6 | U.S. NAVY FIREMAN | N-6 | 2 |
| G-14 | AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | O-02 | 3 |
| G-15 | ASSEMBLY LINE / FACTORY / PLANT WORKER | O-07 | 3 |
| G-16 | BUILDING MAINTENANCE / SUPERINTENDENT (INDUSTRIAL) | O-12 | 3 |
| G-17 | BURNER OPERATOR | O-15 | 3 |
| G-18 | CONSTRUCTION (COMMERCIAL OR INDUSTRIAL) | O-19 | 3 |
| G-19 | CUSTODIAN / JANITOR (INDUSTRIAL ENVIRONMENT) | O-21 | 3 |
| G-20 | ELECTRICIAN | O-22 | 3 |
| G-21A | ENGINEER (CHEMICAL, CONSTRUCTION TRADES, IRON/STEEL, MILITARY, PETROCHEMICAL, SHIPYARD CONSTRUCTION/REPAIR, UTILITIES INDUSTRIES) | O-23 | 3 |
| G-9B | FIREMAN (OTHER INDUSTRIES) | O-25 | 3 |
| G-22A | FURNACE WORKER / REPAIRMAN / INSTALLER (CHEMICAL, CONSTRUCTION TRADES, IRON/STEEL, MARITIME, MILITARY, PETROCHEMICAL, SHIPYARD CONSTRUCTION/REPAIR, UTILITIES INDUSTRIES) | O-28 | 3 |
| G-23 | LABORER | O-34 | 3 |
| G-10B | MACHINIST (OTHER INDUSTRIES) | O-36 | 3 |
| G-24 | NAVY / MARITIME (OTHER SHIPBOARD) | NA | 3 |
| G-25 | POWER PLANT OPERATOR | O-44 | 3 |
| G-26 | RAILROAD WORKER (RAILROAD INDUSTRY) | O-46 | 3 |
| G-27 | RUBBER / TIRE WORKER (TIRE/RUBBER INDUSTRY) | O-50 | 3 |

| Code | Occupation | Original PIQ Code | Contact Group |
|------|------------|-------------------|---------------|
| G-28 | SEAMAN | O-49 | 3 |
| G-29A | SHEET METAL WORKER / SHEET METAL MECHANIC (CHEMICAL, CONSTRUCTION TRADES, IRON/STEEL, MARITIME, MILITARY, SHIPYARD CONSTRUCTION/REPAIR, UTILITIES INDUSTRIES) | O-52 | 3 |
| G-30 | SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | O-54 | 3 |
| G-31 | STEELWORKER (CONSTRUCTION TRADES AND IRON/STEEL INDUSTRIES) | O-56 | 3 |
| N-7 | U.S. NAVY DAMAGE CONTROLMAN | N-3 | 3 |
| N-8 | U.S. NAVY ELECTRICIAN'S MATE | N-4 | 3 |
| N-9 | U.S. NAVY GAS TURBINE SYSTEM TECHNICIAN | N-7 | 3 |
| N-10 | U.S. NAVY INSTRUMENTMAN | N-10 | 3 |
| G-32 | WELDER | O-58 | 3 |
| G-33 | ASBESTOS SPRAYER / SPRAY GUN MECHANIC | O-06 | 4 |
| G-34 | BRICK MASON / LAYER / HOD CARRIER | O-14 | 4 |
| G-35 | CARPENTER | O-16 | 4 |
| G-36 | CLERICAL / OFFICE WORKER | O-18 | 4 |
| G-37A | CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING (CONSTRUCTION TRADES) | O-20 | 4 |
| G-21B | ENGINEER (OTHER INDUSTRIES) | O-23 | 4 |
| G-38 | FIREFIGHTER | O-24 | 4 |
| G-39 | FOUNDRY WORKER | O-27 | 4 |
| G-22B | FURNACE WORKER / REPAIRMAN / INSTALLER (OTHER INDUSTRIES) | O-28 | 4 |
| G-40 | GLASS WORKER | O-29 | 4 |
| G-41 | HEAVY EQUIPMENT OPERATOR (INDUSTRIAL ENVIRONMENT) | O-30 | 4 |
| G-42 | INSULATOR | O-31 | 4 |
| G-43 | IRON WORKER | O-32 | 4 |
| G-44 | JOINER (CONSTRUCTION TRADES, MARITIME, MILITARY, AND SHIPYARD CONSTRUCTION/REPAIR | O-33 | 4 |

| Code | Occupation | Original PIQ Code | Contact Group |
|------|-----------|-------------------|---------------|
| | INDUSTRIES) | | |
| G-45 | LONGSHOREMAN, RIGGER, STEVEDORE (LONGSHORE, MARITIME, PETROCHEMICAL, AND SHIPYARD CONSTRUCTION/REPAIR INDUSTRIES) | O-35, O-49 | 4 |
| G-46 | MIXER / BAGGER | O-38 | 4 |
| G-47 | PAINTER (COMMERCIAL/INDUSTRIAL ENVIRONMENT) | O-40 | 4 |
| G-48 | PLASTERER | O-42 | 4 |
| G-49 | SANDBLASTER | O-51 | 4 |
| G-29B | SHEET METAL WORKER / SHEET METAL MECHANIC (OTHER INDUSTRIES) | O-52 | 4 |
| G-50 | WAREHOUSE WORKER (INDUSTRIAL ENVIRONMENT) | O-57 | 4 |
| G-51 | ASBESTOS MINER | O-03 | 5 |
| G-52 | ASBESTOS PLANT / ASBESTOS MANUFACTURING WORKER | O-04 | 5 |
| G-53 | ASBESTOS REMOVAL / ABATEMENT | O-05 | 5 |
| G-54 | AUTO MECHANIC / BRAKE REPAIRMAN, INSTALLER | O-08 | 5 |
| G-55 | BRAKE MANUFACTURER / INSTALLER | O-13 | 5 |
| G-56 | CHIPPER / GRINDER | O-17 | 5 |
| G-37B | CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING (OTHER INDUSTRIES) | O-20 | 5 |
| G-57 | FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | O-26 | 5 |
| G-58 | NON-ASBESTOS MINER | O-39 | 5 |
| G-59 | NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY)[7] | O-01 | 5 |
| G-60 | PROFESSIONAL (INDUSTRIAL ENVIRONMENT) | O-45 | 5 |
| G-61 | OTHER | NA | 5 |

[6] Unless otherwise indicated, any occupation in a residential/do-it-yourself or non-industrial environment will be classified in this group.

[7] Unless otherwise indicated, any occupation in a residential/do-it-yourself or non-industrial environment will be classified in this group.

# APPENDIX V: AUTHORIZATION FOR SETTLEMENT FACILITY TO OBTAIN TRUST RECORDS

## AUTHORIZATION FOR RELEASE OF RECORDS OF BANKRUPTCY
## TRUSTS AND CLAIMS RESOLUTION FACILITIES

TO WHOM IT MAY CONCERN:

The Claimant named below hereby authorizes each Trust and Claim Resolution Facility listed in the attachment hereto to provide directly to the GST Settlement Facility ("Settlement Facility"), or any of its representatives, all submissions made by Claimant and (if different from the Claimant) the party whose injury forms the basis of the claim (the "Injured Party") to the Trust, including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the Trust or Claim Resolution Facility may provide such documents directly to the Settlement Facility and need not obtain any further authorization from the Claimant or his/her representatives.

A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by the Settlement Facility at any time. If Claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from Claimant): _____

Social Security No.: _____

Date of Birth: _____

Name of representative for Claimant or Injured Party: _____

Signing party: _____

Signature: _____

Date: _____

Notarized:

Attachment: List of Trusts and Claim Resolution Facilities

**List of Trusts and Claim Resolution Facilities**

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |
| Burns and Roe Asbestos Personal Injury Settlement | Manville Personal Injury Settlement Trust | UNR Asbestos-Disease Claims Trust |

V- 3

| Trust | | |
|---|---|---|
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | |

### APPENDIX VI:  SETTLED GST ASBESTOS CLAIMS


### [TO BE PROVIDED]

## APPENDIX VII:  PRE-PETITION JUDGMENT GST ASBESTOS CLAIMS

| Claimant Name | Jurisdiction | Claim Amount Asserted | Judgment Date |
| --- | --- | --- | --- |
| Torres, Dora | Cameron County, TX | $675,000 (plus interest) | March 22, 2010 |
| Morales, Angelica Torres[*] | Cameron County, TX | $675,000 (plus interest) | March 22, 2010 |

[*] Debtors believe claimant is asserting claim as the personal representative of the estate of Oscar Torres.

Document comparison by Workshare Compare on Friday, July 29, 2016 11:54:34 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WORKSITE/WSACTIVE/8701258/3 |
| Description | #8701258v3<WSACTIVE> - Consensual Plan Ex. B |
| Document 2 ID | interwovenSite://WORKSITE/WSACTIVE/8701258/5 |
| Description | #8701258v5<WSACTIVE> - Consensual Plan Ex. B |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 52 |
| Deletions | 37 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 97 |