# EXHIBIT H

FORM OF
OPTION AND REGISTRATION RIGHTS AGREEMENT

**THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.**

**THIS OPTION AND REGISTRATION RIGHTS AGREEMENT** (this "Option and Registration Rights Agreement") is dated as of the _____ day of _____, 20__ and is by and among OldCo, LLC, a North Carolina limited liability company ("Optionor"), EnPro Industries, Inc., a North Carolina corporation ("EnPro"), and the GST Settlement Facility, a Delaware statutory trust (the "Asbestos Trust").

WHEREAS, this Option and Registration Rights Agreement is being entered into pursuant to the terms of the Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC (the "Joint Plan") in Case No. 10-BK-31607 pending before the United States Bankruptcy Court for the Western District of North Carolina (Charlotte Division) (the "Bankruptcy Court") which was confirmed by the Bankruptcy Court on [_____ ___], 20[__] [date of confirmation to be inserted here];

WHEREAS, this Option and Registration Rights Agreement is being entered into by the parties hereto as of the Effective Date of the Joint Plan, as required under Section 7.3.2 of the Joint Plan;

NOW, THEREFORE, pursuant to the requirements of Section 7.3.2 of the Joint Plan, the parties hereto hereby agree as follows:

**Article I**
**Option; Call Right; Put Right**

1.1    Grant of Option. Optionor hereby grants to the Asbestos Trust, on the terms and conditions set forth herein, the right to purchase from the Optionor for an aggregate purchase price of $1.00 in cash the Subject Shares (as such term is defined herein). Such right to purchase the Subject Shares on the terms and conditions set forth herein is referred to as the "Option."

(a)    As used herein, the term "Subject Shares" shall mean shares of EnPro Common Stock equal in a number (with any fraction of a share rounded up to the next whole share) to the quotient of $20,000,000.00 divided by the simple arithmetic average of the Daily VWAPs over the period of 20 consecutive Trading Days (the "Measurement Per Share Price") ending on the date that the Asbestos Trust delivers to the Optionor notice of option exercise of the form attached as Exhibit A hereto (the "Notice of Option Exercise") (or if that date is not a Trading Day, then on the Trading Day that immediately

1

precedes that date) (such 20 consecutive Trading Days being referred to as the "Measurement Period"); provided, however, that if the number of Subject Shares as so determined equals or exceeds 20 percent of the lesser of the number of shares of EnPro Common Stock outstanding on the date hereof or on the date of issuance of Subject Shares upon the exercise of the Option hereunder, then the number of Subject Shares shall be reduced to an amount equal to 19.9% of the lesser of the number of shares of EnPro Common Stock outstanding on the date hereof or on the date of issuance of Subject Shares upon the exercise of the Option hereunder and the Optionor shall pay in cash to the Asbestos Trust the product of the Measurement Per Share Price multiplied by the number of Subject Shares that are reduced by the preceding formula.

(b)     The term "Daily VWAP" means, for any Trading Day, the per share volume-weighted average price of EnPro Common Stock on the New York Stock Exchange, or the primary U.S. national or regional securities exchange or market on which EnPro Common Stock is listed or admitted for trading if EnPro Common Stock is not then listed for trading on the New York Stock Exchange, as displayed under the heading "Bloomberg VWAP" on Bloomberg page "NPO.N <equity> AQR" (or its equivalent successor if such page is not available), in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session of the New York Stock Exchange, or the primary U.S. national or regional securities exchange or market on which EnPro Common Stock is then listed or admitted for trading if EnPro Common Stock is not then listed for trading on the New York Stock Exchange, on such Trading Day (or if such volume-weighted average price is unavailable, the market value of one share of EnPro Common Stock on such Trading Day determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm retained for this purpose by EnPro). The Daily VWAP is to be determined without regard to pre-market hours or after-hours trading or any other trading outside of the regular trading session trading hours.

(c)     The term "Trading Day" means a day during which trading in EnPro Common Stock generally occurs on the primary U.S. national or regional securities exchange or market on which EnPro Common Stock is listed or admitted for trading.

(d)     In the event that during the Measurement Period or between the end of the Measurement Period and the settlement of the exercise of the Option, EnPro shall (i) subdivide or reclassify the outstanding shares of EnPro Common Stock into a greater number of shares or (ii) combine or reclassify the outstanding shares of EnPro Common Stock into a smaller number of shares, the number of Subject Shares issuable upon exercise of the Option shall be equitably adjusted to eliminate the impact of such subdivision, combination or reclassification.

(e)     The Option may be exercised only in whole and not in part.

1.2     Exercise of Option.  To exercise its right to purchase the Subject Shares, the Asbestos Trust must deliver to the Optionor a signed and completed Notice of Option Exercise no earlier than the first anniversary of the date of this Option and Registration Rights Agreement,

or if such first anniversary is not a Trading Day then on the Trading Day next succeeding the first anniversary of the date of this Option and Registration Rights Agreement.

1.3    Termination of Option.  The Option shall expire, and the Asbestos Trust's right to purchase the Subject Shares hereunder shall terminate, if the Asbestos Trust does not deliver Notice of Option Exercise to Optionor by 5:00 p.m. (Charlotte, North Carolina time) on the second anniversary of the date hereof, in which event, in exchange for termination of the Option, the Asbestos Trust shall receive full payment of $20,000,000.00 in cash from the Optionor (the "Termination Payment").  Upon termination of the Option, as provided in this Section 1.3, the Optionor promptly shall notify the Asbestos Trust in writing of such termination by delivery of notice of the form attached hereto as Exhibit B (the "Termination Notice").  Within two Trading Days after receipt of the Termination Notice, the Asbestos Trust shall provide to the Optionor written instructions for the wiring of same-day-available funds in payment of the Termination Payment.  Upon payment in full of the Termination Payment to the Asbestos Trust, the obligations of the Optionor and EnPro hereunder shall cease.

1.4    Call Right.  Optionor shall have the right to call the Option from the Asbestos Trust by delivery of notice of the form attached hereto as Exhibit C (the "Call Notice") to the Asbestos Trust at any time prior to 5:00 p.m. (Charlotte, North Carolina time) on the second Trading Day preceding the first anniversary of the date hereof.  Such right to call the Option may be exercised only in whole and not in part.  In the event that the Optionor timely provides the Call Notice to the Asbestos Trust, the Option shall expire, and the Asbestos Trust's right to purchase the Subject Shares hereunder shall terminate, and the Asbestos Trust shall instead receive full payment of $20,000,000.00 in cash from the Optionor (the "Call Payment").  Within two Trading Days after its receipt of the Call Notice, the Asbestos Trust shall provide to the Optionor written instructions for the wiring of same-day-available funds in payment of the Call Payment.  Upon payment in full of the Call Payment to the Asbestos Trust, the obligations of the Optionor and EnPro hereunder shall cease.

1.5    Put Right.  The Asbestos Trust shall have the right to put the Option to the Optionor by delivery of notice of the form attached hereto as Exhibit D (the "Put Notice") to the Optionor between 5:00 p.m. (Charlotte, North Carolina time) on the second Trading Day preceding the first anniversary of the date hereof and 5:00 p.m. (Charlotte, North Carolina time) on the Trading Day immediately preceding the first anniversary of the date hereof; *provided, however*, that in the event that prior thereto EnPro shall have publicly announced that it has entered into an agreement providing for a merger, consolidation or share exchange in which shares of EnPro Common Stock would be converted into consideration other than shares of EnPro Common Stock, the Asbestos Trust may exercise its right to put the Option to the Optionor by delivery of the Put Notice at any time after such public announcement and before 5:00 p.m. (Charlotte, North Carolina time) on the Trading Day immediately preceding the first anniversary of the date hereof.  Such right to put the Option may be exercised only in whole and not in part.  In the event that the Asbestos Trust timely provides the Put Notice to the Optionor, the Option shall expire, and the Asbestos Trust's right to purchase the Subject Shares hereunder shall terminate, and the Asbestos Trust shall instead receive payment of $20,000,000.00 in cash from the Optionor (the "Put Payment").  The Put Notice shall include the Asbestos Trust's written instructions for the wiring of same-day-available funds in payment of the Put Payment.

3

Upon payment in full of the Put Payment to the Asbestos Trust, the obligations of the Optionor and EnPro hereunder shall cease.

      1.6    <u>Settlement</u>.  Unless the parties agree otherwise, settlement of an exercise of the Option pursuant to a Notice of Option Exercise, of the payment of the Termination Payment pursuant to the Termination Notice, of the payment of the Call Payment pursuant to a Call Notice, or of the payment of the Put Payment pursuant to a Put Notice shall occur on the fifth Trading Day after delivery of such notice.  Certificates evidencing the Subject Shares to be issued in settlement of an exercise of the Option shall be delivered to the address set forth in the Notice of Option Exercise.

      1.7    <u>No Rights as a Shareholder</u>.  This Option and Registration Rights Agreement does not, in and of itself, entitle the Asbestos Trust to any voting rights or other rights as a shareholder of EnPro prior to the issuance of shares to the Asbestos Trust upon the exercise of the Option.

      1.8    <u>Absolute and Unconditional Guaranty of EnPro</u>.  EnPro hereby absolutely, irrevocably, and unconditionally guarantees, as a primary obligor and not merely as a surety, to the Asbestos Trust all of the Optionor's payment and performance obligations under this Option and Registration Rights Agreement, including, without limitation, Optionor's duties and obligations (a) to deliver the Subject Shares upon exercise of the Option in accordance with the terms and conditions hereof, and (b) to pay the sum of $20,000,000.00 in full to the Asbestos Trust in accordance with the terms and conditions set forth in Sections 1.3, 1.4, and 1.5 hereof; *provided, however*, that such guarantee by EnPro of the Optionor's obligation to make the Termination Payment pursuant to Section 1.3 hereof shall become effective on the Effective Date immediately after consummation of the merger of Optionor with and into New Coltec, Inc., as provided in Section 7.10 of the Joint Plan.  EnPro hereby agrees that this Option and Registration Rights Agreement is an absolute and unconditional guarantee of payment and performance and is not merely a surety obligation or a guarantee of collection, and that EnPro shall be jointly and severally liable for the Optionor's obligations of payment and performance hereunder, regardless of the solvency or insolvency of the Obligor at any time.

### Article II
### Representations and Warranties of the Optionor and EnPro

      Optionor and EnPro each hereby represents and warrants to the Asbestos Trust that the following are true and correct as of the Effective Date, and Optionor and EnPro each acknowledge that the Asbestos Trust is relying on each of the following representations and warranties as being true and correct and that the Asbestos Trust's reliance thereon is reasonable:

      2.1    <u>Authorization, Enforceability</u>.

      (a)    This Option and Registration Rights Agreement has been duly authorized by the Optionor and EnPro, and, when executed and delivered by them as contemplated hereby, will constitute valid and legally binding obligations of the Optionor and EnPro, respectively, enforceable against each of them in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium

or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity. The Subject Shares have been duly authorized and reserved for issuance upon exercise of the Option and when so issued in accordance with the terms of the Option will be validly issued, fully paid and non-assessable.

(b)     The execution, delivery and performance by the Optionor and EnPro of this Option and Registration Rights Agreement and the consummation of the transactions contemplated hereby and compliance by the Optionor and EnPro with the provisions hereof, will not (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any lien, security interest, charge or encumbrance upon any of the properties or assets of the Optionor, EnPro or any EnPro Subsidiary under any of the terms, conditions or provisions of (i) its organizational documents or (ii) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Optionor, EnPro or any EnPro Subsidiary is a party or by which the Optionor, EnPro or any EnPro Subsidiary may be bound, or to which the Optionor, EnPro or any EnPro Subsidiary or any of the properties or assets of the Optionor, EnPro or any EnPro Subsidiary may be subject, or (B) violate any statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Optionor, EnPro or any EnPro Subsidiary or any of their respective properties or assets except, in the case of clauses (A)(ii) and (B), for those occurrences that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

(c)     EnPro and Optionor have not, either jointly or separately, entered into any agreement with respect to its securities that may impair the rights granted to the Asbestos Trust under this Option and Registration Rights Agreement or that otherwise conflicts with the provisions hereof in any manner that may impair the rights granted to the Asbestos Trust hereunder.

2.2     _Anti-Takeover Provisions and Rights Plans_.  EnPro has taken all necessary action to ensure that the transactions contemplated under this Option and Registration Rights Agreement, including the exercise of the Option in accordance with its terms, will be exempt from any anti-takeover or similar provisions of EnPro's articles of incorporation, and any other provisions of any applicable "moratorium", "control share", "fair price", "interested stockholder" or other anti-takeover laws and regulations of any jurisdiction.  EnPro has taken, and will take, all actions necessary to render any shareholders' rights plan of EnPro inapplicable to this Option and Registration Rights Agreement and the consummation of the transactions contemplated thereby, including the exercise of the Option by the Asbestos Trust in accordance with its terms.

2.3     _Offering of Securities_. Neither the Optionor, EnPro nor any person acting on any of their behalves has taken any action (including any offering of any securities of EnPro) under circumstances which would require the integration of such offering with the offering of the Option or the Subject Shares under the Securities Act of 1933, as amended ("_Securities Act_"),

and the rules and regulations of the SEC promulgated thereunder, or any other action, which might subject the offering, issuance or sale of any of the Option or the Subject Shares to the Asbestos Trust pursuant to this Option and Registration Rights Agreement to the registration requirements of the Securities Act.

**Article III**
**Covenants**

3.1     <u>Commercially Reasonable Efforts</u>.  Subject to the terms and conditions of this Option and Registration Rights Agreement, each of the parties will use its commercially reasonable efforts in good faith to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or desirable, or advisable under applicable laws, so as to permit consummation of the transactions contemplated by this Option and Registration Rights Agreement as promptly as practicable and otherwise to enable consummation of the transactions contemplated hereby and shall use commercially reasonable efforts to cooperate with the other party to that end.

3.2     <u>Sufficiency of Authorized Common Stock; Exchange Listing</u>.  During the period from the date hereof until the date on which the Option has been exercised or has been terminated, EnPro shall at all times have reserved for issuance, free of preemptive or similar rights, a sufficient number of authorized and unissued shares of EnPro Common Stock to fund delivery of shares upon such exercise.  Nothing in this Section 3.2 shall preclude the Optionor from satisfying its obligations in respect of the exercise of the Option by delivery of shares of EnPro Common Stock held by it.  Prior to the first anniversary of the date hereof, EnPro shall cause the Subject Shares to be listed on the same national securities exchange on which the EnPro Common Stock is listed, subject to official notice of issuance, and shall maintain such listing for so long as any EnPro Common Stock is listed on such exchange.

3.3     <u>Further Covenants</u>.  Except as otherwise specified in this Section 3.3, EnPro and Optionor each hereby covenant and agree as follows:

(a)     Upon the issuance and delivery of the Subject Shares, the Subject Shares shall be duly authorized, duly and validly issued, fully paid and non-assessable, and free and clear of any Liens and any preemptive or similar rights.

(b)     EnPro and Optionor shall promptly pay all Taxes, expenses, and charges attributable to the issuance or delivery of the Subject Shares.

(c)     EnPro and Optionor shall not create or grant (other than pursuant to this Agreement, the Joint Plan, or the other Plan Documents) any Liens or any preemptive or similar rights on the Subject Shares.

(d)     EnPro shall take, or cause to be taken, all actions necessary to:

(i)     comply with all requirements of any Applicable Law that may be imposed on EnPro with respect to the issuance of the Subject Shares to the Asbestos Trust;

6

(ii)    obtain any material consent, authorization, order, or approval of, or any exemption by or from, and qualify with or provide any notice to, any Governmental Authority or Entity that is required or necessary pursuant to Applicable Law to be obtained, performed, or made by EnPro in order to consummate the issuance of the Subject Shares to the Asbestos Trust;

(iii)    ensure (through its Board of Directors, shareholders, other governing bodies, management, or otherwise) that the issuance of the Subject Shares to the Asbestos Trust will not be subject to, or will not trigger, as the case may be, any (A) "poison pill," shareholder or stockholder rights plan, or other anti-takeover or takeover defenses provision contained in the Governing Documents of EnPro or any of its Affiliates or in any other legal instrument or resolution adopted by or pertaining to EnPro; (B) change-of-control or severance or "golden parachute" agreement, plan, or provision (I) to which EnPro or any of its officers or employees is a party or beneficiary, or (II) contained in a legal instrument or resolution adopted or approved by, or pertaining to, EnPro or any of its Affiliates; or (C) any provision of any applicable "moratorium," "control share," "fair price," "interested stockholder," or other Applicable Law regulating mergers, acquisitions, change of control transactions, voting rights, or share acquisitions; and

(iv)    cause (through its Board of Directors, stockholders, other governing bodies, management, or otherwise) the ownership or voting rights of the Asbestos Trust with respect to the Subject Shares not to be limited, qualified, or restricted by any plan, provision, agreement, resolution, legal instrument, or Applicable Law referred to in clauses (iii)(A) through (iii)(C) above.

(e)    EnPro and Optionor shall not enter into any agreement with respect to the EnPro Common Stock that conflicts with, impairs, or limits the rights granted to the Asbestos Trust pursuant to this Option and Registration Rights Agreement or the provisions hereof.  EnPro and Optionor shall not, by amendment of their respective Governing Documents or through any transaction or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by EnPro or the Optionor.

(f)    Concurrently with the issuance of the Subject Shares, EnPro shall deliver to the Asbestos Trust a written opinion of EnPro's outside counsel on such customary or appropriate matters concerning the due authorization, receipt of approvals, issuance, registration, and compliance with the securities laws as the Asbestos Trust may reasonably require.

## Article IV
## Registration and Attendant Rights

4.1    <u>Subject Shares Not Registered</u>. The Asbestos Trust acknowledges that the Option and the Subject Shares have not been registered under the Securities Act or under any state securities laws.  The Asbestos Trust (a) is acquiring the Option pursuant to an exemption from registration under the Securities Act solely for investment with no present intention to distribute the Option to any person in violation of the Securities Act or any applicable U.S. state securities laws, (b) will not sell or otherwise dispose of the Subject Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any applicable U.S. state securities laws, and (c) has such knowledge and experience in financial and business

7

matters and in investments of this type that it is capable of evaluating the merits and risks of the purchase and of making an informed investment decision.

4.2    Legends.

(a)    The Asbestos Trust agrees that all certificates representing the Subject Shares will bear a legend substantially to the following effect:

**"THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS."**

(b) In the event that any of the Subject Shares (i) are sold pursuant to a registration statement effective under the Securities Act or (ii) are eligible to be transferred without restriction in accordance with Rule 144 or another exemption from registration under the Securities Act (other than Rule 144A), EnPro shall issue new certificates representing such Subject Shares, which shall not contain the applicable legend in Section 4.2(a) above; provided that the Asbestos Trust either surrenders to EnPro the previously issued certificates or furnishes proof of loss, destruction, or theft of the certificates and enters into a customary form indemnification agreement to indemnify EnPro against any loss or damages arising with respect to such lost, destroyed or stolen certificates or the issuance by EnPro of replacement certificates therefor.

4.3    Registration Rights.

(a)    Registration.

(i)  Subject to the terms and conditions of this Option and Registration Rights Agreement, EnPro covenants and agrees that promptly after the receipt by the Optionor of Notice of Option Exercise (and in any event no later than 21 days after the receipt by the Optionor of Notice of Option Exercise) it shall prepare and file with the SEC a Shelf Registration Statement (as defined below) covering all of the Registrable Securities (as defined below) of the Asbestos Trust (or otherwise designate an existing Shelf Registration Statement filed with the SEC to cover the Registrable Securities of the Asbestos Trust), and, to the extent the Shelf Registration Statement has not theretofore been declared effective or is not automatically effective upon such filing, EnPro shall use reasonable best efforts to cause such Shelf Registration Statement to be declared or become effective and to keep such Shelf Registration Statement continuously effective and in compliance with the Securities Act and usable for resale of such Registrable Securities for a period from the date of its initial effectiveness until such time as the Asbestos

8

Trust ceases to own any Registrable Securities (including by refiling such Shelf Registration Statement (or a new Shelf Registration Statement) if the initial Shelf Registration Statement expires.  So long as EnPro is a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) at the time of filing of the Shelf Registration Statement with the SEC, such Shelf Registration Statement shall be designated by EnPro as an automatic Shelf Registration Statement.

(ii)  Any registration pursuant to Section 4.3(a)(i) shall be effected by means of a shelf registration on an appropriate form under Rule 415 under the Securities Act (a "Shelf Registration Statement").  If the Asbestos Trust intends to distribute any Registrable Securities by means of an underwritten offering it shall promptly so advise EnPro and EnPro shall take all reasonable steps to facilitate such distribution, including the actions required pursuant to Section 4.3(c); provided that EnPro shall not be required to facilitate an underwritten offering of Registrable Securities unless the expected gross proceeds from such offering exceed $10,000,000.00. The lead underwriters in any such distribution shall be selected by the Asbestos Trust.

(iii)  EnPro shall not be required to effect a registration (including a resale of Registrable Securities from an effective Shelf Registration Statement) or an underwritten offering pursuant to Section 4.3(a): (A) with respect to securities that are not the Registrable Securities; or (B) if EnPro has notified the Asbestos Trust that in the good faith judgment of the Board of Directors of EnPro, it would be materially detrimental to EnPro or its security holders for such registration or underwritten offering to be effected at such time, in which event EnPro shall have the right to defer such registration for a period of not more than 45 days after receipt of the request of the Asbestos Trust; provided that such right to delay a registration or underwritten offering shall be exercised by EnPro (1) only if EnPro has generally exercised (or is concurrently exercising) similar black-out rights against holders of EnPro Common Stock or securities convertible into EnPro Common Stock that have registration rights and (2) not more than three times in any 12-month period and not more than 90 days in the aggregate in any 12-month period.

(iv)  If during any period when an effective Shelf Registration Statement is not available, EnPro proposes to register any of its equity securities, other than a registration pursuant to Section 4.3(a)(i) or a Special Registration (as defined in Section 4.3(i) below), and the registration form to be filed may be used for the registration or qualification for distribution of Subject Shares, EnPro will give prompt written notice to the Asbestos Trust of its intention to effect such a registration (but in no event less than ten days prior to the anticipated filing date) and will include in such registration all Subject Shares with respect to which EnPro has received written requests for inclusion therein within ten business days after the date of EnPro's notice (a "Piggyback Registration"). The Asbestos Trust may withdraw from such Piggyback Registration by giving written notice to EnPro and the managing underwriter, if any, on or before the fifth business day

9

prior to the planned effective date of such Piggyback Registration.  EnPro may terminate or withdraw any registration under this Section 4.3(a)(iv) prior to the effectiveness of such registration, whether or not the Asbestos Trust has elected to include any Registrable Securities in such registration.

(v)  If the registration referred to in Section 4.3(a)(iv) is proposed to be underwritten, EnPro will so advise the Asbestos Trust as a part of the written notice given pursuant to Section 4.3(a)(iv). In such event, the right of the Asbestos Trust to registration pursuant to Section 4.3(a)(iv) will be conditioned upon the Asbestos Trust's participation in such underwriting and the inclusion of the Asbestos Trust's Registrable Securities in the underwriting if the Registrable Securities are of the same class of securities as the securities to be offered in the underwritten offering, and the Asbestos Trust will (together with EnPro and the other persons distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by EnPro. If the Asbestos Trust disapproves of the terms of the underwriting, the Asbestos Trust may elect to withdraw therefrom by written notice pursuant to Section 4.3(a)(iv).

(vi) If either (x) EnPro grants "piggyback" registration rights to one or more third parties to include their securities in an underwritten offering under the Shelf Registration Statement pursuant to Section 4.3(a)(ii) or (y) a Piggyback Registration under Section 4.3(a)(iv) relates to an underwritten offering, and in either case the managing underwriters advise EnPro that in their reasonable opinion the number of securities requested to be included in such offering exceeds the number which can be sold without adversely affecting the marketability of such offering (including an adverse effect on the per share offering price), EnPro will include in such offering only such number of securities that in the reasonable opinion of such managing underwriters can be sold without adversely affecting the marketability of the offering (including an adverse effect on the per share offering price), which securities will be so included in the following order of priority: (A) first, in the case of a Piggyback Registration under Section 4.3(a)(iv), the securities EnPro proposes to sell, (B) then the Registrable Securities of the Asbestos Trust to the extent that the Asbestos Trust has requested inclusion of Registrable Securities pursuant to Section 4.3(a)(ii) or Section 4.3(a)(iv), as applicable, and (C) lastly, any other securities of EnPro that have been requested to be so included, subject to the terms of this Option and Registration Rights Agreement.

(b)      Expenses of Registration. All Registration Expenses (as defined below) incurred in connection with any registration, qualification or compliance hereunder shall be borne by EnPro.  All Selling Expenses (as defined below) incurred in connection with any registrations hereunder shall be borne by the holders of the securities so registered pro rata on the basis of the aggregate offering or sale price of the securities so registered.

(c)     Obligations of EnPro.  EnPro shall use its reasonable best efforts, for so long as there are Registrable Securities outstanding, to take such actions as are under its control to not become an ineligible issuer (as defined in Rule 405 under the Securities Act) and to remain a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) if it has such status on the date of this Option and Registration Rights Agreement or becomes eligible for such status hereafter.  In addition, whenever required to effect the registration of any Registrable Securities or facilitate the distribution of Registrable Securities pursuant to an effective Shelf Registration Statement, EnPro shall, as expeditiously as reasonably practicable:

(i)  Prepare and file with the SEC a prospectus supplement with respect to a proposed offering of Registrable Securities pursuant to an effective registration statement, subject to Section 4.3(d), keep such registration statement effective and keep such prospectus supplement current until the securities described therein are no longer Registrable Securities.

(ii)  Prepare and file with the SEC such amendments and supplements to the applicable registration statement and the prospectus or prospectus supplement used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(iii)  Furnish to the Asbestos Trust and any underwriters such number of copies of the applicable registration statement and each such amendment and supplement thereto (including in each case all exhibits) and of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned or to be distributed by them.

(iv)  Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Asbestos Trust or any managing underwriter(s), to keep such registration or qualification in effect for so long as such registration statement remains in effect, and to take any other action which may be reasonably necessary to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by the Asbestos Trust; provided that EnPro shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(v)  Notify the Asbestos Trust at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the applicable prospectus, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to

11

be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.

(vi)  Give written notice to the Asbestos Trust:

(A)  when any registration statement filed pursuant to Section 4.3(a) or any amendment thereto has been filed with the SEC (except for any amendment effected by the filing of a document with the SEC pursuant to the Securities Exchange Act of 1934, as amended ("Exchange Act")) and when such registration statement or any post-effective amendment thereto has become effective;

(B)  of any request by the SEC for amendments or supplements to any registration statement or the prospectus included therein or for additional information;

(C)  of the issuance by the SEC of any stop order suspending the effectiveness of any registration statement or the initiation of any proceedings for that purpose;

(D)  of the receipt by EnPro or its legal counsel of any notification with respect to the suspension of the qualification of the EnPro Common Stock for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(E)  of the happening of any event that requires EnPro to make changes in any effective registration statement or the prospectus related to the registration statement in order to make the statements therein not misleading (which notice shall be accompanied by an instruction to suspend the use of the prospectus until the requisite changes have been made); and

(F)  if at any time the representations and warranties of EnPro contained in any underwriting agreement contemplated by Section 4.3(c)(x) cease to be true and correct.

(vii)  Use its reasonable best efforts to prevent the issuance or obtain the withdrawal of any order suspending the effectiveness of any registration statement referred to in Section 4.3(c)(vi)(C) at the earliest practicable time.

(viii)  Upon the occurrence of any event contemplated by Section 4.3(c)(v) or 4.3(c)(vi)(E), promptly prepare a post-effective amendment to such registration statement or a supplement to the related prospectus or file any other required document so that, as thereafter delivered to the Asbestos Trust and any underwriters, the prospectus will not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light

12

of the circumstances under which they were made, not misleading. If EnPro notifies the Asbestos Trust in accordance with Section 4.3(c)(vi)(E) to suspend the use of the prospectus until the requisite changes to the prospectus have been made, then the Asbestos Trust and any underwriters shall suspend use of such prospectus and use their reasonable best efforts to return to EnPro all copies of such prospectus (at EnPro's expense) other than permanent file copies then in the Asbestos Trust's or underwriters' possession. The total number of days that any such suspension may be in effect in any 12-month period shall not exceed 90 days.

(ix)  Use reasonable best efforts to procure the cooperation of EnPro's transfer agent in settling any offering or sale of Registrable Securities, including with respect to the transfer of physical stock certificates into book-entry form in accordance with any procedures reasonably requested by the Asbestos Trust or any managing underwriter(s).

(x)  If an underwritten offering is requested pursuant to Section 4.3(a)(ii), enter into an underwriting agreement in customary form, scope and substance and take all such other actions reasonably requested by the Asbestos Trust or by the managing underwriter(s), if any, to expedite or facilitate the underwritten disposition of the Registrable Securities, and in connection therewith in any underwritten offering (including making members of management and executives of EnPro available to participate in "road shows", similar sales events and other marketing activities), (A) make such representations and warranties to the Asbestos Trust and the managing underwriter(s), if any, with respect to the business of EnPro and its subsidiaries, and the Shelf Registration Statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in customary form, substance and scope, and, if true, confirm the same if and when requested, (B) use its reasonable best efforts to furnish the underwriters with opinions of counsel to EnPro, addressed to the managing underwriter(s), if any, covering the matters customarily covered in such opinions requested in underwritten offerings, (C) use its reasonable best efforts to obtain "cold comfort" letters from the independent certified public accountants of EnPro (and, if necessary, any other independent certified public accountants of any business acquired by EnPro for which financial statements and financial data are included in the Shelf Registration Statement) who have certified the financial statements included in such Shelf Registration Statement, addressed to each of the managing underwriter(s), if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters, (D) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures customary in underwritten offerings, and (E) deliver such documents and certificates as may be reasonably requested by the Asbestos Trust, its counsel and the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to clause (i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by EnPro.

13

(xi)  Make available for inspection by a representative of the Asbestos Trust, the managing underwriter(s), if any, and any attorneys or accountants retained by the Asbestos Trust or managing underwriter(s), at the offices where normally kept, during reasonable business hours, financial and other records, pertinent corporate documents and properties of EnPro, and cause the officers, directors and employees of EnPro to supply all information in each case reasonably requested (and of the type customarily provided in connection with due diligence conducted in connection with a registered public offering of securities) by any such representative, managing underwriter(s), attorney or accountant in connection with such Shelf Registration Statement.

(xii)  Use reasonable best efforts to cause all Registrable Securities to be listed on each national securities exchange on which similar securities issued by EnPro are then listed.

(xii)  If requested by the Asbestos Trust or the managing underwriter(s), if any, promptly include in a prospectus supplement or amendment such information as the Asbestos Trust or managing underwriter(s), if any, may reasonably request in order to permit the intended method of distribution of such securities and make all required filings of such prospectus supplement or such amendment as soon as practicable after EnPro has received such request.

(xiii)  Timely provide to its security holders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder.

(d)    <u>Suspension of Sales</u>. Upon receipt of written notice from EnPro that a registration statement, prospectus or prospectus supplement contains or may contain an untrue statement of a material fact or omits or may omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that circumstances exist that make inadvisable use of such registration statement, prospectus or prospectus supplement, the Asbestos Trust shall forthwith discontinue disposition of Registrable Securities until the Asbestos Trust has received copies of a supplemented or amended prospectus or prospectus supplement, or until the Asbestos Trust is advised in writing by EnPro that the use of the prospectus and, if applicable, prospectus supplement may be resumed, and, if so directed by EnPro, the Asbestos Trust shall deliver to EnPro (at EnPro's expense) all copies, other than permanent file copies then in the Asbestos Trust's possession, of the prospectus and, if applicable, prospectus supplement covering such Registrable Securities current at the time of receipt of such notice. The total number of days that any such suspension may be in effect in any 12-month period shall not exceed 90 days.

(e)    <u>Termination of Registration Rights</u>. The Asbestos Trust's registration rights as to any securities held by it (and its Affiliates (as defined below)) shall not be available unless such securities are Registrable Securities.  "Registrable Securities" means (A) the Subject Shares and (B) any equity securities of EnPro issued or issuable directly or

14

indirectly with respect to any of the Subject Shares by way of exchange thereof or share dividend or share split or in connection with a combination of shares, recapitalization, reclassification, merger, amalgamation, arrangement, consolidation or other reorganization, provided that, once issued, such securities will not be Registrable Securities when (1) they are sold pursuant to an effective registration statement under the Securities Act, (2) they may be sold pursuant to Rule 144 without limitation thereunder on volume or manner of sale, (3) they shall have ceased to be outstanding or (4) they have been sold in a private transaction.  No Registrable Securities may be registered under more than one registration statement at any one time.

(f)  <u>Furnishing Information</u>.

(i)  The Asbestos Trust shall not use any "free writing prospectus" (as defined in Rule 405) in connection with the sale of Registrable Securities without the prior written consent of EnPro.

(ii)  It shall be a condition precedent to the obligations of EnPro to take any action pursuant to Section 4.3(c) that the Asbestos Trust and the underwriters, if any, shall furnish to EnPro such information regarding themselves, the Registrable Securities and the intended method of disposition of such securities as shall be required to effect the registered offering of the Registrable Securities.

(g)  <u>Indemnification</u>.

(i)  EnPro agrees to indemnify the Asbestos Trust and the Asbestos Trust's trustees, officers, employees, agents, representatives and Affiliates, and each Person (as herein defined), if any, that controls the Asbestos Trust within the meaning of the Securities Act (each, an "Indemnitee"), against any and all losses, claims, damages, actions, liabilities, costs and expenses (including reasonable fees, expenses and disbursements of attorneys and other professionals incurred in connection with investigating, defending, settling, compromising or paying any such losses, claims, damages, actions, liabilities, costs and expenses), joint or several, arising out of or based upon any untrue statement or alleged untrue statement of material fact contained in any registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto or any documents incorporated therein by reference or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by EnPro or authorized by it in writing for use by the Asbestos Trust (or any amendment or supplement thereto); or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, that EnPro shall not be liable to such Indemnitee in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon (A) an untrue statement or omission made in such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or

15

supplements thereto or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by EnPro or authorized by it in writing for use by the Asbestos Trust (or any amendment or supplement thereto), in reliance upon and in conformity with information regarding such Indemnitee or its plan of distribution or ownership interests which was furnished in writing to EnPro by such Indemnitee for use in connection with such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or supplements thereto, or (B) offers or sales effected by or on behalf of such Indemnitee "by means of" (as defined in Rule 159A) a "free writing prospectus" (as defined in Rule 405) that was not authorized in writing by EnPro.

(ii)  If the indemnification provided for in Section 4.3(g)(i) is unavailable to an Indemnitee with respect to any losses, claims, damages, actions, liabilities, costs or expenses referred to therein or is insufficient to hold the Indemnitee harmless as contemplated therein, then EnPro, in lieu of indemnifying such Indemnitee, shall contribute to the amount paid or payable by such Indemnitee as a result of such losses, claims, damages, actions, liabilities, costs or expenses in such proportion as is appropriate to reflect the relative fault of the Indemnitee, on the one hand, and EnPro, on the other hand, in connection with the statements or omissions which resulted in such losses, claims, damages, actions, liabilities, costs or expenses as well as any other relevant equitable considerations. The relative fault of EnPro, on the one hand, and of the Indemnitee, on the other hand, shall be determined by reference to, among other factors, whether the untrue statement of a material fact or omission to state a material fact relates to information supplied by EnPro or by the Indemnitee and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; EnPro and the Asbestos Trust agree that it would not be just and equitable if contribution pursuant to this Section 4.3(g)(ii) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in Section 4.3(g)(ii). No Indemnitee guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from EnPro if EnPro was not guilty of such fraudulent misrepresentation.

(h)  <u>No Assignment of Registration Rights</u>.  The rights of the Asbestos Trust to registration of Registrable Securities pursuant to Section 4.3 may not be assigned.

(i)  <u>Clear Market</u>. With respect to any underwritten offering of Registrable Securities by the Asbestos Trust pursuant to this Section 4.3, EnPro agrees not to effect (other than pursuant to such registration or pursuant to a Special Registration) any public sale or distribution, or to file any Shelf Registration Statement (other than such registration or a Special Registration) covering, in the case of an underwritten offering of EnPro Common Stock, any of its equity securities, or, in each case, any securities convertible into or exchangeable or exercisable for such securities, during the period not to exceed ten days prior and 60 days following the effective date of such offering or such longer period up to 90 days as may be requested by the managing underwriter for such

underwritten offering. EnPro also agrees to cause such of its directors and senior executive officers to execute and deliver customary lock-up agreements in such form and for such time period up to 90 days as may be requested by the managing underwriter. "Special Registration" means the registration of (A) equity securities and/or options or other rights in respect thereof solely registered on Form S-4 or Form S-8 (or successor form) or (B) shares of equity securities and/or options or other rights in respect thereof to be offered to directors, members of management, employees, consultants, customers, lenders or vendors of EnPro or its subsidiaries or in connection with dividend reinvestment plans.

(j)     Rule 144.  With a view to making available to the Asbestos Trust the benefits of certain rules and regulations of the SEC that may permit the sale of the Registrable Securities to the public without registration, EnPro agrees to use its reasonable best efforts to:

(i)  make and keep public information available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the first anniversary of the date hereof;

(ii)  (A) file with the SEC, in a timely manner, all reports and other documents required of EnPro under the Exchange Act, and (B) if at any time EnPro is not required to file such reports, make publicly available the information required by Rule 144(c)(2);

(iii)  so long as the Asbestos Trust owns any Registrable Securities, furnish to the Asbestos Trust upon request: a written statement by EnPro as to its compliance with the reporting requirements of Rule 144 under the Securities Act, and of the Exchange Act; a copy of the most recent annual or quarterly report of EnPro; and such other reports and documents as the Asbestos Trust may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities to the public without registration; and

(iv)  take such further action as the Asbestos Trust may reasonably request, all to the extent required from time to time to enable the Asbestos Trust to sell Registrable Securities without registration under the Securities Act.

(k)     Definitions.  As used in this Section 4.3, the following terms shall have the following respective meanings:

(iii)  "Person" has the meaning given to it in Section 3(a)(9) of the Exchange Act and as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act.

(ii)  "Register," "registered," and "registration" shall refer to a registration effected by preparing and (A) filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the

17

declaration or ordering of effectiveness of such registration statement or (B) filing a prospectus and/or prospectus supplement in respect of an appropriate effective registration statement on Form S-3.

(iii) "Registration Expenses" mean all expenses incurred by EnPro in effecting any registration pursuant to this Option and Registration Rights Agreement (whether or not any registration or prospectus becomes effective or final) or otherwise complying with its obligations under this Section 4.3, including all registration, filing and listing fees, printing expenses, fees and disbursements of counsel for EnPro, blue sky fees and expenses, expenses incurred in connection with any "road show," and expenses of EnPro's independent accountants in connection with any regular or special reviews or audits incident to or required by any such registration, but shall not include Selling Expenses.

(iv) "Rule 144", "Rule 144A", "Rule 159A", "Rule 405" and "Rule 415" mean, in each case, such rule promulgated under the Securities Act (or any successor provision), as the same shall be amended from time to time.

(v) "Selling Expenses" mean all discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for the Asbestos Trust.

(l)     Specific Performance.  The parties hereto acknowledge that there would be no adequate remedy at law if EnPro fails to perform any of its obligations under this Section 4.3 and that the Asbestos Trust from time to time may be irreparably harmed by any such failure, and accordingly agree that the Asbestos Trust, in addition to any other remedy to which it may be entitled at law or in equity, to the fullest extent permitted and enforceable under applicable law shall be entitled to compel specific performance of the obligations of EnPro under this Section 4.3 in accordance with the terms and conditions of this Section 4.3.

(m)     No Inconsistent Agreements.  EnPro shall not enter into any agreement with respect to its securities that may impair the rights granted to the Asbestos Trust under this Section 4.3 or that otherwise conflicts with the provisions hereof in any manner that may impair the rights granted to the Asbestos Trust under this Section 4.3. In the event EnPro has entered into any agreement with respect to its securities that is inconsistent with the rights granted to the Asbestos Trust under this Section 4.3 (including agreements that are inconsistent with the order of priority contemplated by Section 4.3(a)(vi)) or that may otherwise conflict with the provisions hereof, EnPro shall use its reasonable best efforts to amend such agreements to ensure they are consistent with the provisions of this Section 4.3.

18

## Article V
## Miscellaneous

5.1     Amendment; Waiver; Cumulative Rights and Remedies.  No amendment of any provision of this Option and Registration Rights Agreement will be effective unless made in writing and signed by an officer or a duly authorized representative of each party.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative of any rights or remedies provided by law and not exclusive of any other remedy conferred hereby or by law, and the exercise of any one remedy by each shall not preclude the exercise of any other remedy by the same party.

5.2     Governing Law.  This Option and Registration Rights Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to the conflicts of law principles thereof.

5.3     Notices.  Any notice, request, instruction or other communications provided for herein by any party to the other shall be given or made in writing (including, without limitation, by telecopy or Electronic Transmission) and will be deemed to have been duly given when transmitted by telecopier or Electronic Transmission or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as provided herein.  All notices to a party shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by such party and delivered to the other parties in accordance with this Section 5.3.

If to the Optionor:

OldCo, LLC
5605 Carnegie Blvd., Ste. 500,
Charlotte, NC  28209-4674
Attention: [_____]
Facsimile: [_____]
Email: [_____]

        with a copy to:

Robinson, Bradshaw & Hinson, P.A.
101 North Tyron Street, Ste. 1900
Charlotte, North Carolina 28246
Attention:  Stephen M. Lynch, Esq.
Facsimile:  (704) 373-3955
Email:  slynch@rbh.com

Modified Joint Plan - Ex. H

If to EnPro:

EnPro Industries, Inc.
5605 Carnegie Blvd., Ste. 500,
Charlotte, NC  28209-4674
Facsimile: (704) 731-1531
Attention: Robert S. McLean, Chief Administrative Officer, General Counsel and
Secretary

      with a copy to:

Robinson, Bradshaw & Hinson, P.A.
101 North Tyron Street, Ste. 1900
Charlotte, North Carolina 28246
Attention:  Stephen M. Lynch, Esq.
Facsimile:  (704) 373-3955
Email:  slynch@rbh.com

If to the Asbestos Trust:

[_____]
[_____]
[_____]
Attention: [_____]
Facsimile: [_____]
Email: [_____]

      with a copy to:

[_____]
[_____]
[_____]
Attention: [_____]
Facsimile: [_____]
Email: [_____]

    5.4    <u>Definitions</u>.  For purposes of this Option and Registration Rights Agreement, the following terms shall have the meanings set forth below:

    (a)    The term "<u>Affiliate</u>" means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with, such other person. For purposes of this definition, "<u>control</u>" (including, with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>") when used with respect to any person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

20

(b)     The term "<u>Applicable Law</u>" means, at any time and with reference to any Entity or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Authority, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Authority applicable to such Entity or its property or in respect of its operations or to any referenced circumstances or events.

(c)     The term "<u>Board of Directors</u>" means the board of directors, board of managers, or any other governing body of an Entity.

(d)     The term "<u>Business Combination</u>" means a merger, consolidation, statutory share exchange, or similar transaction that requires the approval of the party's shareholders or members, and includes the merger of Optionor with and into New Coltec, Inc., as provided in Section 7.10 of the Joint Plan.

(e)     The term "<u>Effective Date</u>" has the meaning ascribed to that term in the Joint Plan.

(f)     The term "<u>Electronic Transmission</u>" shall mean delivery of information by electronic mail, facsimile or other electronic format acceptable to the parties.  An Electronic Transmission shall be considered written notice for all purposes hereof.

(g)     The term "<u>EnPro Common Stock</u>" means (1) the common stock of EnPro, $0.01 par value per share, (2) the common stock of any successor corporation thereto, or (3) any similar equity ownership interest in any other successor Entity thereto.

(h)     The term "<u>Entity</u>" means an individual, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association, a governmental unit or subdivision thereof, including the United States Bankruptcy Administrator, or any other entity, whether acting in an individual, fiduciary, or other capacity.

(i)     The term "<u>Governing Documents</u>" means, as to any Entity, its articles or certificate of incorporation and bylaws, its partnership agreement, its certificate of formation and operating agreement, or the organizational or governing documents of such Entity.

(j)     The term "<u>Governmental Authority</u>" means the United States of America, a state, commonwealth, district, territory, municipality, or foreign state; or a department, agency, instrumentality, court, or tribunal of the United States of America, a state, a commonwealth, a district, a territory, a municipality, or a foreign state; or other foreign or domestic government, or subdivision thereof.

(k)     The term "<u>Material Adverse Effect</u>" means a material adverse effect on the business, results of operation or financial condition of EnPro and its consolidated subsidiaries taken as a whole.

(l)     The term "<u>Plan Documents</u>" has the meaning ascribed to that term in the Joint Plan.

(m)     When a reference is made in this Option and Registration Rights Agreement to a subsidiary of a person, the term "<u>subsidiary</u>" means any corporation, partnership, joint venture, limited liability company or other entity (1) of which such person or a subsidiary of such person is a general partner or (2) of which a majority of the voting securities or other voting interests, or a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or persons performing similar functions with respect to such entity, is directly or indirectly owned by such person and/or one or more subsidiaries thereof.

(n)     The term "<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties, and any similar liabilities with respect thereto.

5.8     <u>Assignment</u>.  Neither this Option and Registration Rights Agreement nor any right, remedy, obligation nor liability arising hereunder or by reason hereof shall be assignable by any party hereto without the prior written consent of the other party, and any attempt to assign any right, remedy, obligation or liability hereunder without such consent shall be void, except (a) an assignment, in the case of a Business Combination where such party is not the surviving entity, or (b) a sale of substantially all of its assets, to the Entity which is the survivor of such Business Combination or the purchaser in such sale.

5.9     <u>Severability</u>.  If any provision of this Option and Registration Rights Agreement, or the application thereof to any person or circumstance, is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

5.10     <u>No Third Party Beneficiaries</u>.  Nothing contained in this Option and Registration Rights Agreement, expressed or implied, is intended to confer upon any person or entity other than EnPro, the Optionor, and the Asbestos Trust any benefit, right or remedies.

5.11     **<u>WAIVER OF JURY TRIAL</u>**.  EACH PARTY HEREBY WAIVES, FOR ITSELF, AND ITS SUCCESSORS AND ASSIGNS, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF,

Modified Joint Plan - Ex. H

UNDER, OR IN CONNECTION WITH, THIS OPTION AND REGISTRATION RIGHTS AGREEMENT.

5.12    Counterparts.  This Option and Registration Rights Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Option and Registration Rights Agreement, or any notice, communication, agreement, certificate, document, or other instrument in connection herewith by telecopier, facsimile, portable document format ("PDF"), or other Electronic Transmission shall be as effective as delivery of a manually executed counterpart of thereof.  The signature of any party by telecopier, facsimile, PDF, or other Electronic Transmission is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature on an original document.

5.13    Headings.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

5.14    Entire Agreement.  This Option and Registration Rights Agreement, together with the Joint Plan and the other Plan Documents, is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein or in the Joint Plan and the other Plan Documents with respect to the registration rights granted by EnPro with respect to the Subject Shares.  This Option and Registration Rights Agreement, together with the Joint Plan and the other Plan Documents, supersedes all prior agreements and understandings between the parties with respect to such subject matter.

5.15    Currency Denomination.  All sums of money referred to herein are denominated in United States of America dollars.

5.16    Survival of Representations and Warranties.  All representations and warranties contained in this Option and Registration Rights Agreement shall survive the execution and delivery of this Option and Registration Rights Agreement and the other Plan Documents.

[signature page follows]

23

Modified Joint Plan - Ex. H

**IN WITNESS WHEREOF**, the Optionor, EnPro, and the Asbestos Trust have executed this Option and Registration Rights Agreement by their duly authorized representatives as of the date first set forth above.

**OLDCO, LLC**

By:    _____
Name:  [_____]
Title: [_____]

**ENPRO INDUSTRIES, INC.**

By:    _____
Name:  [_____]
Title: [_____]

**GST SETTLEMENT FACILITY**

By:    _____
Name:  [_____]
Title: [_____]

24

**EXHIBIT A**

**FORM OF
NOTICE OF OPTION EXERCISE**

[insert date]

Coltec Industries, Inc.
(as successor by merger to OldCo, LLC)
5605 Carnegie Blvd., Ste. 500,
Charlotte, NC  28209-4674
Attention: _____

This notice is being delivered pursuant to Section 1.2 of the Option and Registration Rights Agreement dated as of _____ __, 20__ (the "Option Agreement") among OldCo, LLC, EnPro Industries, Inc. and GST Settlement Facility.  Capitalized terms used herein, and not otherwise defined herein, have the meanings given to them in the Option Agreement.

The Asbestos Trust hereby provides notice of its exercise of the Option as of the date hereof. Settlement of the exercise of the Option shall occur on _____ __, 20__ [insert date], which is five Trading Days after the date hereof.

Certificates evidencing the Subject Shares to be issued to the Asbestos Trust are to be delivered to the following address:

_____

_____

_____

The name and address of the Asbestos Trust are as follows:

_____

_____

_____

_____

The Federal taxpayer identification number of the Asbestos Trust is: _____.

A-1

[In the event that the number of the Subject Shares is to be reduced pursuant to the proviso included in Section 1.1(a) of the Option Agreement, the cash payment to be made due to the reduction in the number of Subject Shares shall be delivered to the undersigned in accordance with the following wiring instructions:

_____

_____

_____

_____]

**GST SETTLEMENT FACILITY**

By:  _____
Name: [_____]
Title: [_____]

A-2

Modified Joint Plan - Ex. H

**EXHIBIT B**

## FORM OF
## TERMINATION NOTICE

[insert date]

[_____]
[_____]
[_____]
Attention: [_____]


This notice is being delivered pursuant to Section 1.3 of the Option and Registration Rights Agreement dated as of _____ __, 20__ (the "Option Agreement") among OldCo, LLC, EnPro Industries, Inc., and the GST Settlement Facility. Capitalized terms used herein, and not otherwise defined herein, have the meanings given to them in the Option Agreement.

The undersigned, which is the successor by merger to OldCo, LLC, hereby provides notice that the second anniversary of the Effective Date of the Joint Plan has occurred without delivery by the Asbestos Trust of the Notice of Option Exercise or the Put Notice and without delivery by Optionor of the Call Notice. As a result, the Option has expired in accordance with the terms of the Option Agreement, which, in turn, has triggered the right of the Asbestos Trust to receive the Termination Payment.

Please provide promptly, and in any event within two Trading Days, written instructions for wire transfer of the $20,000,000.00 Termination Payment. Such written wiring instructions should be sent to the undersigned by email ([insert email address]) or facsimile ([insert facsimile number]).


**COLTEC INDUSTRIES, INC. (successor by merger to OldCo, LLC)**


By:   _____
Name: [_____]
Title: [_____]


B-1

Modified Joint Plan - Ex. H

**EXHIBIT C**

**FORM OF
CALL NOTICE**

[insert date]

[_____]
[_____]
[_____]
Attention: [_____]


This notice is being delivered pursuant to Section 1.4 of the Option and Registration Rights Agreement dated as of _____ __, 20__ (the "Option Agreement") among OldCo, LLC, EnPro Industries, Inc., and the GST Settlement Facility.  Capitalized terms used herein, and not otherwise defined herein, have the meanings given to them in the Option Agreement.

The undersigned, which is the successor by merger to OldCo, LLC, hereby provides notice of its exercise of its right under Section 1.4 of the Option Agreement to call the Option as of the date hereof.  Settlement of the call of the Option shall occur on _____ __, 20__, which is five Trading Days after the date hereof.

Please provide promptly, and in any event within two Trading Days, written instructions for wire transfer of the $20,000,000.00 Call Payment.  Such written wiring instructions should be sent to the undersigned by email ([insert email address]) or facsimile ([insert facsimile number]).


**COLTEC INDUSTRIES, INC. (successor
by merger to OldCo, LLC)**


By: _____
Name: [_____]
Title: [_____]

8739527v2                                                    Modified Joint Plan - Ex. H

**EXHIBIT D**

**FORM OF
PUT NOTICE**

[insert date]

Coltec Industries, Inc.
(as successor by merger to OldCo, LLC)
5605 Carnegie Blvd., Ste. 500,
Charlotte, NC  28209-4674
Attention: _____

This notice is being delivered pursuant to Section 1.5 of the Option and Registration Rights Agreement dated as of _____ __, 20__ (the "Option Agreement") among OldCo, LLC, EnPro Industries, Inc., and the GST Settlement Facility.  Capitalized terms used herein, and not otherwise defined herein, have the meanings given to them in the Option Agreement.

The undersigned hereby provides notice of its exercise of its right under Section 1.5 of the Option Agreement to put the Option as of the date hereof.  Settlement of the put of the Option shall occur on _____ __, 20__, which is five Trading Days after the date hereof.

The Put Payment shall be delivered to the undersigned in accordance with the following wiring instructions:

_____
_____
_____
_____

The name and address of the Asbestos Trust are as follows:

_____
_____
_____
_____

The Federal taxpayer identification number of the Asbestos Trust is: _____.

**GST SETTLEMENT FACILITY**

By:  _____
Name: [_____]
Title: [_____]

D-1

8739527v2

Modified Joint Plan - Ex. H