# EXHIBIT I

## EXHIBIT I

## PLEDGE AGREEMENT

**THIS PLEDGE AGREEMENT** (this "**Agreement**"), dated as of the Effective Date (as defined in the Plan referred to below), is made by and between **NEW COLTEC, INC.,**[1] a North Carolina corporation (the "**Pledgor**"), and the **GST SETTLEMENT FACILITY**, a Delaware statutory trust (the "**Secured Party**").

## RECITALS

A.   Section 7.3.2 of the Joint Plan of Reorganization of Garlock Sealing Technologies LLC, *et al*. and OldCo, LLC, successor by merger to Coltec Industries Inc ("**OldCo**"), as initially filed in the United States Bankruptcy Court for the Western District of North Carolina on May 20, 2016 (as amended, supplemented, or otherwise modified from time to time, and together with the exhibits and schedules to the foregoing, as the same may be in effect from time to time, the "**Plan**"), provides that the Secured Party is to be funded with, among other things, the Deferred Contribution, an obligation of the Pledgor that shall be paid in full and in cash on or before the first anniversary of the Effective Date of the Plan.

B.   Section 7.3.2 of the Plan further provides, among other things, that payment of the Deferred Contribution shall be secured by a pledge of, and the granting of a security interest in, 50.1% of the GST/Garrison Equity Interests, which pledge and grant shall become effective on the Effective Date immediately after the merger of OldCo with and into the Pledgor, as provided in Section 7.10 of the Plan (the "**Merger**").

C.   The Pledgor will obtain benefits as a result of the consummation of the Plan, which benefits are hereby acknowledged, and accordingly desires to execute and deliver this Agreement.

## STATEMENT OF AGREEMENT

**NOW THEREFORE**, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   **Defined Terms**. All capitalized terms used herein (including, without limitation, in the preamble and recitals hereof) without definition shall have the meanings ascribed to those terms in the Plan. Unless otherwise defined herein, or unless the context otherwise requires, all terms used herein that are defined in the UCC shall have the meanings ascribed to them in the UCC. In addition, as used in this Agreement, the following terms shall have the following meanings:

(a)   "**Laws**" means, at any time and with reference to any Entity or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and

---

[1] Legal name of the Pledgor will change to Coltec Industries, Inc. (or such other name as notified to the Secured Party not less than 15 days prior to the Effective Date) on Effective Date upon effectiveness of the Merger.

orders of any Governmental Unit, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Unit applicable to such Entity or its property or in respect of its operations or to any referenced circumstances or events.

(b)     "**Lien**" means, with respect to any property or asset (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment as collateral, or encumbrance of any kind or nature in respect of such property or asset (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable Law of any jurisdiction) to secure payment of a debt or performance of an obligation.

(c)     "**Proceeds**" means all proceeds (including proceeds of proceeds) of the Pledged Interests, including, without duplication, (a) all rights, benefits, distributions, premiums, profits, dividends, interest, cash, instruments, documents of title, accounts, contract rights, inventory, equipment, general intangibles, deposit accounts, chattel paper, and other property from time to time thereafter received, receivable, or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution for, any of the Pledged Collateral, or proceeds thereof (including any cash, Equity Interests, or other securities or instruments issued after any recapitalization, readjustment, reclassification, merger, or consolidation with respect to the Reorganized Debtors and any security entitlements as defined in the UCC with respect thereto); and (b) "proceeds" as such term is defined in the UCC.

(d)     "**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of North Carolina; *provided, however*, that in the event, by reason of mandatory provisions of Law, any or all of the perfection or priority of, or remedies with respect to, any Pledged Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of North Carolina, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority, or remedies.

2.     **Rules of Interpretation**.

(a)     All terms defined in this Agreement in the singular form shall have comparable meanings when used in the plural form, and vice versa.

(b)     Whenever the context may require, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(c)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(d)     Any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified.

2

(e) All references herein to Sections shall be deemed references to Sections of this Agreement unless the context shall otherwise require.

(f) The headings of the various sections and subsections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.

(g) Unless otherwise provided herein, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply.

3. **Pledge and Grant of Security Interest**. As security for the due and punctual payment of the Deferred Contribution to the Secured Party in accordance with Section 7.3.2 of the Plan, effective as of the Effective Date and immediately following the Merger, the Pledgor hereby pledges, assigns, and delivers to the Secured Party, and grants to the Secured Party a continuing first-priority lien upon and security interest in, all of its right, title, and interest in and to the following (collectively, the "**Pledged Collateral**"):

(a) the Equity Interests described on **Exhibit A** hereto (the "**Pledged Interests**"), and, subject to **Section 7** hereof, all dividends, distributions, cash, instruments, warrants, options, securities, and other property and rights (including voting rights) received as a result of owning such Pledged Interests and Proceeds from time to time received, receivable or otherwise made upon or distributed in respect of or in exchange for any or all of the Pledged Interests; and

(b) to the extent not otherwise excluded in the foregoing, all Proceeds thereof.

4. **Delivery of Pledged Collateral; UCC Financing Statements**. On the Effective Date, the Pledgor shall deliver all certificates or instruments representing or evidencing any Pledged Collateral to the Secured Party pursuant hereto, to be held by the Secured Party in accordance with this Agreement. The Pledged Collateral shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed undated instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Secured Party. The Pledgor hereby authorizes the Secured Party to file at any time or from time to time one or more UCC financing statements and amendments thereto relating to all or any part of the Pledged Collateral.

5. **Representations and Warranties**. The Pledgor represents and warrants to the Secured Party that each of the following representations and warranties is true and correct, and the Pledgor acknowledges that the Secured Party is relying on each of the following representations and warranties as being true and correct and that the Secured Party's reliance thereon is reasonable:

(a) The Pledgor is duly incorporated, validly existing, and in good standing under the Laws of the State of North Carolina (*provided, however*, with respect to good standing, only to the extent the concept of good standing exists in such jurisdiction of incorporation) and has full corporate power and authority to execute and deliver this Agreement.

3

(b)     The Pledgor's execution and delivery of this Agreement has been duly authorized by all necessary corporate actions on the part of the Pledgor.

(c)     This Agreement constitutes a legal, valid, and binding obligation of the Pledgor, enforceable against it in accordance with the terms hereof, except as such enforceability may be limited by: (i) bankruptcy, insolvency, reorganization, fraudulent transfer or conveyance, and other Laws of general applicability relating to or affecting creditors' rights; and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

(d)     The Pledgor is the record and beneficial owner of the Pledged Interests.

(e)     The Pledged Interests have been duly and validly authorized and issued to the Pledgor and (to the extent applicable) are fully paid and non-assessable.

(f)     **Exhibit A** attached hereto completely and accurately identifies, as of the date hereof, (A) the number of issued and outstanding Equity Interests of each issuer thereof (an "**Issuer**") held by the Pledgor (and, separately, the number of issued and outstanding Equity Interests of each Issuer thereof pledged by the Pledgor hereunder) and (B) the percentage of the aggregate issued and outstanding equity interests of each Issuer represented by the Pledged Interests.

(g)     All of the Pledged Interests are free of all Liens except for the security interest and lien in favor of the Secured Party created hereby, and there are no outstanding warrants, options, or other rights to purchase, or shareholder, voting trust, or similar agreements outstanding with respect to any of the Pledged Interests.

(h)     No effective financing statement or other instrument similar in effect under any applicable Law validly covering all or any part of the Pledged Interests is on file in any filing or recording office.

(i)     The delivery of the Pledged Interests to the Secured Party pursuant to this Agreement (and, with respect to Pledged Interests consisting of membership interests or partnership interests that are not "securities" under Article 8 of the UCC, the filing in the appropriate filing office of a UCC financing statement describing the same as collateral) is effective to create a valid and perfected first priority security interest in the Pledged Collateral in favor of the Secured Party (to the extent such security interest can be perfected by filing a UCC financing statement or possessing such Pledged Interests delivered to the Secured Party), free of any adverse claim, and such security interest is entitled to all of the rights, priorities and benefits afforded by the UCC.

(j)     No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or consent of any other Entity is required for (i) the pledge and grant of a security interest by the Pledgor pursuant to this Agreement, (ii) the perfection of the security interest granted hereunder in favor of the Secured Party (except for the filing of a UCC financing statement in the case of any Pledged Interests consisting of membership interests or partnership interests that are not "securities" under Article 8 of the UCC), (iii) the execution, delivery or performance of

4

this Agreement by the Pledgor, or (iv) the exercise by the Secured Party of its rights and remedies hereunder (except as the Pledgor or the Secured Party may have taken or directed and except as may be required in connection with any disposition of the Pledged Collateral by Laws affecting the offering and sale of securities generally).  The Pledgor has caused each Issuer to record on its books and records that the Pledged Interests are subject to the pledge and security interest created hereby.

(k)     The exact name of the Pledgor, as of the Effective Date and immediately prior to the Merger, is New Coltec, Inc.  The exact name of the Pledgor, as of the Effective Date and effective upon the Merger, will be [Coltec Industries, Inc.][2]

(l)     The Pledgor represents that GST has caused each of its issued and outstanding membership interests to provide, by its terms, that it is a "security" governed by Article 8 of the UCC and to be evidenced by a certificate by the Effective Date.

6.     **Covenants; Further Assurances**.  Until the Deferred Contribution is paid in full and in Cash:

(a)     The Pledgor will not sell or otherwise dispose of, or grant any warrant or option with respect to, any of the Pledged Collateral, or create or suffer to exist any Lien or security interest (other than the lien and security interests in favor of the Secured Party) on any Pledged Collateral.

(b)     The Pledgor will not change its name, type of organization or jurisdiction of organization without, in each case, giving at least 15 days' prior written notice thereof to the Secured Party and taking all action necessary or reasonably requested by the Secured Party in order to maintain the effectiveness and priority of the security interest granted hereby.

(c)     The Pledgor shall maintain its corporate existence and, at all times, maintain at least one complete set of its books and records concerning the Pledged Collateral.

(d)     If, while this Agreement is in effect, the Pledgor shall become entitled to receive or shall receive additional Equity Interests in any Issuer, the Pledgor agrees, in each case, to accept the same as the Secured Party's agent and to hold the same in trust for the Secured Party, and to deliver the same forthwith to the Secured Party in the exact form received, with the endorsement of the Pledgor where necessary and/or with duly executed undated instruments of transfer or assignment, in blank, all in form and substance reasonably satisfactory to the Secured Party, to be held by the Secured Party, subject to the terms hereof, as part of the Pledged Interests; *provided, however*, that the Pledgor shall only be required by this paragraph to pledge and deliver such additional Equity Interests as shall be necessary to cause the aggregate Pledged Interests to equal 50.1% of the aggregate issued and outstanding Equity Interests of each Issuer.

---

[2] Or such other name as notified to the Secured Party not less than 15 days prior to the Effective Date.

5

(e)     The Pledgor shall not take any action, or permit any Issuer to take any action, to cause any Equity Interest comprising the Pledged Collateral not to be a "security" within the meaning of, or not to be governed by, Article 8 of the UCC as in effect under the Laws of any state having jurisdiction or to become uncertificated.

(f)     The Pledgor shall, from time to time, at its expense, promptly execute and deliver all further instruments, documents and notices and take all further action that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create, perfect and protect any security interest granted or purported to be granted by this Agreement or to enable the Secured Party to exercise and enforce its rights and remedies hereunder.  Without limiting the generality of the foregoing, the Pledgor will, upon the Secured Party's request, appear in and defend any action or proceeding that may affect the Pledgor's title to or the Secured Party's security interest in the Pledged Collateral.

(g)     The Pledgor shall furnish to the Secured Party, from time to time upon request, statements and schedules further identifying, updating, and describing the Pledged Collateral and such other information, reports and evidence concerning the Pledged Collateral as the Secured Party may reasonably request.

7.     **Voting Rights; Dividends; Etc.**

(a)     So long as no Event of Default has occurred and is then continuing in respect of which the Secured Party has elected to exercise the rights and remedies set forth in **Section 7(b)** below:

> (i)     The Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral, or any part thereof, for any purpose not inconsistent with the terms of this Agreement; and

> (ii)    The Pledgor shall be entitled to receive all distributions, dividends (in the form of cash, securities or otherwise), cash, instruments, chattel paper and other rights, property or Proceeds and products from time to time received, receivable or otherwise distributed in respect of the Pledged Collateral.

(b)     At any time that an Event of Default has occurred and is then continuing in respect of which the Secured Party has elected to exercise the rights and remedies set forth in this **Section 7(b)**:

> (i)     All rights of the Pledgor to exercise voting and other consensual rights in respect of the Pledged Collateral shall immediately cease upon the Secured Party's election to exercise its rights hereunder, and upon such election all such voting and other consensual rights shall become vested in the Secured Party and the Secured Party shall thereupon have the sole right to exercise such voting and other consensual rights (including, without limitation, the right to vote in favor of, and to exchange any or all of the Pledged Collateral upon, the consolidation, recapitalization, merger or other reorganization with respect to an Issuer).  In order to effect the foregoing, the Pledgor hereby grants to the Secured Party an irrevocable proxy to vote the Pledged Collateral and, any time that an

6

Event of Default exists, the Pledgor agrees to execute such other proxies as the Secured Party may reasonably request. The appointment of the Secured Party as proxy is coupled with an interest and shall be valid and irrevocable until the Deferred Contribution has been fully paid in Cash; and

(ii) All rights of the Pledgor to receive and retain any distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper, or other Proceeds or property paid or payable with respect to, or on account of, any of the Pledged Collateral shall immediately cease and any such distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper, or other Proceeds or property paid or payable with respect to, or on account of, any of the Pledged Collateral shall be paid to the Secured Party (for application to the Deferred Contribution, with respect to any cash or cash equivalents, or to be held by the Secured Party as additional security for the Deferred Contribution, with respect to any other type of property). Any distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper or other Proceeds or property paid or payable with respect to any of the Pledged Collateral and received by the Pledgor contrary to the provisions of this Agreement shall be received in trust for the benefit of the Secured Party, shall be segregated from other assets (including, in the case of cash or cash equivalents, other funds) of the Pledgor and shall be forthwith paid to the Secured Party (for application to the Deferred Contribution, with respect to any cash or cash equivalents, or to be held by the Secured Party as additional security for the Deferred Contribution, with respect to any other type of property).

8. **Secured Party May Perform**. If the Pledgor fails to perform any agreement contained herein, then upon the occurrence and during the continuance of an Event of Default, the Secured Party may itself perform, or cause performance of, such agreement at the expense of the Pledgor.

9. **Limitation on Duty of Secured Party with Respect to the Pledged Collateral**. Beyond the safe custody thereof, the Pledgor agrees that the Secured Party shall have no duties concerning the custody and preservation of any Pledged Collateral in its possession (or in the possession of any agent of the Secured Party) or with respect to any income thereon or the preservation of rights against prior parties or any other rights pertaining thereto. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property. The Secured Party shall not be liable or responsible for any loss or damage to any of the Pledged Collateral, or for any diminution in the value thereof, by reason of the act or omission of any agent selected by the Secured Party in good faith. It is expressly agreed that the Secured Party shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with respect to any Pledged Collateral, but the Secured Party may do so.

7

10. **Remedial Provisions**.

(a) Each of the following events shall be an "**Event of Default**" for purposes of this Agreement:

(i) Any failure to pay in full and in Cash, including a default in the full payment of, the Deferred Contribution to the Secured Party as and when due in accordance with Section 7.3.2 of the Plan; and

(ii) Any failure or omission by the Pledgor to perform, including a default by the Pledgor in the performance of, any of its obligations under this Agreement, which failure or omission continues for a period of fourteen (14) days after the earlier of (A) a senior officer of the Pledgor becoming aware thereof and (B) the receipt of written notice thereof by the Secured Party from the Pledgor.

(b) Upon the occurrence and during the continuance of an Event of Default, the Secured Party and its attorneys may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the UCC and applicable Law, and the Secured Party may also, without demand, advertisement or notice of any kind (other than the notice specified below relating to a public or private sale), sell the Pledged Collateral or any part thereof in one or more portions at one or more public or private sales or dispositions, at any exchange, broker's board or at any of the Secured Party's offices (or those of the Secured Party's attorneys) or elsewhere, for cash, on credit, or for future delivery, at such price or prices and upon such other terms as the Secured Party deems advisable. The Pledgor agrees that, to the extent notice of sale shall be required by Law, at least ten (10) days' notice to the Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification of such matters; *provided* that no notification need be given to the Pledgor if it has authenticated after default a statement renouncing or modifying any right to notification of sale or other intended disposition. At any sale of the Pledged Collateral, if permitted by Law, the Secured Party may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for the purchase of the Pledged Collateral or any portion thereof free of any right or equity of redemption in the Pledgor. The Secured Party shall not be obligated to make any sale of Pledged Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

The Pledgor recognizes that the Secured Party may be unable to effect a public sale of all or part of the Pledged Collateral and may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such Pledged Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the seller than if sold at public sales and agrees that such private sales shall be deemed to have been made in a commercially reasonable manner, and that the Secured Party shall be under no obligation to delay a sale of any of the Pledged Collateral for

8

the period of time necessary to permit the Issuer of such Pledged Collateral to register such securities for public sale under the Securities Act of 1933, or under any other applicable requirement of Law, even if such Issuer would agree to do so. To the extent permitted by Law, the Pledgor hereby specifically waives (and, as applicable, releases) any right or equity of redemption, and any right of stay or appraisal, which the Pledgor has or may have under any Law now existing or hereafter enacted.

The Pledgor acknowledges that the Secured Party shall not be liable for any failure or delay in realizing upon or collecting the Deferred Contribution, or any guaranty thereof or collateral security therefor; and the Pledgor further acknowledges that the Secured Party shall not have any duty to take any action with respect thereto.

11. **Security Interest Absolute**. To the maximum extent permitted by applicable Law, all rights of the Secured Party, all pledges, Liens, and security interests made or granted hereunder, and all obligations of the Pledgor hereunder shall, upon the effectiveness of this Agreement, in accordance with the terms hereof, be absolute and unconditional irrespective of:

(a) any change in the time, manner, or place of payment of all or part of the Deferred Contribution, or any other amendment or waiver of or any consent to any departure from any of the Plan Documents;

(b) any exchange, release, or non-perfection of any other collateral, or any release or amendment or waiver of, or consent to departure from, any guaranty for all or part of the Deferred Contribution;

(c) the insolvency of the Pledgor or EnPro; or

(d) any other circumstances that might otherwise constitute a defense available to, or a discharge of, the Pledgor, other than the payment in full and in Cash of the Deferred Contribution.

12. **Application of Proceeds**. All Proceeds collected by the Secured Party upon any sale, other disposition of, or realization upon any of the Pledged Collateral, together with all other moneys received by the Secured Party hereunder, shall be applied as follows:

(a) *first*, to payment of the expenses of such sale or other realization, including reasonable compensation to the Secured Party and its agents and counsel, and all expenses, liabilities and advances incurred or made by the Secured Party, its agents and counsel in connection therewith or in connection with the care, safekeeping or otherwise of any or all of the Pledged Collateral;

(b) *second*, after payment in full of the amounts specified in subsection (a) above, to payment of the Deferred Contribution; and

(c) *finally*, after payment in full of the amounts specified in subsections (a) and (b) above, any surplus then remaining shall be paid to the Pledgor, or its successors or assigns, or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

9

The Pledgor shall remain liable to the extent of any deficiency between the amount of all Proceeds realized upon sale or other disposition of the Pledged Collateral pursuant to this Agreement and the amount of the Deferred Contribution. Upon any sale of any Pledged Collateral hereunder by the Secured Party (whether by virtue of the power of sale herein granted, pursuant to judicial proceeding, or otherwise), the receipt of the purchase money or other Proceeds of sale by the Secured Party or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Pledged Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money or other Proceeds of sale paid over to the Secured Party or such officer or be answerable in any way for the misapplication thereof.

13. **Termination**. This Agreement and the lien and security interest granted hereunder shall terminate and be released, automatically and without the necessity of action on the part of any Entity, when the Deferred Contribution has been paid in full and in Cash, and all rights to the Pledged Collateral shall thereupon revert to the Pledgor. In connection with the foregoing, the Secured Party shall execute and deliver to the Pledgor or its designee any documents or instruments which the Pledgor shall reasonably request from time to time to evidence such termination and release and shall assign, transfer and deliver to the Pledgor, without recourse and without representation or warranty, such of the Pledged Collateral as may then be in the possession of the Secured Party.

14. **Binding Effect; Assignments**. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns, *provided* that neither party shall have the right to assign its rights or obligations hereunder or any interest herein without the prior written consent of the other.

15. **No Waiver**. No failure or delay of the Secured Party of any kind in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. No waiver by the Secured Party of any default, Event of Default, or breach of this Agreement shall operate as a waiver of any other default, Event of Default, or breach of this Agreement or of the same default, Event of Default, breach of this Agreement on a future occasion, and no action by the Secured Party hereunder shall in any way affect or impair the Secured Party's rights and remedies or the obligations of the Pledgor under this Agreement. The rights and remedies of the Secured Party hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise have. No notice or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice in similar or other circumstances.

16. **Governing Law**. This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of North Carolina (without regard to the conflicts of law provisions thereof).

17. **Amendment**. Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into by the parties hereto.

10

18. **Notices**.  All communications and notices hereunder shall be in writing and given as provided in Section 11.9 of the Plan.  All communications and notices hereunder to the Pledgor shall be given to it at its address set forth on **Schedule I** attached hereto.

19. **WAIVER OF JURY TRIAL**.  EACH PARTY HEREBY WAIVES, FOR ITSELF, AND ITS SUCCESSORS AND ASSIGNS, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.

20. **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but to the extent any provision of this Agreement is held to be invalid, void, voidable, prohibited, illegal, or unenforceable in any respect under any applicable Law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.  The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable, or rejected provision of this Agreement with an effective, valid, and enforceable provision that will achieve, to the fullest extent possible, the economic, business, and other purposes of the invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision.

21. **Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (e.g., "pdf" or "tif" file format) shall be effective as delivery of a manually executed counterpart of this Agreement.

22. **Construction**.  The headings of the various sections and subsections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.  Unless the context otherwise requires, words in the singular include the plural and words in the plural include the singular.

23. **Effectiveness**.  This Agreement (i) is hereby executed and delivered as of the Effective Date and immediately prior to the Merger, and (ii) shall be effective as of the Effective Date and immediately following the Merger.

*(Signatures on following pages)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by and through their duly authorized representatives as of the day and year first above written.

Pledgor:

**NEW COLTEC, INC.**

By: _____
Name: _____
Title: _____

Secured Party:

**GST SETTLEMENT FACILITY**

By: _____
    Lewis R. Sifford, Trustee

## Exhibit A

## Identification of Pledged Securities[3]

| Issuer | Class or Other Description of Pledged Securities | Certificate Number | Number of Pledged Securities | Total Outstanding Securities | Percentage of Total Outstanding Securities Pledged |
|---|---|---|---|---|---|
| Garlock Sealing Technologies LLC | | | | | 50.1% |
| Garrison Litigation Management Group, Ltd. | Common Stock | | | | 50.1% |

---

[3] To be completed.

SCHEDULE I

| **Pledgor** | **Address** |
|---|---|
| [New Coltec, Inc.] | 5605 Carnegie Blvd., Suite 500<br>Charlotte, NC 28209-4674<br>Attention: General Counsel |